KRISTEN L. BOYLES (CSBA #158450)
JAN E. HASSELMAN (WSBA # 29107)
*[Pro Hac Vice Application Pending]*
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA  98104
(206) 343-7340
kboyles@earthjustice.org
jhasselman@earthjustice.org

SUSAN JANE M. BROWN (OSBA #054607)
*[Pro Hac Vice Application Pending]*
WESTERN ENVIRONMENTAL LAW CENTER
4107 NE Couch St.
Portland, OR.  97232
(503) 914-1323
brown@westernlaw.org

GREGORY C. LOARIE (CSBA #215859)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA  94111
(415) 217-2000
gloarie@earthjustice.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALASKA COMMUNITY ACTION ON TOXICS, AMERICAN ALPINE CLUB, CALIFORNIA WILDERNESS COALITION, CENTER FOR BIOLOGICAL DIVERSITY, CENTER FOR ENVIRONMENTAL HEALTH, CENTER FOR FOOD SAFETY, ENVIRONMENT AMERICA, ENVIRONMENTAL DEFENSE FUND, ENVIRONMENTAL PROTECTION INFORMATION CENTER, FOOD AND WATER WATCH, FRIENDS OF THE EARTH, NATIONAL PARKS CONSERVATION ASSOCIATION, NATIONAL WILDLIFE FEDERATION, | Case No. 3:20-cv-5199<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>(National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*; Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*) |

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 1 -

1

2

3

4

5

6

7

8

9

10

OCEAN CONSERVANCY, RIO GRANDE
INTERNATIONAL STUDY CENTER,
SOUTHERN UTAH WILDERNESS
ALLIANCE, WE ACT FOR
ENVIRONMENTAL JUSTICE, WESTERN
WATERSHEDS PROJECT, THE
WILDERNESS SOCIETY, and WINTER
WILDLANDS ALLIANCE,

                  Plaintiffs,

v.

COUNCIL ON ENVIRONMENTAL
QUALITY, and MARY NEUMAYR, in her
official capacity as Chair of the Council on
Environmental Quality,

                  Defendants.

## INTRODUCTION

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1.       The National Environmental Policy Act of 1970 ("NEPA"), 42 U.S.C. § 4331 *et*

*seq*., often called the "Magna Carta" of American environmental law, embodies our Nation's

environmental conscience.  In enacting NEPA, Congress issued a sweeping declaration of values

and a call to action, centering the protection of human health and the environment in all federal

agency decisions.  The statute affirms the government's role to "fulfill the responsibilities of

each generation as trustee of the environment for succeeding generations."  *Id*. § 4331(b)(1).  To

implement these goals, NEPA institutes a national policy of "look before you leap" by requiring

all federal agencies to carefully analyze and disclose to the public the potential environmental

impacts of, and feasible alternatives to, federal agency actions.  *Id*. § 4332(c).  It is, in short, the

people's environmental law.

2.       Since 1978, regulations promulgated by the Council on Environmental Quality

("CEQ"), an agency created by NEPA within the executive office of the President, have guided

25

26

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 2 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

every federal agency's implementation of NEPA. *See* 40 C.F.R. Part 1500 (1978). CEQ's regulations codified early judicial precedent interpreting the meaning and reach of NEPA's obligations, and they provided the basis for a substantial body of judicial precedent spanning over four decades. CEQ's regulations also formed the foundation for more specific regulations enacted by federal "action" agencies—from the U.S. Forest Service to the Federal Energy Regulatory Commission—to implement their particular missions. Over the decades, the 1978 CEQ regulations have stood the test of the time, with only minor amendments.

3.      That long history of continuity with respect to CEQ's interpretation of NEPA has come to an abrupt halt under the current administration. The current administration explicitly admitted that it placed the interests of pipelines, fossil fuel energy production, and road building over that of environmental and public health. Over the vociferous objections of states, members of Congress, myriad conservation, environmental justice, and public health organizations, and the general public, on July 16, 2020 CEQ issued a final rule ("Final Rule") rewriting the entirety of its 1978 regulations. *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act; Final Rule*, 85 Fed. Reg. 43,304 (July 16, 2020) (to be codified at 40 C.F.R. Part 1500). More than an update, the Final Rule upends virtually every aspect of NEPA and its longstanding practice, contradicts decades of court interpretations of NEPA's mandates, and undercuts the reliance placed on NEPA by the public, decision-makers, and project proponents. The Final Rule limits the scope of actions to which NEPA applies, eviscerates the thorough environmental analysis that lies at the heart of the statute, reduces the ability of the public to participate in federal agency decision-making, and seeks to limit judicial review of agency NEPA compliance. All told, the Final Rule frustrates Congress's manifest intent in enacting NEPA and threatens human health and the environment.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 3 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

4.      Plaintiffs in this action are a diverse coalition of national and regional environmental justice, outdoor recreation, public health, and conservation organizations that rely on NEPA to protect their varied interests in human health and the environment.  Plaintiffs challenge the Final Rule for three broad reasons.  First, CEQ failed to consider and disclose the significant environmental impacts from the Final Rule in an environmental assessment ("EA") or environmental impact statement ("EIS"), in violation of NEPA itself.  Second, the Final Rule is arbitrary and capricious in a number of ways, as CEQ failed to explain its decision in light of the evidence in the record, including public comments, failed to review the impacts of the rule on the advancement of environmental justice, failed to consider the relevant factors when altering longstanding practice, and changed longstanding agency interpretations and practice without adequate explanation or justification.  Finally, in many ways, the Rule is inconsistent with the text, structure, and intent of NEPA itself and violates the Administrative Procedure Act ("APA").

5.      Plaintiffs seek an order declaring the Final Rule unlawful and vacating the Final Rule, reinstating the NEPA regulations previously in force.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (United States as defendant).  The Court may issue a declaratory judgment and further relief under 28 U.S.C. §§ 2201-02.  This action is brought pursuant to the APA, 5 U.S.C. § 551 *et seq.*[1]

---

[1] Pursuant to 16 U.S.C. § 1540(g), a subset of Plaintiffs plan to provide 60 days' notice of legal violation to CEQ for failure to consult on the Final Rule in violation of Endangered Species Act Section 7.  If CEQ fails to provide a satisfactory response, Plaintiffs will take appropriate steps to amend this complaint to include these claims at the conclusion of the 60-day period.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 4 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

7.      Venue is properly vested in this Court under 28 U.S.C. § 1391(e), as a number of Plaintiffs reside in this district, Plaintiffs have members and offices in this District, and many of the consequences of the defendants' violations of the law giving rise to the claims occurred or will occur in this district.

INTRADISTRICT ASSIGNMENT

8.      This case is properly assigned to the San Francisco Division or the Oakland Division under Civil L.R. 3-2(c) because several of the Plaintiffs and/or their members are located in counties within those districts.

PARTIES

A.      Plaintiffs

1.      *Descriptions, Interests, and Injury of Each Plaintiff Organization*

9.      Plaintiff Alaska Community Action on Toxics ("ACAT") is a 501(c)(3) non-profit with its main office in Anchorage, Alaska.  ACAT also has staff and conducts community health research in Gambell and Savoonga, both located on Saint Lawrence Island, Alaska.  ACAT believes everyone has a right to clean air, clean water, and toxic-free food.  Driven by a core belief in environmental health and justice, ACAT empowers communities to eliminate exposure to toxics through collaborative research, shared science, education, organizing, and advocacy. ACAT employs a community-based approach guided by the following core values: community right-to-know, environmental justice, the precautionary principle, elimination of the production and release of toxics, rights and sovereignty of Indigenous peoples, and a culture of caring and wellness.  ACAT has approximately 300 donors, 50 volunteers, and several thousand people who have signed up as interested citizens and activists to receive communications and actions alerts about issues relevant to environmental contamination by toxic chemicals.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 5 -

10.     ACAT works primarily with Alaska Native communities who rely on the land and ocean for physical, spiritual, and cultural sustenance.  Those communities depend on healthy marine ecosystems, in particular, for hunting, fishing, and food security.  ACAT conducts public education programs to educate its constituent members about the environmental and public health risks, including risks and harms from oil development, chemical dispersants used in oil spill response, the proposed Pebble and Donlin Creek Mines, the proposed Ambler Mining District Industrial Access Road, and military training, testing, and bombing/artillery exercises in sensitive ecological areas, such as wetlands, stream and river corridors, and estuaries (e.g. bombing of Eagle River Flats) and other areas of high biological diversity (e.g. high impact training operations in the Gulf of Alaska).

11.     ACAT regularly uses NEPA and its public processes to advocate for issues on behalf of its supporters and communities in Alaska.  ACAT has most recently submitted scoping comments in response to the 2020 U.S. Department of Defense, Department of the Air Force Notice of Intent to prepare an Environmental Impact Statement under the National Environmental Policy Act for the proposed action of year-round mortar and artillery live fire training on Eagle River Flats, an ecologically and culturally important estuary north of Anchorage on the Joint Bases Elmendorf AFB-Fort Richardson.  ACAT also prepared comments for the scoping process and on the Draft Environmental Impact Statements for the proposed Donlin Creek Mine and Ambler Mining District Industrial Access Road.  In 2019, ACAT prepared and submitted comments on the Draft Environmental Impact Statement for the proposed Pebble Mine.

12.     As a science-based organization with over 20 years of experience working on toxic contamination, ACAT has worked with many Alaskan communities faced with and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 6 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

concerned about pollution from mines and oil exploitation and the effects on the environment, traditional wild foods, and people's health.  ACAT staff, supporters, and the communities ACAT works with are harmed by the Final Rule because they eliminate the vital protections that have been in place for decades.  The environmental justice implications of the Final Rule are profound, and preventing such injustices is at the core of ACAT's mission.

13.     Staff member Patti Saunders is ACAT's Development Director, having previously worked as an attorney and commercial fisherman in Prince William Sound, Southeast Alaska, and Bristol Bay.  Ms. Saunders has previously submitted public comments to government agencies during NEPA review processes and will do so again in the future when proposed projects threatened the environmental and public health of Alaska.  As a commercial fisherman who fished in Bristol Bay for a season and who has friends who have (and in some cases continue to) fish there, she is keenly aware of the Bristol Bay watershed's importance as a world-class fishery that has both economic and cultural value for Alaskans.  It is a virtually pristine, intact ecosystem that has supported Alaska Natives for thousands of years.  It also provides recreational opportunities for Alaskans and non-Alaskans: fishing, birding, wildlife viewing, nature photography, hiking, kayaking, and canoeing.  Ms. Saunders enjoys these types of recreational opportunities, including birdwatching, in the Bristol Bay watershed.  She has definite plans to return to the Bristol Bay region to enjoy all it has to offer an outdoor enthusiast in the next two to four years.

14.     Pamela Miller has served as ACAT's Executive Director since 1997.  Ms. Miller has more than 35 years of experience in research, policy, advocacy, and training programs focused on environmental health, justice, human rights, and marine ecology.  Since 2005, she has served as Principal Investigator for community-based environmental health research projects

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 7 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

supported by the National Institute of Environmental Health Sciences and focused on the long-term effects of endocrine-disrupting chemicals on the environment and human health.  In 2016, Ms. Miller was elected to serve as the co-chair of the International Pollutants Elimination Network, a global network of more than 500 environmental health and justice organizations working in over 100 countries for a toxics-free future.  Ms. Miller has personally been involved in writing NEPA comments, attending public hearings, and engaging in litigation when NEPA has been violated.  Ms. Miller has been the primary person working on chemical dispersant issues for ACAT since 2002.  The use of dispersant chemicals in the event of an offshore oil spill would greatly impact the health and cultural well-being of ACAT's supporters, including its Board Members.

15.    Harriet Penayah, a Yupik Elder from the Native Village of Savoonga on Saint Lawrence Island in the Bering Sea, is an ACAT board member.  Ms. Penayah and her family rely on the harvest of marine fish and marine mammals for spiritual, physical, and cultural sustenance.  A significant part of the Penayah family diet comes from the ocean, including fish like salmon, cod, and halibut, as well as marine mammals like ringed seal, bearded seal, walrus, and bowhead whale.  St. Lawrence Island is located in the northern Bering Sea and within the Norton Sound region on the Alaska Outer Continental Shelf.  The Norton Sound area experienced oil and gas development in the 1980s.  It is also proposed for oil and gas leasing under the federal Bureau of Ocean Energy Management's Draft Proposed Program for 2019-2024.  Oil development in the Bering Sea and use of chemical dispersants in response to an oil spill in the Norton Sound region would impact Ms. Penayah and her family's food security by polluting the marine ecosystems on which they depend for food.  It would also disrupt the migratory patterns of important marine mammals, such as the bowhead whale.  Marine animals

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 8 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

form the basis of Harriet's diet and cultural traditions.  If chemical dispersants impacted the safety of these food sources, Ms. Penayah and her family would not be able to replace these sources with food purchased from a grocery store, due to the deep cultural importance that these animals hold for Ms. Penayah and her family.  ACAT engages in the NEPA process, including preparation of public comments and participation in hearings concerning oil and gas development in the Bering, Chukchi, and Beaufort Seas, in order to protect the health of marine ecosystems and Alaska Native communities that rely on traditional foods from the sea.

16.     Plaintiff American Alpine Club ("AAC") is a 501(c)(3) non-profit organization based in Golden, Colorado with over 25,000 members nationally and 3,491 members in California.  Founded in 1902 to support the research and exploration of mountainous regions, the AAC remains committed to supporting the climbing and human-powered outdoor recreation communities over a century later.  At the core of AAC's policy efforts are critical issues facing climbers and outdoor recreationists nationally, such as keeping public lands pristine, wild, and open to human-powered recreation.  One of the key tools that enable the AAC to effectively advocate for these issues on behalf of its membership and the climbing community broadly is the public process afforded by NEPA.  NEPA mandates informed decision-making, based on sound science, and requires that, to the fullest extent possible, all agencies of the federal government take a hard look at environmental consequences prior to issuing a decision.  NEPA declares a broad national commitment to protecting and promoting environmental quality under the CEQ regulations, which are influential in shaping agency implementation of the statute.

17.     The Final Rule is extremely detrimental to the outdoor community's interests and adversely affects the AAC and its membership.  The changes will hamstring AAC's members' ability to effectively participate in public comment periods, maintain accountability and

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

transparency in public lands decision-making, and advocate for solutions to climate change, among other issues.  For these reasons, the AAC has promoted the disbandment of this proposal at every stage of the CEQ rulemaking process, from having provided public testimony at the CEQ hearing in Denver, Colorado to submitting technical comments on the proposed rulemaking alongside their partners at the Outdoor Alliance, a coalition dedicated to protecting public lands and waters for human powered recreation.

18.     A key concern among AAC members are the effects of a changing climate on its communities, climbing areas, and ecosystems.  Mountain regions are warming at roughly twice the pace of the global average, and AAC members are bearing witness to these changes directly. As climbers, skiers, and mountaineers, AAC members are intimately familiar with the mountain landscapes of the United States.  Many of AAC's members also rely on a predictable climate to sustain their livelihoods.  Whether as a mountain guide, a gear shop owner, or a retail employee, a reliable climate in many United States mountain towns equates to a reliable tourism and outdoor recreation economy.  In 2018, the annual climbing industry contribution to the United States Gross Domestic Product ("GDP") was $12.5 billion, where the outdoor recreation economy as a whole generated 7.6 million jobs and accounted for more than 2.2% of the country's GDP, according to the Bureau of Economic Analysis.

19.     AAC membership has historically engaged in federal agency land use planning, such as in U.S. Forest Service forest planning or Bureau of Land Management ("BLM") resource management plan development, where members could influence the outcome of energy development, mining, or logging projects through extensive public engagement, expert testimony and scientifically informed environmental reviews.  In addition, NEPA's cumulative and indirect effects analysis has benefited AAC members by requiring that the federal government consider

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 10 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   the impact of their decision-making on the climate and factor this into the creation of reasonable

2   plan alternatives.

3       20.     This is particularly troubling in areas with complex management issues such as

4   Bears Ears National Monument, where following a Presidential Proclamation which reduced the

5   original monument designation in size by 85%, thousands of acres of land in southeastern Utah

6   including many important rock-climbing areas as well as Native American sacred and cultural

7   sites, were opened to oil and gas development.  The AAC and its partners relied on NEPA to

8   inform the BLM resource management planning process for the Indian Creek and Shash Jaa units

9   on issues of recreation and natural resource management.

10      21.     Dr. Len Necefer, a member of the AAC since 2017, resides in Tucson, Arizona

11  where he is a Professor of American Indian Studies at the Udall Center for Public Policy at the

12  University of Arizona as well as the CEO of Colorado based company, Natives Outdoors.  Dr.

13  Necefer is a member of the Navajo Nation and his research focuses on the intersection of

14  indigenous peoples and natural resource management.  An avid climber and backcountry skier,

15  Dr. Necefer currently serves as a board member for the AAC and volunteers his time on the

16  AAC Policy Committee, which advises AAC staff on recreation management and natural

17  resource policy issues.  Dr. Necefer has relied heavily on the NEPA process to voice concern

18  over impacts caused by energy development on climbing and cultural resources in resource

19  management planning.  Dr. Necefer worked with the Bears Ears Inter-Tribal Coalition to

20  orchestrate collaborative comments for the BLM during their resource planning process for the

21  Indian Creek and Shash Jaa units in Bears Ears National Monument.  Not only does Dr. Necefer

22  visit Bears Ears National Monument to enjoy the world-renowned rock climbing in Indian Creek,

23  an area with hundreds of documented climbing routes, but also the area is a sacred site for the

24

25  COMPLAINT FOR DECLARATORY
26  AND INJUNCTIVE RELIEF - 11 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Navajo Nation and contains numerous cultural resources.  Dr. Necefer has firm and definite plans to visit and climb in these areas in the future.  Dr. Necefer utilizes NEPA to provide management guidance on several areas like Bears Ears, where sacred ancestral lands overlap with well-documented recreation areas.

22.     Dr. Necefer has also worked extensively on the Oak Flat land exchange in the Coconino National Forest where Resolution Copper plans to open a large-scale copper mine. The proposed mine will span two miles wide and over 1,000 feet deep, destroying hundreds of rock climbs as well as vast stands of Emory oak, medicinal plants, and ceremonial sites important to the San Carlos Apache tribe.  This mine, if approved in the pending EIS, will mark the biggest loss of climbing area access in history.

23.     Dr. Necefer's ability to enjoy the future of Oak Flat, and Bears Ears National Monument has hinged in part on his ability to voice concern for their management throughout the NEPA process.  Dr. Necefer's interest in protecting climbing areas and important cultural sites will be harmed by the CEQ's narrowing of NEPA's scope of review, as well as the reduced public participation and allowing a private corporation, like Resolution Copper, who has a vested interest in its project, to draft its own EIS.  Dr. Necefer has concrete plans to return to Bears Ears National Monument as well as areas closer to home, such as the Coronado National Forest, and hopes to continue participating in the management of the climbing resources of these areas.  As a professor and small business owner, the CEQ's shortened timeline for submitting comments will make it near impossible for him to provide adequately substantive comments, resulting in his important opinions being overlooked.  Finally, as a member of the Navajo Nation, Dr. Necefer fears that his community will be overlooked in future energy development projects by the

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 12 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1  abbreviated NEPA process and that adequate consultation with tribes and the appropriate

2  fulfillment of the government's trust responsibility agreement will not be met.

3       24.     Byron Harvison is an attorney who resides in Park City, Utah, who has been a

4  member of the AAC for more than 15 years.  Mr. Harvison is a long-time volunteer for the AAC,

5  serving as the AAC Salt Lake Chapter Chair, and also volunteers with the Salt Lake Climbers

6  Alliance.  An avid rock and ice climber, Mr. Harvison has worked extensively on recreation and

7  public lands policy issues through the NEPA process in Utah.  Throughout his long climbing

8  career, Mr. Harvison has climbed all over the Western United States, and frequents federally

9  managed public lands often to recreate.  Mr. Harvison has concrete plans to continue to climb in

10  Utah and elsewhere in the west in the future.  Currently, Mr. Harvison and other climbers in the

11  Salt Lake region are volunteering their time to work on the Uinta-Wasatch Cache National Forest

12  Plan revision, with the intent of influencing a specific climbing management plan through public

13  comment afforded by NEPA.

14       25.     Additionally, Mr. Harvison and a team of other AAC members, staff, and local

15  Salt Lake climbers, have been working to challenge the Little Cottonwood Canyon ("LCC") EIS

16  alternatives.  Mr. Harvison has climbed here in the past and has definite plans to return to the

17  area in the future to climb here again.  A proposed gondola and road widening project would

18  have several direct and indirect impacts on the climbing resources of the LCC, an area that is a

19  critically important resource to the climbers of Salt Lake.  Mr. Harvison and other climbers who

20  visit LCC to recreate in the future will be greatly impacted by several of the proposed

21  alternatives which could severely alter the state of climbing in the canyon.  LCC is a highly

22  congested roadway that generates large amounts of air pollution, especially during the winter

23  months.  If climate change and air quality implications are not thoroughly considered in the

24

25  COMPLAINT FOR DECLARATORY
   AND INJUNCTIVE RELIEF - 13 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

NEPA process, Mr. Harvison, other Utah residents, and climbers everywhere will be negatively affected.  The Final Rule's removal of the indirect and cumulative effects analysis requirement will result in a failure to account for the visual and auditory effects of projects such as this and limited comment periods will make it increasingly difficult for volunteers like Mr. Harvison to offer informed public comment.  Additional restrictions on Mr. Harvison's ability to provide comment on federal land management decisions will result in negative consequences to his recreational experience in the Wasatch-Cache National Forest and on other National Forest units across the country.

26. Plaintiff <u>California Wilderness Coalition</u> ("CalWild") is a non-profit organization incorporated under the laws of the State of California with its central office in Oakland, California, and field offices in Sacramento, Redding, Fresno, and Los Angeles, California. CalWild, on behalf of its 632 members, works in a variety of ways to protect and restore the state's wildest natural landscapes and watersheds on federal public lands.  These important wild places provide clean air and water, refuges for wildlife, mitigation against the effects of climate change, and outstanding opportunities for recreation and spiritual renewal for people.  CalWild is the only statewide organization dedicated solely to protecting and restoring the wild places and native biodiversity of California's public lands.  CalWild is dedicated to achieving Congressionally-designated protections (e.g., wilderness, national monument), as well as administrative protections by state or federal agencies, for California's wild public lands. CalWild pursues these objectives through legislative campaigns, grass-roots organizing, and public education (such as publishing monthly news journals, blogs, and white papers) concerning conservation issues, and, when necessary, legal action.  CalWild regularly send action alerts to members and subscribers to inform them about when and how to comment on specific proposed

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 14 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

projects and plans, such as BLM planning or National Monument review.  In addition, CalWild regularly participates in and submits comments itself on proposed federal agency land and/or resource management plans and site-specific project proposals (e.g., logging, mining, geothermal, renewable energy), primarily related to public lands managed by BLM and United States Forest Service.

27.     For decades, CalWild has relied on NEPA to effectively advocate for these issues on behalf of its membership.  Beyond NEPA's public information and participation requirements, NEPA requires informed decision-making, based on sound science, and requires that, to the fullest extent possible, all agencies of the federal government take a hard look at environmental consequences prior to issuing a decision.  NEPA declares a broad national commitment to protecting and promoting environmental quality, a goal CalWild embraces. CalWild joined a comment letter of conservation, health, and justice organizations and businesses opposing the proposed NEPA rules.

28.     CalWild members, including Pamela Nelson of Warner Springs, California, have long-standing, particularized interests in public lands and wildlife that NEPA helps to protect. Ms. Nelson has been a CalWild member for at least 15 years, and she has used NEPA to keep informed about and comment on projects and planning near her home and in areas where she regularly recreates and has definite plans to continue visiting into the future, in particular the San Bernardino and Cleveland National Forests, where Ms. Nelson regularly enjoys hiking, exploring, and bird and wildlife watching.  In the last seven years, Ms. Nelson has participated in NEPA planning and commenting processes for forest plan amendments to the Inyo, Sequoia, and Sierra National Forest Plans.  She has also submitted NEPA comments on the California Desert Conservation Plan and San Gabriel Mountains National Monument Land Management Plan.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 15 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

29.     CalWild member Maureen Forney, a resident of both San Leandro, California, in Alameda County, and Bear Valley, California in Alpine County, frequently visits national forests, national parks, and lands managed by the BLM, where she engages in and will continue to engage in many activities including hiking, running, mountain biking, snowshoeing, cross-country skiing, bouldering, kayaking, swimming, camping, animal tracking, sightseeing, and wildlife watching, particularly in the Stanislaus National Forest where one of her homes is located.  Ms. Forney has also submitted written and oral NEPA comments to federal agencies about how she wants to see public lands managed, and she will be harmed if her ability to continue to do so is limited.

30.     Plaintiff Center for Biological Diversity ("the Center") is a nonprofit organization dedicated to the preservation and restoration of biodiversity, native species, and ecosystems. Founded in Tucson, Arizona with offices throughout the country, including in Oakland and Los Angeles, California, the Center works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction.  The Center has more than 1.6 million supporters, including more than 74,000 members from all across the United States, with approximately 17,214 in California.  The Center and its members have longstanding recreational, aesthetic, scientific, professional, and other concrete interests in conserving native species throughout the country and routinely advocate for native species conservation and protection. Center attorneys, scientists, organizers, and advocates routinely participate in commenting at all phases of NEPA processes before numerous federal agencies, including the U.S. Forest Service, BLM, the Bureau of Reclamation, the U.S. Army Corps of Engineers, the U.S. Fish and Wildlife Service, and many others.  The Center also employs numerous media and outreach staff to

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 16 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    inform the Center's members about, and encourage and assist members in participating in,

2    NEPA reviews.  The Center submitted detailed comments on the proposed NEPA rule.

3        31.    For example, the Center is currently challenging a BLM decision to approve

4    rights-of-way for powerlines, natural gas, water, and petroleum product in Utah that will

5    facilitate the construction of the first commercial scale facility to process a rock known as "oil

6    shale" into a petroleum product.  The oil shale plant will produce 50,000 barrels of shale oil per

7    day, produce significant amounts of air and climate pollution, and will require up to 10,000 acre-

8    feet of water per year for thirty years from the Green River, home to four endangered fish.  The

9    Center and other groups have challenged BLM's rights-of-way because the agency's NEPA

10   analysis failed to consider the cumulative and indirect impacts of the federal rights-of-way,

11   including the air and climate pollution and water depletion impacts of the oil shale production

12   facility.  Because the Final Rule eliminates the consideration of cumulative effects and does not

13   even mandate the consideration of indirect effects, it will make it difficult if not impossible for

14   the Center to engage in this kind of advocacy in the future, resulting in an imminent increase in

15   harm to wildlife, public lands and waters, and the shared climate.

16       32.    The Center communicates extensively with its members and supporters, as well as

17   the general public, about threats to imperiled species, the protection of public lands, and the

18   ongoing and future damage from the global climate crisis by issuing press releases and

19   statements, publishing online news through its publication "The Revelator," holding webinars,

20   and sending emails and action alerts.  The Center's members participate in and rely on the NEPA

21   review processes, and will be harmed by the Final Rule.  For example, the Final Rule's explicit

22   elimination of cumulative impacts review will significantly impede the ability of the Center and

23   its members to obtain and disseminate adequate information about, and ensure government

24

25   COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 17 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

consideration of, the climate change impacts of projects such as oil and gas development plans, rights-of-way for oil shale development, federal coal leasing, and federal auto fleet standards that will contribute to cumulatively significant and devastating greenhouse gas emissions.  In addition to impeding the Center's ability to obtain such essential information as part of the NEPA process, the Final Rule also necessitates that the Center expend its limited organizational resources in an effort to obtain and compile such information from other sources.

33.     The Center has individual members, including but not limited to Ileene Anderson of California and Taylor McKinnon of Arizona, who regularly visit, study, work, photograph, or recreate on lands where NEPA has been and will be used in reviewing federal projects.  Each of the members has specific intentions to continue to interact with these areas frequently and on an ongoing basis.  Center members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their interactions with these parts of the natural world.

34.     Ileene Anderson is a botanist, a Center member since 1998, and a staff member at the Center since 2005.  Ms. Anderson is also a frequent user of the federal lands in the California Desert, where she hikes, photographs, searches for rare plants, watches birds and other wildlife, and enjoys the solace that wildlands can provide.  Among the places she has visited on numerous occasions are federal lands on and adjacent to Conglomerate Mesa (on the doorstep of Death Valley National Park).  There, she has camped, hiked, and botanized the area at least three times in the last five years including her most recent visit to the area earlier in 2020.  This area near Owens Lake, California, is renowned for its dense western Joshua tree forests, rare plants, unique cultural resources and pristine landscape, positioned between wilderness areas on BLM, Forest Service, and National Park Service managed lands (Malpais Mesa, Inyo Mountains, and Death Valley).  Ms. Anderson plans to return to Conglomerate Mesa in 2020 and beyond once the

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 18 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Covid-19 restrictions are relaxed to enjoy the outstanding scenic beauty of this area and look for plants and wildlife.

35.     Over the past 25 years, Ms. Anderson has participated in many NEPA processes evaluating mining, off-road vehicles, grazing, energy projects, land use management plans, habitat conservation plans, railroads, pipelines, highways, land exchanges, and many others.  Ms. Anderson also wrote sections of NEPA documents for federal agencies when she was employed as a consulting biologist.  She has found NEPA's procedural safeguards to be crucial to improving projects and reducing the unnecessary impacts, because in her experience, NEPA review typically reveals diverse perspectives and impact-reduction solutions that otherwise would not be identified by the agency acting alone.

36.     The Final Rule harms Ms. Anderson, including by impairing her ability to evaluate and comment on the indirect and cumulative impacts of projects like a pending proposal to undertake exploratory drilling for gold on the Conglomerate Mesa, and the harms the project poses to off-site resources, including the landscapes and visitor experiences from and within Death Valley National Park and the adjacent wilderness areas, the damage from indirect impacts of off-road vehicle use, cumulative impacts of this proposal together with the 2018 approved exploration plan, and the reasonably foreseeable construction of a large gold mine.

37.     Taylor McKinnon is a former owner of a Utah river rafting business, amateur photographer, a Center member since 2007, and is now employed as the Center's Senior Public Lands Campaigner.  Mr. McKinnon grew up and still lives in Flagstaff, Arizona, amidst national forests and parks that he continues to visit.  As he has since he was young, Mr. McKinnon now regularly uses and enjoys federal and other public lands for hiking, cycling, camping, fishing, photography, snowboarding, birding, nature and wildlife observation and vehicle touring.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 19 -

Among the lands that he has regularly visited for some of these activities in the last several years (most recently in 2018) is the sage brush and sandstone high desert of the remote Book Cliffs along the Utah-Colorado border, where BLM approved rights-of-way for the nation's first commercial scale oil shale plant.  Mr. McKinnon has also regularly participated in NEPA processes on numerous federal agency proposals over the last decade involving lands where he recreates, including lands at issue in the Utah oil shale plant.

38.     As part of his enjoyment of public lands, Mr. McKinnon regularly visits (and plans to return this year to) Grand Canyon National Park and the Forest Service lands near the town of Tusayan, Arizona.  He visits the South Rim area several times each year to hike, sight see, and take photographs of the Grand Canyon and wildlife in the area.  The Forest Service last year received applications from an Italian development corporation named Stilo for rights-of-way across National Forest lands near the Grand Canyon's South Rim for water and natural gas pipelines, electricity, and a paved road to facilitate a massive commercial and residential development on private land.  Stilo's proposed development, located within two miles of the southern boundary of Grand Canyon National Park, would increase Tusayan's population ten-fold, likely cause depletion of aquifers that are the only source of water for natural springs along Grand Canyon's South Rim, worsen air, noise and light pollution within the Park, and fragment habitat for wildlife that use the Park.  When Stilo submitted a prior version of this application to the Forest Service in 2014, Mr. McKinnon on the Center's behalf submitted comments and helped lead a major public campaign opposing Stilo's proposal as part of the agency's NEPA scoping process.  The Forest Service ultimately rejected Stilo's application based largely on the indirect and cumulative impacts to the National Park that Mr. McKinnon and others had raised. The Final Rule's complete elimination of cumulative impacts as a consideration in NEPA

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 20 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

analyses and its elimination of the mandate that agencies consider and disclose indirect effects would mean NEPA reviews of Stilo's 2019 application – which the Forest Service is likely to initiate this year – need not address impacts to Grand Canyon National Park at all, increasing the likelihood that Stilo's development will impair the Park resources that Mr. McKinnon enjoys.

39.     Plaintiff Center for Environmental Health ("CEH") is a California non-profit organization founded in 1996 with its principal place of business in Oakland, California.  CEH has approximately 22 staff members, and an email list of 25,000 supporters who regularly receive information and action alerts.  CEH works on the regional and national level.

40.     CEH protects people from toxic chemicals by working with communities, consumers, workers, government, and the private sector to demand and support business practices that are safe for public health and the environment.  For CEH, people and their health and well-being are the ultimate concern.  Air, water, food, and consumer products should be free of dangerous and untested chemicals.

41.     CEH works collaboratively with environmental justice organizations and low-income communities to address the disproportionate toll that toxic chemicals take on their neighborhoods.  Historically, CEH's legal action has spurred hundreds of major retailers to remove lead and other toxic chemicals from child and adult jewelry, fashion accessories including those marketed toward low income buyers, candies, toys, lunchboxes, personal care products, and more.  CEH has also taken legal action (primarily using California's Safe Drinking Water and Toxic Enforcement Act, Proposition 65) to force polluting industries to reduce, or otherwise mitigate, hazardous air emissions from low-income communities and communities of color.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 21 -

42.     One of CEH's core values is that people need information in order to both protect themselves and their families and also to advocate for businesses and the government to enact health protective policies.  This is the type of public information and public participation that NEPA requires.

43.     CEH submitted comments on the Proposed Rule in March 2020 in coordination with other environmental justice and public health organizations.  Those comments were critical of the proposed rule because CEH felt it would hurt the ability of communities to know what projects were planned and it would harm the ability of the public to meaningfully explain to decision-makers how their communities would be impacted.

44.     CEH supporters and staff members have used NEPA's standards and requirements to bring about on-the-ground protections.  For example, CEH Senior Scientist Caroline Cox's work has been focused on toxics for decades.  In the 1980s, Ms. Cox was part of a group that used NEPA litigation to force dramatic changes in the use of herbicides for growing timber in the Pacific Northwest.  Forcing the U.S. Forest Service and BLM to fully comply with NEPA resulted in changed Forest Service practices, as NEPA's requirements to review alternatives and fully engage the public brought the agency new information and perspectives. The net result was that herbicide use decreased dramatically because the NEPA process was so successful in addressing issues that people on the ground cared about.

45.     CEH is harmed by the changes in the NEPA regulations that create less public transparency, fail to foster full public participation, curtail review of alternatives, and fail to review the indirect and cumulative impacts of proposed projects.

46.     Plaintiff Center for Food Safety ("CFS") is a national public interest nonprofit organization dedicated to empowering people, supporting farmers, and protecting the planet from

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 22 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

the harms of industrial agriculture.  CFS's program areas encompass all aspects of food and agriculture production, from pesticides and commodity crops to livestock production to ocean and coastal aquaculture to the climate impacts of agriculture.  In each area CFS strives to ensure responsible government oversight and advocates for a more sustainable, regenerative food future. CFS has over 970,000 members across the country, and offices in San Francisco, CA; Portland, OR; and Washington, D.C.  CFS and its members are being, and will be, adversely affected by the Final Rule.

47.     Since its inception in 1997, CFS has incorporated NEPA review in all its program areas, and acts as a watchdog to ensure agencies fulfill NEPA's requirements to allow for reasoned decision-making and informed public participation.  CFS has multiple full-time staff members (policy, scientific, outreach, and legal) devoted to overseeing federal agencies' NEPA review regarding the regulation of food and agriculture.

48.     To fulfill its mission, CFS disseminates to government agencies, members of Congress, and the general public a wide array of educational and informational program materials often addressing major federal actions requiring NEPA review.  CFS also sends out action alerts to its True Food Network.  These alerts generate public involvement, education, and engagement with governmental officials, including during NEPA public comment periods on federal projects affecting the sustainable food systems CFS promotes.  Collectively, the dissemination of this material has made CFS an information clearinghouse for public involvement in NEPA processes in the realm of sustainable food and agriculture.

49.     In addition to information and public education, when necessary, CFS engages in public interest litigation challenging industrial food production and agricultural practices that harm public health and the environment and/or impact farmers, its members, and the public

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 23 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

interest.  CFS has a long history of watchdogging federal agencies' NEPA compliance, in order to ensure agencies responsibly and rigorously analyze, among other things, the reasonably foreseeable impacts of their actions, consider a full range of reasonable alternatives, and thoroughly analyze cumulative and intertwined socioeconomic impacts.

50.     In March 2020, CFS submitted public comments on the Proposed Rule and was a signatory to three additional joint comment letters.  The Final Rule injures CFS as an organization and its members individually.  CFS and thousands of its members frequently participate in NEPA public comment periods.  Through shortening comment periods, significantly reducing available information on cumulative and indirect impacts, and exempting more federal projects, CFS and its members will struggle to meaningfully participate in the NEPA process or will be prevented from doing so.  Without access to information on cumulative and indirect impacts, CFS will be forced to divert organizational resources to look into these impacts and fully inform members on federal projects, resources that otherwise would be used on CFS mission central activities.  The Final Rule's weakening of agency NEPA reviews will divert resources from CFS's other work, including advocating for organic production and other sustainable, regenerative food systems.  Overall, CEQ's unlawful rollbacks of NEPA regulations frustrates CFS's organizational mission to inform the public on the harmful impacts of industrial agriculture and promote sustainable food systems.

51.     The Final Rule also injures CFS's members directly by restricting their ability to participate in agency decision-making, as well to assure that agencies take a hard look at their actions, actions that injure the members' health, environmental, aesthetic, recreational, and intertwined socioeconomic interests.  Many of CFS's members rely on healthy and safe methods

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 24 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    of food production to keep safe themselves, their families, their livelihoods, and the environment

2    on which they rely.

3           52.     For example, CFS members who live and recreate and own businesses in

4    Washington's Willapa Bay and Puget Sound are adversely impacted by industrial commercial

5    shellfish aquaculture and relied on the Army Corps of Engineers to thoroughly assess the

6    impacts, including cumulative, of allowing tens of thousands of acres of aquaculture in these

7    aquatic ecosystems.  CFS member Ross Barkhurst, a U.S. Naval Academy graduate, lives on 270

8    acres on Willapa Bay, including two shellfish beds totaling 60 acres, where he has for years

9    harvested shellfish and used to sell them commercially, and where he recreates as an avid hunter,

10   fisher, and bird-watcher.  He has watched as the health of his tidelands and those around the Bay

11   he loves are degraded from industrial shellfish aquaculture and especially the pesticide use

12   associated with it, and has recorded the waning numbers of various fish and waterfowl species.

13   The Corps' past failure to adequately assess the impacts from the aquaculture it permits under

14   NEPA have adversely affected Mr. Barkhurst, as well as other CFS members who live or

15   recreate in these tidal areas, eat oysters, and enjoy watching the large variety of wildlife there,

16   including threatened and endangered species.

17          53.     Mr. Fritzi Cohen, another CFS member, owns a historic bed and breakfast on

18   Willapa Bay but has been unable to harvest the oysters it was once famous for from the tide bed,

19   due to the impacts of industrial shellfish aquaculture permitted by the Corps, but not properly

20   analyzed under NEPA.

21          54.     These members, and others who live and recreate on Washington shorelines, have

22   been participating in the regulatory processes for years and will continue to do so, especially now

23   that a federal court has found that the Corps' NEPA analysis was deficient and sent the agency

24

25   COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 25 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    back to fully assess the impacts, especially cumulative impacts, of commercial shellfish

2    aquaculture.  CFS members' interest in the information required under NEPA as well as their

3    own participation in the NEPA process, is directly harmed by the Final Rule, especially insofar

4    as it removes the obligation for agencies to perform cumulative impact analyses.

5    　　　　55.　　CFS members in the Gulf of Mexico are also adversely impacted by the lack of

6    NEPA analysis for offshore aquaculture.  CFS member Barbara Findley, a resident of Bonita

7    Springs, Florida, is an avid boater and beachgoer who relies on the NEPA process to protect her

8    aesthetic and recreational interests in Gulf marine life, as well as use of the bodies of waters

9    surrounding her home state.  Ms. Findley regularly utilizes Florida's Gulf and Atlantic coasts,

10   and takes pleasure in viewing the variety of marine species in the Gulf and surrounding waters,

11   including loggerhead, green, and leatherback turtles; cobia, grouper, red snapper, tarpon, and

12   snook; Key West stingrays, cassiopeas, and moon jellyfish; and bottlenose dolphins.  As a result,

13   Ms. Findley is concerned with the development of offshore projects such as offshore aquaculture

14   farms.  Ms. Findley's ability to enjoy the future of waters surrounding her home state is hinged

15   in part on her ability to voice concerns for their management throughout the NEPA process.  Ms.

16   Findley's interest in the protection of marine species in the Gulf from offshore aquaculture

17   facilities (which are permitted by federal agencies) will be harmed by the CEQ's narrowing of

18   NEPA scope of review.

19   　　　　56.　　Plaintiff Environment America is a non-profit corporation organized under the

20   laws of Colorado.  It has hundreds of thousands of members nationwide, with approximately 434

21   active members in California.  Its mission is to transform the power of our imaginations and our

22   ideas into change that makes our world a greener and healthier place for all.  Environment

23   America's staff works for clean air, clean water, clean energy, wildlife and open spaces, and a

24

25   COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 26 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

livable climate.  Its members put grassroots support behind Environment America's research, advocacy, and litigation.

57.    Environment America has worked to ensure that the goals of NEPA are achieved and that it remains a powerful tool to protect our health and environment and safeguard our natural treasures for posterity.  Environment America opposed the regulations at issue in this litigation when they were first proposed and provided testimony in opposition, as well as submitted written comments.  In addition, Environment America produced a blog post explaining the dangers of the proposal and a factsheet to educate the public as to NEPA's importance.

58.    Environment America has individual members, including but not limited to Joseph Sandri of Maryland and Peter Skopec of Wisconsin, who regularly visit, study, work, photograph, or recreate on lands where NEPA has been and will be used in reviewing federal projects.  Each of the members has specific intentions to continue to interact with these areas frequently and on an ongoing basis.  Environment America members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their interactions with these parts of the natural world.

59.    Joseph Sandri has been a member of Environment America since 2009 and lives in Maryland.  Mr. Sandri has participated in NEPA processes in the past.  He is a member of the board of directors of the Archangel Ancient Tree Archive, which is a non-profit organization that locates and propagates the world's largest and most iconic trees.  In his role as a member of the board of directors, Mr. Sandri wrote and submitted a comment opposing U.S. Forest Service's proposal to exempt the Tongass National Forest from the 2001 Roadless Area Conservation Rule.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 27 -

60.     Peter Skopec has been a member of Environment America since 2020 and lives in Wisconsin.  Mr. Skopec has participated in NEPA processes in the past, and he plans to participate in NEPA processes in the future.  For example, in his role as the director of the Wisconsin Public Interest Research Group, a non-profit public interest advocacy organization, Mr. Skopec was involved in the NEPA review process for the proposed expansion of highway I-94 in Milwaukee.  Mr. Skopec provided in-person testimony on December 4, 2014, and he submitted written comments on January 27, 2015, April 15, 2016, and May 5, 2016.  On July 8, 2020, it was announced that the I-94 expansion project will be revived, and Mr. Skopec plans to participate in any public engagement opportunities provided by NEPA in the future.

61.     Plaintiff Environmental Defense Fund ("EDF") is a national nonprofit organization representing over 384,000 members nationwide, including over 62,000 in California.  Since 1967, EDF has linked science, economics, and law to create innovative, equitable, and cost-effective solutions to urgent environmental problems.  EDF employs over a hundred scientists, economists, engineers, business school graduates, and lawyers to help solve challenging environmental problems in a scientifically sound and cost-effective way.  EDF pursues initiatives at the state and national levels designed to protect human health and the environment.  EDF frequently participates in NEPA review processes for federal actions, including by submitting comments and bringing litigation to ensure agencies adequately evaluate the impacts of their actions under NEPA, including climate impacts.  EDF and its individual members will be adversely affected by the Final Rule.

62.     Francis Don Schreiber is a member of EDF and a rancher and landowner in Rio Arriba County, New Mexico in the San Juan Basin, one of the most active areas in the country for oil and gas production.  Mr. Schreiber has a split estate—he owns the surface rights to his

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 28 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

land, and the mineral rights on his property are owned by the federal government and managed by the BLM.  Mr. Schreiber also holds a federal permit to graze cattle, sheep and horses for approximately 2,700 acres of land managed by the BLM.  There are over a hundred oil and gas wells managed by BLM on and immediately adjacent to Mr. Schreiber's ranch.  Mr. Schreiber has advocated for BLM to consider the health, environmental, and climate impacts of the oil and gas development that BLM manages, and implement measures to reduce venting, flaring, and leaking of natural gas on his land.  Rigorous NEPA review has been, and will continue to be, critical for reducing the harm that this federally-managed oil and gas development causes Mr. Schreiber, his family, and his community.  For example, a BLM regulation, opposed by Mr. Schreiber, that allowed increased waste of natural gas and increased methane and local air pollution from federally-managed oil and gas development, including the wells on Mr. Schreiber's ranch, was recently vacated by a court in this district because BLM failed to comply with NEPA.  The court specifically held that BLM had failed to adequately assess cumulative impacts, including climate impacts, under NEPA.  Currently, a Draft Resource Management Plan Amendment and Environmental Impact Statement for expanding oil and gas development in the San Juan Basin is under consideration at the BLM Farmington Field Office.  The Final Rule removes required consideration of cumulative impacts under NEPA, among other damaging changes, harming Mr. Schreiber, who must live with the cumulative impacts of BLM's decisions for oil and gas development on his land.

63.     Jonathan Goldstein is Director of Legislative and Regulatory Affairs at EDF and an EDF member.  Mr. Goldstein frequently submits comments on behalf of EDF on federal agency NEPA documents.  For example, Mr. Goldstein submitted comments in 2018 on BLM's draft resource management plan and environmental impact statement for Carlsbad that

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 29 -

highlighted how BLM failed to conduct adequate NEPA analysis of the impacts, including

cumulative impacts, from existing and future oil and gas development in the planning area.  Mr.

Goldstein plans to continue to submit comments in the future on NEPA documents, including

during the currently-open comment period on BLM's draft resource management plan

amendment and environmental impact statement for Farmington.  Mr. Goldstein is also a

frequent user of federal public lands that will be impacted by the changes to NEPA regulations,

including by limiting consideration of climate change effects.  Mr. Goldstein regularly hikes and

mountain bikes in the Roosevelt National Forest near his home in Lyons, Colorado and plans to

continue to do in the future.

64.     Plaintiff Environmental Protection Information Center ("EPIC") is a nonprofit

organization based in Arcata, California.  EPIC advocates for the protection and restoration of

Northwest California's forests, using an integrated, science-based approach, combining public

education, citizen advocacy, and strategic litigation.

65.     EPIC was founded in 1977 as a membership organization and its members shape

the priorities of the organization through electing its board of directors.  EPIC has approximately

700 members and over 12,000 supporters.  EPIC members also contribute to the work of the

organization through volunteering to review projects.  NEPA is critical to EPIC's work.  In the

past year, EPIC has commented on over 30 NEPA projects and has four ongoing federal cases

alleging violations of the act.

66.     EPIC members have an interest in areas and activities that will be impacted by the

revised regulations.  For example, Felice Pace is a member of EPIC and volunteers his time to

help EPIC monitor cattle grazing on public land.  Mr. Pace currently resides in Klamath Glen,

California.  Mr. Pace has participated over a hundred projects on the Klamath National Forest,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 30 -

1   Six Rivers National Forest and Shasta-Trinity National Forest and NEPA is critical to Mr. Pace's

2   work to voice his concerns.  Mr. Pace runs the Project to Reform Public Land Grazing in

3   Northern California.  Through the Project, Mr. Pace spends numerous days in the field

4   documenting the effects of grazing on the environment.  As part of this, Mr. Pace is particularly

5   careful to document how grazing near and in streams can impact salmonids listed under the

6   Endangered Species Act.  Because he has spent considerable personal resources developing

7   long-term data about the impacts of grazing on salmonids, Mr. Pace has a unique interest in areas

8   that will be harmed by the challenged rule.

9          67.     Joseph and Susan Bower are also members of EPIC and devote considerable time

10  and effort into commenting on Forest Service projects.  Mr. and Ms. Bower moved to Peanut,

11  California in May 1973 and have lived on their homestead since that time.  Their land backs up

12  against the Shasta-Trinity National Forest, which serves as their backyard and source of domestic

13  drinking water.  Mr. and Ms. Bower first became engaged in Forest Service projects in 1975

14  because of concerns over herbicide use and have remained engaged since that time.  Because

15  they are reliant on the National Forest for their water and because land management decisions,

16  such as fire break projects, on the National Forest affect their homestead, they actively use

17  NEPA to comment on proposed projects, commenting on over a hundred proposed projects

18  primarily on the Shasta-Trinity National Forest.  Mr. and Ms. Bower are particularly concerned

19  with the fate of the northern spotted owl, a species listed as "threatened" under the Endangered

20  Species Act, because the spotted owl is a designated indicator species for forest health.  In their

21  experience, examining the cumulative effects of a project is particularly important for the

22  "checkerboard" lands of Northern California, where private and public lands are arranged in neat

23  squares like on a checkerboard.  Under the challenged rules, it appears that much if not all of the

24

25  COMPLAINT FOR DECLARATORY
26  AND INJUNCTIVE RELIEF - 31 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    cumulative effects analysis that they have relied upon would no longer be required.  Their

2    interest in knowledge about cumulative effects, and their ability to advocate for changes to a

3    project because of potential cumulative effects, is harmed by the challenged rule.

4         68.    Trisha Lotus also exemplifies how EPIC works to satisfy the interests of its

5    members and how the challenged rule would injure its members.  Ms. Lotus is a member of

6    EPIC and a resident of Humboldt County, California.  Ms. Lotus has been instrumental in a

7    federal challenge brought by EPIC to the Richardson Grove Project, a proposed highway

8    widening project through Richardson Grove State Park.  The proposed highway widening would

9    critically affect old-growth redwoods in the park, whose root system would be cut and paved

10   over as part of the project.  Ms. Lotus was moved to do something about the project because for

11   her, this project was personal.  In 1922 Ms. Lotus's great-grandfather, Henry Devoy, entrusted

12   the 120 acres of land to the State of California which came to be known as Richardson Grove

13   State Park.  As an EPIC member, Ms. Lotus and others encouraged EPIC to intercede in the

14   project, beginning a decade-long engagement with this project that has resulted in numerous

15   federal cases that have stopped the project from moving forward.  The challenged rule would

16   likely have caused this project to fall outside of NEPA's bounds, as federal financing of a project

17   is no longer deemed to cause a project to be a "major federal action" under NEPA.  Since being

18   an involved plaintiff in the Richardson Grove State Park lawsuit, Ms. Lotus continues to monitor

19   highway projects in her area.  Many of these highway projects receive significant funding from

20   the Federal Highway Administration, and would possibly be exempt from NEPA in the future.

21   Trisha's ability to influence state highway projects would be diminished under the challenged

22   rule and she would be injured by this loss of her ability to participate.

23

24

25   COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 32 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

69.     Plaintiff <u>Food and Water Watch</u> ("FWW") is a national, non-profit, membership organization that mobilizes people to build political power to move bold and uncompromised solutions to the most pressing food, water, and climate problems of our time.  FWW uses grassroots organizing, media outreach, public education, research, policy analysis, and litigation to protect people's health, communities, and democracy from the growing destructive power of the most powerful economic interests.  FWW's priority campaigns include fighting for a just and rapid transition to 100% clean, renewable energy and away from fossil fuels, and fighting for a ban on factory farms, also known as concentrated animal feeding operations ("CAFOs").  Central to its mission, FWW has advocated against new fossil fuel infrastructure, government support for factory farms, and other harmful federal projects since its founding in 2005.  This work regularly involves engaging in the NEPA review process and communicating with FWW members about opportunities to participate in NEPA reviews.  FWW has more than 180,000 members nationwide, including 7,767 in California, and maintains offices across the country including an office in Oxnard and Los Angeles, with its headquarters in Washington, D.C.  FWW submitted comments on the proposed NEPA rule.

70.     FWW is currently challenging a Federal Energy Regulatory Commission NEPA review for failure to consider cumulative and indirect effects of a project.  FWW is also currently challenging a Farm Service Agency NEPA review for a Maryland chicken factory farm because it fails to adequately consider the cumulative impacts of agency financing of the project.  It brings these challenges on behalf of members whose interests are harmed by these projects.  However, by eliminating the requirement that agencies consider cumulative and indirect effects, and declaring that Farm Service Agency financing is not subject to NEPA review, the Final Rule

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 33 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

will make it difficult if not impossible for FWW to engage in this kind of advocacy work in the future, resulting in increased environmental and public health harm.

71.   FWW communicates extensively with its members and supporters, as well as the general public, about climate change, water pollution, and other harmful impacts of fossil fuel infrastructure proposals and other federally permitted or funded actions by releasing reports and fact sheets, issuing press releases and statements, publishing online news pieces, and sending emails and action alerts.  FWW members participate in and rely on the NEPA review processes, and will be harmed by the Final Rule.  For example, the Rule's elimination of cumulative impacts review will make it difficult or impossible for FWW and its members to obtain adequate information about and ensure government consideration of the climate change impacts of projects such as fracked gas pipelines that will contribute to cumulatively significant and devastating greenhouse gas emissions.  The Final Rule's exclusions will make it impossible for FWW and its members to comment in opposition to proposed factory farms that receive federal financing, because there will no longer be a NEPA public comment process to notify citizens of projects proposed in their communities associated with the receipt of federal funds: the prior CEQ regulations required this public disclosure and analysis, but the Final Rule eliminates this requirement.

72.   FWW has individual members, including but not limited to Dane Schumacher of Arkansas and Carol Kuehn of New Jersey, who regularly visit, study, work, photograph, or recreate on lands or marine areas where NEPA has been and will be used in reviewing federal projects.  Each of the members has specific intentions to continue to interact with these areas frequently and on an ongoing basis.  FWW members and staff derive recreational, spiritual,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 34 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1  professional, scientific, educational, and aesthetic benefits from their interactions with these parts

2  of the natural world.

3      73.     FWW member Dane Schumacher resides on a small, sustainable farm in Carroll

4  County, Arkansas and generates a portion of his income selling produce from the farm.  Mr.

5  Schumacher irrigates his farm from the waters of adjacent Dry Fork Creek, a tributary of the

6  Kings River, which is part of the White River watershed.  He also swims, kayaks, and recreates

7  in these waters, and plans to continue to do so in the future.  However, Mr. Schumacher's use

8  and enjoyment of these waters is diminished by the operation of factory farms upstream that

9  discharge pollution into them: he can smell factory farm waste (i.e., animal waste) and is

10  concerned about farm pollution in the places he swims and recreates.  Mr. Schumacher relies on

11  NEPA processes to learn of new projects that are federally permitted or funded, and seeks to

12  participate in such processes to ensure that her concerns about downstream pollution are

13  addressed.  Farm Service Agency funding is often the sole federal trigger for NEPA for these

14  kinds of projects.  On one occasion, Mr. Schumacher participated in a NEPA process considering

15  funding of a factory farm near his home: his comments helped persuade the agency that the site

16  was ill-suited for such a project and the project was abandoned, thereby preventing a likely

17  additional source of pollution in the waters near his home.  Elimination of NEPA reviews for

18  such agency funding would mean future NEPA reviews that adversely affect Mr. Schumacher

19  would not occur at all, resulting in additional pollution in his watershed and further undermining

20  his use and enjoyment of these waters.

21      74.     Carol Kuehn, another FWW member, is a homeowner living in South Brunswick,

22  New Jersey, whose property abuts the proposed NorthEast Supply Enhancement Project's

23  Compression Station 206.  She has been involved in the NEPA process opposing the

24

25  COMPLAINT FOR DECLARATORY
   AND INJUNCTIVE RELIEF - 35 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

construction of the pipeline and compressor station that would result in noxious petrochemical emissions near her property.  Ms. Kuehn would be adversely affected by the narrowed scope of NEPA review proposed by the Final Rule, because the Final Rule would not require the Federal Energy Regulatory Commission – the federal agency responsible for permitting the pipeline and compressor station – to analyze the cumulative and indirect impacts of the project that could result in serious damage to her property and respiratory health.  Moreover, reduced public participation opportunities would result in the diminished capability of Ms. Kuehn to be involved in the decision-making process related to the fate of her property.

75.    Plaintiff Friends of the Earth ("FoE") is a tax-exempt, 501(c)(3) organization and a not-for-profit corporation existing under the laws of the District of Columbia with offices in Washington D.C. and Berkeley, California and staff located across the country.  FoE is a membership organization consisting of more than 170,000 members and more than 1.7 million activists nationwide.  FoE is also a member of Friends of the Earth-International, which is a network of grassroots groups in 74 countries worldwide.  FoE's mission is to protect our natural environment, including air, water, and land, to create a more healthy and just world. FoE utilizes public education, advocacy, legislative processes, and litigation to achieve its organizational goals.

76.    FoE has five core campaign programs: Climate & Energy, Democracy, Economic Policy, Food & Agriculture, and Oceans & Vessels.  All of these programs utilize the processes afforded by NEPA to engage in major federal project decision-making.  FoE's Climate program promotes energy conservation and clean energy sources, including wind, solar, and geothermal power, to end dependence on fossil fuels, reduce greenhouse gas emissions, and mitigate climate change.  FoE's Economic Policy program works to redirect tax policies and public spending to

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 36 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

make polluters pay for the costs of their pollution, and to drive the transition to a cleaner, low-carbon economy.  FoE's Democracy program works to create stronger and more effective environmental policies by fostering representative and responsive democratic institutions across the United States.  FoE's Food program seeks a fundamental shift in our food system: from toxic and chemical intensive to healthy and ecologically regenerative; from corporate controlled to democratically governed; and from a system that embodies the deepest inequities in our society to one that advances justice and fulfills the needs of all eaters now and in the future.  FoE's Oceans program works to protect our oceans, the tens of millions of people who live near, and the marine creatures who reside in from the threats from oil spills, air pollution, sewage releases, industrial ocean fish farming, and unnatural ocean noise.

77.     The Final Rule is extremely detrimental to and adversely affects the FoE's interests and those of FoE's members and activists.  The changes will restrict FoE's members' ability to effectively participate in public comment periods, maintain accountability and transparency in major federal project decision-making, and advocate for solutions to climate change, air and water pollution and fight against environmentally damaging projects.  In addition to restrictions on the scope of NEPA, the Final Rule impedes FoE and its members' ability to provide important experience-based and culturally significant comments through newly enforced restrictions on the specificity of a substantive comment.  Many FoE members live on the frontlines of various proposed major federal projects or existing projects that are being modified which trigger existing NEPA requirements.  However, the shortened time limits for EA/EIS documents—as well as the overly strict specificity requirements for public comments that demand a level of technical training that many FoE members do not possess or have the time to provide—will result in agencies disregarding many of FoE's member perspectives.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 37 -

78.     In particular, FoE member and senior oceans campaigner Verner Wilson will be harmed by the implementation of the Final Rule.  Mr. Wilson is a member of the Curyung Tribe in Bristol Bay, Alaska.  Pebble Mine, a proposed metals mine in Bristol Bay, threatens one of the largest and last remaining wild salmon populations in the world.  The project is moving forward in a NEPA process with the final EIS published on July 24, 2020.  The mine could generate more than 10 billion tons of dangerous waste, wipe out 90 miles of salmon streams and pollute more than 5,000 acres of wetlands, ponds and lakes.  It would likely plummet the salmon population—catastrophically impacting local communities and earth's last great wild sockeye salmon fishery.  Mr. Wilson and his family would be significantly impacted by the project as they are subsistence fishers who rely on the wild salmon runs every year.  If NEPA is curtailed even further, Mr. Wilson will be significantly impacted in his ability to participate in and object to the Pebble Mine and any other major federal projects that are proposed for the region.

79.     Plaintiff <u>National Parks Conservation Association</u> ("NPCA") is a non-profit organization whose mission is to enhance and protect the National Park System.  NPCA was formed in 1919 and today has 1.4 million members and supporters, with approximately 40,629 members in California and offices in Oakland, Joshua Tree, Los Angeles, and Fresno.  NPCA is headquartered in Washington, D.C., and has 27 regional and field offices throughout the country.  A robust NEPA process is essential to NPCA's mission of protecting national parks, which is why NPCA provided oral testimony and detailed written comments on the proposed revisions to CEQ's NEPA regulations.

80.     NPCA is regularly involved in NEPA processes and submits comments on proposed projects and activities on and near national park lands.  For instance, the Midwest regional office recently submitted comments to the National Park Service on its environmental

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 38 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

assessment associated with Independence Day fireworks at Mount Rushmore National Memorial, and several regional offices have submitted NEPA comments to the BLM on recent oil and gas lease sales.  NPCA is also currently asserting NEPA claims in several lawsuits, including in the challenge to the Alton Coal Mine expansion near Bryce Canyon National Park and the challenge to three BLM leasing decisions for oil and gas development covering approximately 117,000 acres near Dinosaur National Monument.

81.    NPCA has individual members and staff who regularly visit, study, work, photograph, or recreate on lands or marine areas where NEPA has been and will be used in reviewing federal projects.  Each of these members and staff have specific intentions to continue to interact with these areas frequently and on an ongoing basis.  NPCA members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their interactions with these parts of the natural world.

82.    Joy Oakes, of Arlington, Virginia, is Senior Director of the Mid-Atlantic regional office for NPCA and long-time NPCA member, has frequently utilized the NEPA process to advocate for the protection of natural, cultural, and historical places.  Most recently, in her role as Senior Director, Ms. Oakes has been participating in the NEPA permit application review process for the Surry-Skiffes Creek transmission line project in the scenic James River area. This project is close to the Colonial National Historical Park, an area that Ms. Oakes has visited many times throughout her lifetime and plans to continue visiting in the future for both professional and personal reasons.  Ms. Oakes expects to be involved in other NEPA processes in the future, including assisting with comments on the Federal Highway Administration's I-495 & I-270 Managed Lanes Study Draft EIS, which was released in July 2020.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 39 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

83.     The Final Rule reduces Ms. Oakes' ability to participate in these and other future NEPA processes by limiting the alternatives considered (e.g., in the case of the transmission line across the James River, potentially not identifying alternatives that would meet electricity needs while also protecting the region's historic character and resources), eliminating the consideration of cumulative impacts (e.g., the impacts the transmission line would have on climate change), and shortening the amount of time given to review draft EISs and provide comments.

84.     Plaintiff National Wildlife Federation ("NWF") is the nation's largest member-supported non-profit conservation advocacy and education organization, with more than six million members and supporters, including more than 583,000 members and supporters in California.  NWF has affiliate organizations in fifty-two states and territories, including California.  NWF has regional offices and staff located throughout the United States, including a California Regional Office headquartered in Midpines, California and additional staff in San Anselmo, California.  NWF is organized under the laws of the District of Columbia and is headquartered in Reston, Virginia.

85.     NWF works to unite all Americans to ensure wildlife thrive in a rapidly changing world.  NWF advances this mission through numerous programs that, among other things, work to protect, restore, and connect wildlife habitat; confront climate change; defend the public's interest in ownership and management of public lands; address the threat of invasive species and other systemic threats to wildlife; advance modern approaches to wildlife management; and connect Americans with wildlife through education and advocacy engagement.

86.     A robust NEPA process is essential to NWF's mission, which is why NWF actively engaged in both the entire process leading up to the promulgation of the Final Rule. Among other things, NWF provided extensive and detailed written comments at all stages;

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 40 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

provided oral testimony at both the Denver, CO and Washington D.C. public hearings on the Proposed Rule; met twice with representatives from the Office of Management and Budget and other federal agencies to discuss our concerns during the Office of Information and Regulatory Affairs review process; mobilized comments on the Proposed Rule from more than 350 organizations; and collectively generated almost 50,000 individual comments on the from our members and supporters through our Action Alert system.

87.     NWF attorneys, policy advocates, scientists, and organizers routinely participate in commenting at all phases of NEPA processes before numerous federal agencies, including the U.S. Forest Service, BLM, the U.S. Army Corps of Engineers, the U.S. Fish and Wildlife Service, Bureau of Ocean Energy Management, and others.  NWF engages in litigation to ensure full compliance with NEPA.  NWF takes an active role in educating members of Congress about the importance of maintaining the integrity of NEPA and the NEPA implementing regulations, and about the importance of strong Congressional oversight to ensure that federal agencies properly apply NEPA when making major federal decisions that affect the quality of the environment.  NWF also employs numerous media and outreach staff to inform NWF's members about, and encourage and assist members in participating in, NEPA reviews.

88.     For example, NWF is currently litigating the U.S. Army Corps of Engineers' failure to properly comply with NEPA in connection with its navigation maintenance activities on a 195-mile portion of the Mississippi River.  Key issues in this litigation include the indirect and cumulative impacts of in-stream navigation structures, which have significantly increased flood levels in the Mississippi River by up to 15 feet in some locations and 6 to 10 feet over broad stretches where these structures are prevalent.  Prior to filing this challenge, NWF had engaged in all aspects of the NEPA processes providing detailed scoping comments, detailed

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 41 -

comments on the draft EISs, and detailed comments on the final EISs.  NWF routinely monitors

upcoming NEPA review processes and engages in those reviews as appropriate, including the

NEPA processes for oil and gas lease sales and for U.S. Army Corps of Engineers' projects and

permits, among others.  By eliminating consideration of indirect and cumulative effects, the Final

Rule will make it difficult if not impossible for NWF to engage in this kind of advocacy in the

future, resulting in increased harm to wildlife, public lands and waters, and our shared climate.

89.     NWF communicates extensively with its members and supporters, as well as the

general public, about threats to wildlife, the protection of public lands, the ongoing and future

damage from the global climate crisis, and the importance of retaining the long-standing

protections provided by NEPA and the nation's other environmental laws, by issuing press

releases and statements, blogs, newsletters, magazines, and sending emails and action alerts.

NWFs members participate in and rely on the NEPA review processes, and will be harmed by

the Final Rule.  For example, the Final Rule's elimination of references to indirect impacts

strikes at the heart of the ability of NWF and its members to obtain information on the indirect

effects of levees, navigation structures, reservoir operating plans, pumping plants and other

major infrastructure on increased flooding, losses of wetlands and other vital wildlife habitat, and

reductions in critical river flows.  The Final Rule's elimination of cumulative impacts review

will make it difficult or impossible for NWF and its members to obtain adequate information

about, and ensure government consideration of, the cumulative impacts of climate change on:

(a) the effectiveness, sustainability, and impacts of flood and storm damage reduction and other

projects in both riverine and coastal areas; and (b) the climate change impacts of projects such as

oil and gas development or mining operations.  The Final Rule's provision allowing federal

agencies to waive NEPA if other review processes are associated with, or required for, a project

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 42 -

will eliminate the ability of NWF and its members to obtain adequate information about, or provide their views and comments on, many types of projects.

90.     NWF has individual members, including but not limited to Michael Bartlett of New Hampshire and Melissa Samet of California who regularly visit, study, work, photograph, or recreate on lands, waters, or coastal areas where NEPA has been and will be used in reviewing federal projects and permitting decisions.  Each of these members has specific intentions to continue to interact with these areas frequently and on an ongoing basis.

91.     Michael Bartlett is a member of the Board of Directors of NWF and has been a member of NWF since 2012.  Mr. Bartlett has both a deep personal and a professional interest in migratory birds.  Mr. Bartlett is an avid birder and amateur ornithologist with a particular affinity for migratory bird species such as the Peregrine Falcon, which is one of his favorite species, and the Screech Owl.  Mr. Bartlett spends considerable time observing birds in his home state of New Hampshire and has installed bird houses and bird feeders on his property to attract both migratory and "overwintering" species, and species endemic to New Hampshire like Chickadees, Nuthatches, Downy Woodpeckers, American Goldfinches, and Northern Cardinals.  Mr. Bartlett likewise seeks out opportunities to study and observe bird populations when he is traveling in the United States and abroad.

92.     Earlier in his life, Mr. Bartlett worked for the U.S. Fish and Wildlife Service for more than thirty-seven years, including many years as Supervisor of the Service's New England Field Office, working on matters related to the preservation of avian wildlife resources—including the protection of migratory bird species like loons, terns, and waterfowl.  While the director of the New England Field Office, Mr. Bartlett supervised the office's Endangered Species Program, which included work protecting migratory birds like the Piping Plover.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 43 -

93.     On February 3, 2020, the U.S. Department of Interior Fish and Wildlife Service issued a proposed rule that followed up on a legal memorandum issued in December of 2017 to remove long-standing protections of about 1,000 species of migratory birds, including many that are present in New Hampshire like the common loon, black-capped chickadee, and the above mentioned species, among others, from the impacts of incidental takes under the Migratory Bird Treaty Act.  Incidental takes – like deaths from oil pits, oil spills, large buildings, power lines, and wind turbines – comprise the largest number of takes of migratory birds.  On June 5, 2020, the U.S. Fish and Wildlife Service issued a draft EIS on the proposed rule (the MBTA DEIS).  Applying the new NEPA rule to the MBTA DEIS would greatly deprive Mr. Bartlett's ability as a member of the public concerned with birds to assess and obtain information about how the proposed MBTA take rule might impact the birds he watches and cares about.  For instance, impacts like climate change and habitat loss are causing many bird species to decline.  Without a consideration of cumulative impacts, the impacts of the proposed MBTA take rule in combination with these other reasonably foreseeable impacts may not be assessed or disclosed to members of the public like Mr. Bartlett.

94.     Melissa Samet, the Senior Water Resources Counsel for NWF and an NWF member, has frequently utilized the NEPA process in a professional and personal capacity to advocate for the protection of rivers, wetlands, and coastal areas.  Ms. Samet has worked for NWF since 2010 where she directs water resources campaigns and provides policy and legal direction on issues related to water resources planning and projects, with a particular focus on improving the planning practices of the U.S. Army Corps of Engineers and improving floodplain management.  Ms. Samet has engaged in NEPA litigation; and has educated Congress about the importance of maintaining the full suite of protections provided by NEPA and the CEQ NEPA

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 44 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

regulations and of the importance of effective Congressional oversight of federal agency

compliance with NEPA, including through Congressional testimony.  She has found NEPA's

procedural safeguards to be crucial to improving projects and reducing and preventing

unnecessary impacts, because in her experience, NEPA review typically reveals diverse

perspectives, key scientific information, likely impacts, and impact-reduction solutions that

otherwise would not be identified by the agency acting alone.  Ms. Samet believes that the Final

Rule will severely undercut her ability to evaluate and comment on the indirect and cumulative

impacts of major federal actions, including U.S. Army Corps of Engineers' flood and storm

damage reduction projects, navigation projects, reservoir operating plans, and permitting

decisions that typically have far reaching indirect and cumulative impacts.

95.    Ms. Samet is a frequent user of federal, state, and other protected lands in

California, where she hikes, watches birds and other wildlife, photographs, and seeks out the

solace that wildlands can provide.  Among the places she has visited on many occasions are

Point Reyes National Seashore in Marin County, Mount Tamalpais in Marin County, Yosemite

National Park in Mariposa County, Humboldt Redwoods State Park in Humboldt County,

Sequoia National Park in Tulare County, Monterey Bay in Monterey County, and Point Lobos

State Natural Reserve in Monterey County.  Ms. Samet visits Point Reyes National Seashore on

a regular basis, where she has hiked and watched hawks, owls, pelicans, shorebirds, waterfowl,

seals, whales, Tule Elk and many other mammals at least 6 times each year for more than two

decades.  Her most recent visit to Point Reyes was in July 2020, and she plans to continue to visit

Point Reyes on at least a bi-monthly basis for the foreseeable future.  In addition to relying on

NEPA in her professional capacity, Ms. Samet has engaged in the NEPA process in her personal

capacity, most recently providing detailed comments on the National Park Services' Draft

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 45 -

Environmental Impact Statement for a General Management Plan Amendment for Point Reyes National Seashore. Those comments highlighted significant indirect and cumulative impacts of the proposed management plan, including the cumulative impacts of climate change and the indirect impacts of the proposed plan on the Seashore's rich array of predator species.

96. Plaintiff Ocean Conservancy is a nonprofit, science-based conservation organization working to protect the ocean from today's greatest global challenges. Together with its partners, Ocean Conservancy creates science-based solutions for a healthy ocean and the wildlife and communities that depend on it. Since 1972, Ocean Conservancy has sought to improve the health of our nation's marine wildlife and fish, and to face threats such as ocean trash, shipping, overfishing, and ocean acidification. Ocean Conservancy has over 150,000 members and supporters worldwide, with approximately 20,591 in California. Ocean Conservancy is headquartered in Washington, D.C. and has offices in Alaska, Washington, Florida, Oregon, Texas, and Santa Cruz and Santa Barbara, California.

97. Ocean Conservancy communicates extensively with its members, its supporters, and the general public about threats to ocean health, climate change, ocean acidification, ocean plastics, and fishery management, and comments on numerous federally permitted or funded actions. The organization regularly releases reports and fact sheets, issues press releases and statements, publishes online blog and news pieces, and sends emails and action alerts to its members and supporters. Ocean Conservancy's members participate in and rely on NEPA's review processes, and will be harmed by the Final Rule. For example, the Final Rule's elimination of cumulative impacts review will make it difficult or impossible for Ocean Conservancy and its members to obtain adequate information about, and ensure government consideration of, the impacts of greenhouse gases on the ocean, such as ocean acidification and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 46 -

warming waters, which leads to shifting fish stocks that harm Ocean Conservancy's members and interests.  Nor will Ocean Conservancy and its members be able to obtain adequate information about shipping and new shipping routes in the Arctic region, which are of interest to Ocean Conservancy and its members.

98.     In the context of fishery management, NEPA procedures constitute an important means of ensuring that fishery managers consider important issues that the Magnuson-Stevens Act does not address: in this way, the Magnuson-Stevens Act is not a "functional equivalent" of the NEPA process. NEPA plays an integral role in the fishery management process and Ocean Conservancy and its members will be harmed by the Final Rule because they will be unable to fully engage in the fishery management process.  At a time when we understand better than ever that a healthy ocean ecosystem is necessary to support thriving fisheries, NEPA interjects larger environmental issues into a process proscribed by the Magnuson-Stevens Act that otherwise focuses on maximizing how many fish can be caught.

99.     Further, many Ocean Conservancy members are fishermen who spend substantial amounts of time at sea or operate fish transport or packing activities.  These members will be harmed by shortened NEPA analysis and public comment timelines envisioned by the Final Rule.

100.     Ocean Conservancy has individual members, including but not limited to Captain Dave Monti of Rhode Island, who regularly visit, study, work, photograph, or recreate on lands or marine areas where NEPA has been and will be used in reviewing federal projects.  Each of the members has specific intentions to continue to interact with these areas frequently and on an ongoing basis.  Ocean Conservancy members and staff derive recreational, spiritual,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 47 -

professional, scientific, educational, and aesthetic benefits from their interactions with these parts of the natural world.

101.    Captain Dave Monti is an Ocean Conservancy member who resides in Warwick, Rhode Island and keeps his charter boat, the *Virginia Joan*, in North Kingstown, Rhode Island. He generates a portion of his income as a charter boat captain and guide.  Captain Monti has been fishing for over 45 years and expects to do so for the foreseeable future.  He helps his clients target Rhode Island fish species such as striped bass, bluefish, summer flounder (fluke), scup, tautog, black sea bass, cod, and bonito in the Narragansett Bay, Block Island, and Newport areas.  Captain Monti relies on NEPA reviews and public processes to be informed and involved in federal decisions affecting the areas he fishes in and the habitat that his target fish need to stay productive, including permitting decisions regarding the Block Island Wind Farm.  Elimination or curtailment of NEPA reviews for the siting of wind farms or for fishery management actions would result in additional threats in the waters he fishes in and the fish species he targets for his clients.  The proposed rule would undermine his use and enjoyment of these waters and public fishery resources.

102.    Plaintiff Rio Grande International Study Center ("RGISC") is a public interest, 501(c)(3) advocacy organization located in Laredo, Texas.  It has a staff of two full-time employees and three part-time employees.  RGISC's mission is "to preserve and protect the Rio Grande-Rio Bravo, its watershed and environment, through awareness, advocacy, research, education, stewardship and bi-national collaboration for the benefit of present and future generations."  Nearly 95% of the population in Laredo is Hispanic and more than one-third of the city's population lives in poverty, more than twice the state average.  RGISC staff and board

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 48 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   members live, work, and recreate in and along the Rio Grande and will continue to do so into the

2   future.

3       103.    RGISC's workload includes monthly river sampling and water quality testing at

4   multiple locations in Webb County through the Texas Clean Rivers Program to monitor the

5   health of the river.  RGISC helped establish this program through local and state entities and has

6   done monthly monitoring for more than 25 years.  The City of Laredo has asked RGISC to

7   operate an educational center (the "South Laredo Nature and Birding Center" or "SoLa Center")

8   to promote appreciation of the flora, fauna and wildlife of the region, and in particular within the

9   Rio Grande ecosystem.  Every year in early February, RGISC hosts a four-day Laredo Birding

10  Festival, and RGISC staff and volunteers take visitors from across the United States and different

11  countries to observe birds along the Rio Grande in Webb and Zapata counties.  RGISC also leads

12  community outings called Loving Laredo Paddles and Loving Laredo Hikes along the river

13  several times a year to raise awareness of the beauty and ecological importance of the Rio

14  Grande.  The Laredo Birding Festival and Community Paddles generate revenue for RGISC.

15      104.    RGISC uses NEPA and its requirements for public transparency, information-

16  sharing, and participation in its work to protect the Rio Grande.  For example, in 2009-2010, led

17  by then Executive Director Jay Johnson Castro and Board members Dr. Tom Vaughan & Dr.

18  James Earhart, RGISC informed and educated the families living in Barrio de Colores of the

19  potential adverse environmental impacts of a U.S. Customs and Border Protection project to

20  remove Carrizo cane vegetation along the U.S.-Mexico border through herbicide spraying along

21  the river banks.

22      105.    RGISC board member, Israel Reyna, an attorney with the Texas Rio Grande

23  Legal Aid, advised the families of their rights and protections under NEPA, including the right to

24

25  COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 49 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    know all of the potential harms to their human environment, to ensure alternatives were

2    considered, a bilingual notice of the proposed project, and of their right to sue if NEPA was

3    violated.

4         106.    In ensuing federal litigation, Dr. Earhart, a biologist and scientist on the RGISC

5    board, wrote an affidavit that supported the suit's allegations of the potential harmful effects to

6    families in Barrio de Colores from exposure to herbicides used to remove the Carrizo cane,

7    particularly because of aerial spray drift.  Through a court-approved settlement, Customs and

8    Border Protection agreed to use a combination of principally non-chemical methods to remove

9    Carrizo cane, using herbicide in one area only after a 5 day warning period and public

10   information provided in both English and Spanish.  The federal agency also agreed to hire a

11   certain number of workers from the local labor pool, and to convene a public information

12   meeting to fully explain the cane removal and control activities to the local community, again in

13   both English and Spanish.  Finally, the federal agency agreed to implement future NEPA

14   analysis regarding Carrizo cane removal with at least one public scoping meeting, a 45-day

15   comment period, and summaries and documents translated into Spanish and distributed at the

16   local public library.  *Barrio de Colores v. U.S. Customs and Border Protection, Dep't of*

17   *Homeland Security*, No. 09-0035 (S.D. Tex.).

18        107.    RGISC is currently deep in the throes of a battle against the federal government's

19   plans to build a border wall, approximately 121 river miles along the Rio Grande in the Laredo

20   Sector.  NEPA, in addition to dozens of other federal laws, has been waived to expedite

21   construction of the Border Wall.  Waiver of NEPA for the Border Wall has meant that the federal

22   government can undertake projects or issue permits without consulting local communities and

23

24

25   COMPLAINT FOR DECLARATORY

26   AND INJUNCTIVE RELIEF - 50 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1  local experts.  Waiver of NEPA has taken away the community's voice and input into projects

2  that would harm the environment, public health, cultural heritage, and way of life.

3     108.   Like waiver of NEPA, RGISC believes that the Final Rule will undercut its ability

4  and the ability of the community that RGISC serves to evaluate and comment on the full impacts

5  of projects like the border vegetation control project.  The Final Rule also harms RGISC's ability

6  to push federal agencies to fully provide local communities timely, accessible, Spanish-language

7  information about proposed actions and meaningful opportunities to participate in federal

8  decisions that affect them.

9     109.   Plaintiff <u>Southern Utah Wilderness Alliance</u> ("SUWA") is a nonprofit

10  environmental membership organization dedicated to the preservation of outstanding wilderness

11  found throughout Utah, and the management of wilderness-quality lands in their natural state for

12  the benefit of all Americans.  SUWA promotes local and national recognition of the region's

13  unique character through research and public education, and supports administrative and

14  legislative initiatives to permanently protect Utah's wild places.  SUWA has more than 14,000

15  members in all fifty states, with 2,155 members in California, and maintains offices in Utah and

16  Washington D.C.  SUWA members use and enjoy federal public lands throughout Utah for a

17  variety of purposes, including scientific study, recreation, wildlife viewing, aesthetic

18  appreciation, viewing cultural and historic artifacts, and financial livelihood.

19     110.   SUWA staff are well versed in CEQ's NEPA regulations and regularly review

20  and analyze NEPA documents and submit detailed, technical comments on proposed actions that

21  may impact areas proposed for wilderness designation or other federal public lands in Utah.

22  These comments often address federal agencies' discounting of greenhouse gas emissions and

23  impacts to climate change from proposed actions like federal oil and gas lease sales and

24

25  COMPLAINT FOR DECLARATORY

26  AND INJUNCTIVE RELIEF - 51 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

applications for oil and gas drilling permits and the clearcutting native vegetation.  SUWA staff

and members work to safeguard remarkable federal public lands in Utah will be harmed by the

Final Rule.  SUWA submitted comments on CEQ's draft rule.  SUWA has individual members,

including Neal Clark and Landon Newell, who establish SUWA's significant interest in the

rulemaking and standing to bring this facial challenge.

111.    Mr. Clark has been a full-time employee of SUWA since 2011 and serves as the

organization's Wildlands Program Director, and also serves as House Counsel.  In this capacity,

Mr. Clark oversees the drafting and filing of dozens of SUWA comments annually on various

federal agency NEPA documents.  For example, in 2018 SUWA submitted comments on BLM's

draft resource management plans and environmental impact statements for the Shash Jaa and

Indian Creek units of the reduced Bears Ears national monument and highlighted numerous

instances where the Bureau had failed to comply with the letter and spirit and NEPA's

implementing regulations.

112.    Mr. Clark is also an active member of SUWA.  Mr. Clark lives in Moab, Utah and

spends much of his free time exploring BLM, Forest Service, and National Park Service public

lands in southern Utah, including hiking and camping in Bears Ears National Monument, rafting

in Labyrinth Canyon, and mountain biking on Bureau-managed lands surrounding Moab.  He

engages in these activities on a daily basis, year-round, and intends on continuing to do so for

years to come.  Mr. Clark's interest in the protection and preservation of these federal public

lands will be harmed by the Final Rule because by eliminating the requirement that federal

agencies fully consider and disclose the cumulative impacts of climate change these agencies

will make fundamentally uninformed decisions that will result in short and long term degradation

that threaten the places he recreates in and enjoys.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 52 -

113.    Mr. Newell has been a full-time employee of SUWA since 2012 and serves as one of the organization's staff attorneys.  In this capacity Mr. Newell focuses his work on reviewing BLM proposals to hold quarterly oil and gas lease sales across Utah, as well as the Bureau's management of those leases and applications by private companies to drill wells and exploit subsurface resources.  Mr. Newell submits detailed comments on these proposals, as well as files administrative appeals and federal court litigation regarding the Bureau's failure to comply with NEPA's hard look mandate.

114.    Mr. Newell is also an active member of SUWA.  Mr. Newell lives in Salt Lake City and frequently camps, sightsees, hikes, fishes, and visits Native American cultural sites on BLM lands in Utah.  For example, in the spring of 2020 Mr. Newell traveled to Utah's San Rafael Swell (managed by BLM) and Capitol Reef National Park to hike, camp, and sightsee. He already has plans to return to these places in the fall and winter of 2020.  These public lands are part of the Colorado Plateau in Utah and one of the areas expected to get hotter and drier over the coming years due to climate change.  Mr. Newell's interest in the protection of these places is threatened by the environmental degradation brought on by climate change, including drought, aridification of soils, and loss of native vegetation, and decision by agencies like BLM to approve oil and gas leases and wells that will be made without considering and disclosing their impacts to the climate.

115.    Plaintiff, WE ACT for Environmental Justice ("WE ACT") is a non-profit organization founded in 1988 in the West Harlem neighborhood of New York City.  WE ACT's mission is to build healthy communities by ensuring that people of color and/or low income residents participate meaningfully in the creation of sound and fair environmental health and protection policies and practices.  WE ACT envisions a community that has informed and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 53 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

engaged residents who participate fully in decision-making on key issues that impact their health and community; strong and equal environmental protections; increased environmental health through community-based participatory research and evidence-based campaigns.  WE ACT has grown to 16 staff members, offices in New York City and Washington D.C., and over 800 members throughout New York City.

116.    WE ACT is a leading group in the Environmental Justice Movement, which began in order to call attention to and organize against systemic environmental racism, which is often left out of mainstream, largely white, environmental advocacy agendas.  In 1991, a multinational group, including WE ACT, attended The First People of Color Environmental Leadership Summit in Washington D.C.  At the event, "The Principles of Environmental Justice" were created and agreed upon, and still stand as a guiding set of principles for the Environmental Justice Movement today.

117.    Throughout the 32 years of its existence, WE ACT has provided effective leadership in the development of New York City and northeast region environmental justice alliances to network, collaborate, and impact environmental policy-making.  WE ACT is also the administrative arm of the Environmental Justice Leadership Forum, which is a coalition of nearly 60 environmental justice advocates and experts working to eliminate environmental injustices through technical assistance, capacity building, and policy solutions.

118.    WE ACT's founders, Peggy Shepard, Chuck Sutton, and Vernice Miller-Travis started as community activists.  They have long viewed NEPA as an important tool for advocacy. They used the procedures and requirements of the National Environmental Policy Act in their attempt to address the noxious emissions and pollution from the North River Sewage Treatment Plant, which lines the banks of the Hudson River along Manhattan Island in the West Harlem

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 54 -

community for almost half a mile.  They conducted significant research into the land use and

siting history of this largely federally funded facility and uncovered that EPA Region 2 had twice

declared a Finding of No Significant Impact under NEPA for the North River plant.  As a result,

the public was never informed about how a facility designed to treat 180 million gallons a day of

raw sewage and wastewater, constructed without any odor- control features at all, might impact

the tens of thousands of people who live near the plant.

119.    Peggy Shepard is the co-founder and executive director of WE ACT for

Environmental Justice.  She has lived in New York City for over 30 years.  In both her role as a

community advocate and executive director of WE ACT, she and WE ACT staff have worked to

effectively educate WE ACT membership on the importance of public engagement, and how to

effectively organize at the local level.  Ms. Shepard has a long history of organizing and

engaging Northern Manhattan residents in community-based planning and campaigns to address

environmental protection and environmental health policy locally and nationally.  She has

successfully combined grassroots organizing, environmental advocacy, and environmental health

community-based participatory research to become a national leader in advancing environmental

policy and the perspective of environmental justice in urban communities to ensure that the right

to a clean, healthy and sustainable environment extends to all.

120.    With NEPA as the foundation for many state and city level regulations, WE ACT

has utilized similar regulations to engage locally to voice concerns about projects that impact

their community.  In 2017, WE ACT community members concerned about New York City's

plan to rezone the Inwood neighborhood utilized the public participation provisions to voice their

apprehension about this project.  The nine residents submitted in depth written comments on the

environmental impact statement because they believed the proposed rezoning would lead to an

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 55 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

increase in density and serious environmental and socioeconomic risks that, if it is enacted as proposed, would cause irreparable harm to their neighborhood.  They also believed that the redevelopment project would jeopardize the special character of their neighborhood.  Their comment particularly identified that the redevelopment plan for Inwood increased the likelihood of tenant displacement, would negatively impact minority- and women-owned businesses in the area, and the community would experience the social impact of the loss of the community's library.  The New York Supreme Court judge sided with these local residents, contending the prior environmental review of the project ignored concerns they had raised.

121.    WE ACT submitted comments on the Proposed Rule in March 2020 in coordination with Yale University's Environmental Justice Law Clinic.  WE ACT's comments reflected their grave concern about how these proposed changes would drastically diminish the ability of communities to know what projects were planned and also be able to meaningfully provide their expertise to articulate how their respective communities would be impacted.  NEPA is one of the key tools WE ACT uses to effectively advocate on behalf of its membership.  The NEPA mandates of public participation and informed decision-making, based on sound science and requiring all agencies of the federal government to take a hard look at environmental consequences prior to issuing a decision, are vital protections.

122.    WE ACT serves a very diverse membership who live in neighborhoods like Washington Heights and Inwood.  According to the 2018 New York City's Community Health Profile, 47% of residents in WE ACT's service area are born outside of the United States and 37% have limited proficiency in English.  Spanish translation is a costly but necessary service WE ACT provides for all materials for membership.  The changes to the Final Rule cut the public comment period on major federal projects from 45 days to just 30.  That's not enough

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 56 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

time for WE ACT community members to organize and respond to long technical documents that are often only provided in English.  These changes to rule would also limit the way agencies distribute information.  Without in-person meetings, and a requirement that agencies physically distribute documents, WE ACT community members are in danger of being silenced and left in the dark.

123.    WE ACT community members without access to the internet or those with slower access will be disadvantaged.  Communities with lower socio-economic statuses are often the ones impacted the most by projects.  By moving documents online, these communities will not have a chance to meaningfully participate and voice their concerns.

124.    WE ACT like many environmental justice communities are disproportionately impacted by pollution.  Race, even more than class, is the number one indicator for the placement of toxic facilities in this country.  Exposure to elevated levels of air pollution are linked to or exacerbate cardiovascular and respiratory diseases, often leading to emergency department visits, hospitalizations and premature death, as well as reduced birth weight and cancer.  The result is that Black, Asian, and Latino/a communities have some of the highest rates of asthma nationwide, and African Americans are three times more likely to die from asthma-related causes than the white population.

125.    Communities of color and low income communities are often the hardest hit by climate change.  While air quality in New York City has improved over the past few decades due to actions taken to reduce pollution emissions, not all neighborhoods are experiencing that improvement equally.  NYC neighborhoods with higher rates of poverty also have higher rates of nearby emissions and pre-existing illnesses that are more sensitive to air quality issues.  In Northern Manhattan, residents continue to suffer disproportionately from the impacts of air

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 57 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    pollution, particularly those living in East Harlem.  East Harlem children wind up hospitalized

2    for asthma at more than three times the New York City rate.  The changes to NEPA eliminate

3    that requirement for agencies to look not just at the incremental impacts of their actions, but also

4    the cumulative effects.  While one project might not emit much pollution by itself, but combined

5    with the emissions of other facilities or projects in the area, the cumulative effects might pose an

6    unacceptable health risk.  Cumulative impacts are life-or-death impacts for already vulnerable

7    communities.

8         126.    Plaintiff Western Watersheds Project ("WWP") is a 501(c)(3) non-profit

9    conservation organization based in Hailey, Idaho with over 12,000 members and supporters

10   nationwide, 74 current dues-paying members in California, and one member of the Board of

11   Directors who resides in Berkeley, California.  Founded in 1993 to protect and restore western

12   watersheds and wildlife through education, public policy initiatives, and legal advocacy.  WWP

13   has offices in Idaho, Montana, Wyoming, Arizona, Utah, Washington, Oregon, and Nevada, and

14   focuses its efforts on minimizing environmental impacts to federal public lands, with a particular

15   focus on public lands livestock grazing.

16        127.    WWP works to influence and improve public lands management throughout the

17   West with a primary focus on the negative impacts of livestock grazing on 250 million acres of

18   western public lands, including harm to ecological, biological, cultural, historic, archeological,

19   scenic resources, wilderness values, roadless areas, Wilderness Study Areas and designated

20   Wilderness.  WWP works to ensure that commercial projects on public lands are compatible with

21   maintaining healthy and fully functioning native ecosystems that support diverse and abundant

22   wildlife, clean water and native fish habitats, and outstanding opportunities for public recreation

23   and enjoyment.

24

25   COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 58 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

128. NEPA is critical to WWP's work because it: first, ensures that WWP is notified of major federal actions with potential to significantly impact the environment; second, allows WWP to participate in those actions through submitting detailed comments based in science and law; and third, encourages better outcomes by requiring federal agencies to "look before they leap" and consider WWP's input in their decision-making. WWP commonly recommends alternative conservation measures for federal plans or projects, and its alternatives are at times included within the range that federal decision-makers ultimately consider in detail. NEPA also helps WWP engage its base of members and supporters by encouraging them to participate in opportunities to share their perspectives with federal agencies through the NEPA process.

129. Addressing the environmental impacts of livestock grazing on federal public lands, including those managed by the Bureau of Land Management, the Forest Service, and the National Park Service, is at the heart of WWP's conservation advocacy, and NEPA provides the framework for federal grazing leases, large-scale land-use plans, federal programs impacting wildlife such as USDA Wildlife Services, and federal projects including energy development, and sagebrush and juniper vegetation destruction projects. Domestic livestock are the most widespread – and often the most important – human impact on federal public lands and waterways. Poorly managed livestock grazing degrades land health and vegetation communities, spreads invasive weeds like cheatgrass that destroys wildlife habitat function and increases fire risk, causes erosion and sedimentation that harms the spawning habitats of native fishes, and inputs levels of fecal coliform and other biological contaminants that can violate Clean Water Act standards.

130. Many of WWP's members use federal public lands throughout the West as a primary source for recreation, engaging in activities ranging from hiking and camping to

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 59 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

birdwatching, rockhounding, cross-country skiing, angling, hunting, wildlife viewing, and nature study.  The recreational experience of WWP members is harmed by improper livestock grazing, and WWP commonly receives and investigates complaints from our members of livestock trespassing on public lands closed to grazing, or heavily impacting their recreational experiences in areas of high recreation value like federal campgrounds.  NEPA is often the sole way that the public can have a voice to achieve the proper management of the federal public lands and call attention to inappropriate or environmentally harmful practices approved by federal agencies, and seek corrective actions through NEPA processes.

131.    Erik Molvar is Executive Director of Western Watersheds Project, and also has been a member of the organization since 2016.  Mr. Molvar has been intimately involved in researching the science and law applicable to Point Reyes National Seashore, located in Marin County, California, and in drafting comment letters on behalf of Western Watersheds Project and its members that have been submitted to the National Park Service as part of the NEPA process for the park's General Management Plan (GMP).  Mr. Molvar has personally visited Point Reyes National Seashore and Golden Gate National Recreation Area (NRA, also governed under GMP) five separate times since 2015, most recently in May of 2020, for the purposes of camping, hiking, wildlife viewing, wildlife photography, landscape photography, and nature study, and he intends to return to this area as soon as health concerns due to the global pandemic subside.  Mr. Molvar's enjoyment of these lands was impaired by federally permitted livestock grazing and other agricultural activities, including spraying of liquified manure from dairy operations, invasive weed proliferation, and hazing of elk away from areas of the National Seashore where livestock are permitted, and the Park Service may remedy these harms by imposing restrictions on livestock use currently under study in the GMP planning process.  His future enjoyment of the

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 60 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

National Seashore and Golden Gate NRA may be impaired as a result of the Final Rule's elimination of indirect and cumulative impacts analysis requirements, imposition of new exhaustion requirements on issues raised by other commenters, and potential imposition of bond or other financial security requirements. He has definite plans to return to Point Reyes, and a refunded airplane ticket to use, as soon as COVID-19 pandemic makes travel to California advisable.

132.    Dr. Jason A. Lillegraven, a member of WWP since 2017, is a paleontologist/geologist and retired Professor of Geology and Zoology at the University of Wyoming. He has camped and recreated extensively on federal public lands throughout Wyoming, usually in conjunction with his geological and paleontological research. Indeed, he completely restored a sheep wagon to support his extended geological mapping program in Wyoming's Hanna/Carbon Basin. Dr. Lillegraven has worked in conjunction with WWP in submitting detailed, science-based comments during federal agency NEPA processes, advocating for conservation and protections for public lands and wildlife. He also has submitted independent comments on federal NEPA processes, most recently including for the U.S. Forest Service's ongoing Landscape Vegetation Analysis project, originally proposed to permit over 300,000 acres of logging on the Medicine Bow National Forest near his home in Laramie. Dr. Lillegraven also submitted comments on the Thunder Basin National Grassland plan amendment referenced above. In 2005, he submitted an expert declaration for an U.S. Interior Board of Land Appeals challenge against a NEPA-based decision on the Cherokee West 3D vibroseis exploration project on BLM lands in the southern Red Desert, a project stayed in part on the strength of his expert testimony. Dr. Lillegraven has keen interests in water diversion projects, and he submitted comments in opposition to the Corp of Engineers-supported Million

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 61 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Conservation Resource Group's proposal to establish trans-basin water diversion from the Green River in Wyoming to Pueblo, in southern Colorado.  Similarly, he recently wrote in opposition to the Lake Powell Pipeline Project in southern Utah.  Dr. Lillegraven also served as a leader in opposition to development of the Dunlap Wind Energy Project that eventually was built north of Medicine Bow, Wyoming.  More successfully, Dr. Lillegraven was largely responsible for opposition to approval and any future plans for development of the DKRW coal gasification project in Wyoming's Carbon Basin.

133.   Plaintiff <u>The Wilderness Society</u> ("TWS") is a national non-profit organization working to unite people to protect America's wild places.  Founded in 1935 and with more than one million members and supporters, with approximately 27,000 members and over 12,000 supporters in California and an office in Oakland, California, TWS has led the effort to permanently protect 111 million acres of wilderness and to ensure sound management of our shared national lands.  The Wilderness Society sees a future where people and wild nature flourish together, meeting the challenges of a rapidly changing planet.  To accomplish that vision, TWS works to ensure that public lands are a solution to the climate and extinction crises and that all people benefit equitably from public lands.  Of all our bedrock conservation laws, NEPA perhaps best speaks to the vision The Wilderness Society seeks to accomplish by enshrining democratic principles of transparency, public participation, science-based environmental review, and accountability into government decision-making.

134.   TWS, its members, supporters, and partners have relied on NEPA and CEQ's implementing regulations to drive the organization's engagement in countless agency decision-making processes over the last fifty years – everything from small local decisions on a particular national forest ranger district to sweeping national regulatory changes.  The environmental

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 62 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

review and public process requirements in CEQ's 1978 NEPA regulations have facilitated decades of productive and informed dialogue between TWS and federal land managers, local communities, tribes, and other stakeholders that paved the way for decisions to protect roadless and wilderness-quality lands, policies to reduce climate pollution from fossil fuel development on public lands, and management plans for newly established national monuments and other crown-jewels of our federal public lands system.

135.    The Final Rule will harm the ability of TWS and its members to protect wild and sensitive landscapes threatened by mining, drilling, logging, and other extractive uses, make public lands part of the climate solution, and ensure that all people in the U.S. benefit equitably from public lands.  TWS submitted comments and provided public testimony at every opportunity during the rulemaking process, detailing how the proposed regulatory changes would harm TWS's ability achieve its mission.

136.    TWS has individual members, including but not limited to Rebecca Rom of Minnesota and Brad Meiklejohn of Alaska, who regularly visit, study, work, photograph, or recreate on lands or marine areas where NEPA has been and will be used in reviewing federal projects.  Each of the members has specific intentions to continue to interact with these areas frequently and on an ongoing basis.  TWS members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their interactions with these parts of the natural world.

137.    Rebecca Rom has been a member of TWS since the 1970s.  Ms. Rom is a life-long citizen advocate for the protection and preservation of the world's greatest canoe country wilderness: the Boundary Waters Canoe Area Wilderness and Voyageurs National Park.  She lives within the Superior National Forest near Ely, Minnesota and in close proximity to the

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 63 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Boundary Waters.  Ms. Rom has definite plans to continue to explore the Boundary Waters and Voyageurs in 2020 and beyond.  For her entire adult life, Ms. Rom has been heavily engaged in NEPA processes involving activities affecting these areas, as well as NEPA processes affecting federal public lands throughout the nation, including proposals to develop sulfide-ore copper mining in the Superior National Forest in the headwaters of the Boundary Waters and downstream of Voyageurs.

138.     Brad Meiklejohn has been a TWS member since 2019.  Throughout his decades-long career as a conservation advocate and in his personal capacity as an avid wilderness explorer, Mr. Meiklejohn has engaged in dozens of NEPA processes to protect federal public lands in his home state of Alaska and across the country.  He has an especially deep and long involvement in utilizing NEPA to protect the Arctic National Wildlife Refuge – one of the wildest undisturbed landscapes remaining on the planet and a place that he has visited nearly every year since 1989 – and intends to continue his annual sojourns there into the future.

139.     Plaintiff Winter Wildlands Alliance ("WWA") is a national non-profit organization dedicated to preserving winter wildlands and quality human-powered snowsports experiences on public lands.  Founded in 2000, WWA represents a growing community of human-powered winter adventurers from across the country.  WWA's 15,080 members and supporters – 398 of whom reside in California, and the members of their 33 grassroots groups, deeply value natural winter soundscapes and the opportunity for refuge and respite afforded by the last remaining places across the United States where solitude, fundamental wildness, and non-motorized experiences are preserved.  From its headquarters in Boise, Idaho and field offices in Mammoth Lakes, California and Bozeman, Montant, WWA works with land managers, elected officials, grassroots groups and other partners to pursue a balanced, adaptive,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 64 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

and collaborative approach to public lands management for the long-term protection of the places where their members recreate and seek adventure.  WWA's priority campaigns include over-snow vehicle travel management planning on Forest Service lands, Forest Service land management planning, and defense of non-motorized backcountry recreation opportunities on public lands – all of these campaigns rely upon the public process afforded by NEPA and guided by CEQ's NEPA regulations.

140.    Central to its mission, WWA is currently engaged in over a dozen different Forest Service land or travel management planning processes; three projects involving the expansion of ski resorts on public land; and several additional projects involving federal land management. This work regularly involves engaging in the NEPA process and communicating with WWA members about opportunities to participate in comment periods and other opportunities for engagement allowed for by NEPA.  WWA submitted comments on the proposed rule, and prior to the publication of the final regulations, met with the Office of Information and Regulatory Affairs to discuss their comments.

141.    WWA has individual members, including but not limited to Gus Bekker of Washington and Darrel Jury of California, who regularly visit, study, work, photograph, or recreate on lands where NEPA has been and will be used in reviewing federal projects.  Each of the members has specific intentions to continue to interact with these areas frequently and on an ongoing basis.  WWA members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their interactions with these parts of the natural world.

142.    Gus Bekker, a WWA member since 2002 and board member of one of WWA's grassroots groups, El Sendero Backcountry Ski and Snowshoe Club, lives in Wenatchee, Washington.  An avid backcountry skier, Mr. Bekker has worked for years to advocate for

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 65 -

backcountry skiing and preservation of winter wildlands on the Okanogan-Wenatchee National Forest, where he regularly skis during the winter months. Mr. Bekker skied several areas on the Forest this past winter, and has definite plans to do so again this year as soon as there is sufficient snow. He has engaged extensively in many Forest Service projects in order to preserve opportunities for backcountry winter recreation on Forest Service lands near Wenatchee. Currently, Mr. Bekker is advocating for backcountry skier interests as the Forest Service considers whether to grant a road right-of way to Mission Ridge Ski and Snowboard Resort near Wenatchee. Mr. Bekker relies on the NEPA process to learn of new projects that may be federally authorized and participates in these processes to advocate for his and his organization's interests. As the road right-of-way proposal shows, these projects are not always directly related to backcountry recreation yet can have significant consequences to Mr. Bekker's interests. Elimination of the mandate that agencies consider indirect and cumulative effects and barriers to public participation would mean that either Mr. Bekker would be unable to participate in decisions affecting backcountry skiing on the Okanogan-Wenatchee National Forest, his concerns would be dismissed as unrelated to the project at hand, or his participation may not "count" if the responsible official deems his comments lacking in technicality or specificity. In all cases, it is likely that the Forest Service would make decisions that reduce or negatively impact the use and enjoyment of National Forest lands for Mr. Bekker and his fellow backcountry skiers.

143.    Darrel Jury, a WWA member since 2015 and president of the WWA grassroots group Friends of Plumas Wilderness, relies on the NEPA process to engage in public land management near his home in Quincy, California. Specifically, Mr. Jury advocates for Wilderness, Wild & Scenic Rivers, and non-motorized areas for winter recreation on the Plumas,

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Lassen, and Tahoe National Forests, where he often recreates.  Mr. Jury visits these national

forest lands near his home on a weekly basis and is looking forward to skiing Thompson Peak on

the Plumas National Forest as soon as there is sufficient snow to do so.  He is extensively

involved in over-snow vehicle planning on the Plumas, Lassen, and Tahoe National Forests and

has submitted NEPA comments on these planning processes at multiple stages in the process.

Mr. Jury's deep interest in Wilderness preservation and preserving refuges for quiet winter

recreation opportunities will be harmed by the narrowed scope of NEPA review in the Final

Rule.

>           2.      *Interests and Injuries Common to All Plaintiffs*

144.     As detailed above, Plaintiff groups and their members reside near, visit, or

otherwise use and enjoy areas where NEPA analysis has occurred and will be undertaken in the

future.  Plaintiffs have concrete interests in CEQ's lawful implementation of NEPA and its vital

role in preventing harm to people and the environment, and the regulatory revisions challenged

in this lawsuit fundamentally undermine and contradict the requirements of NEPA.  Plaintiffs

have members who reside, work, travel, and recreate in places where federal agency actions and

decisions occur, where threatened and endangered plants and animals are found, and where non-

federal projects that require federal involvement, approval, and/or funding have been and will be

proposed.  Plaintiffs' concrete interests are also injured by CEQ's violation of procedural duties

under NEPA and the APA.  *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961

(9th Cir. 2003); *W. Watershed Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011).  The past,

present, and future enjoyment of the scientific, recreational, aesthetic, economic, and

conservation benefits to Plaintiffs' members has been, is being, and will continue to be

irreparably harmed by CEQ's disregard of its statutory duties.  The "presence of one party with

standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v.*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 67 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

*Forum For Academics and Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *see Brown v. City of Los Angeles*, 521 F.3d 1238, 1240 n.1 (9th Cir. 2008) ("[T]he presence in a suit of even one party with standing suffices to make a claim justiciable").

145.    The Final Rule will impede all of the Plaintiff organizations' ability to obtain information vital to their central conservation missions, and will also require Plaintiffs to divert scarce organizational resources from other programs to support their engagement in ongoing and upcoming NEPA processes.  For instance, with shorter timelines and higher standards for comment "specificity," Plaintiffs will need to devote new staff time and resources to effectively engage and support their members, supporters, and partners during important public comment periods.  For those Plaintiffs that have them, Plaintiffs' legal and technical staff will also need to spend additional time and resources preparing detailed information to demonstrate, among other things, that the host of significant environmental impacts associated with proposals to mine, drill, log, or conduct other activities on public lands have "a reasonably close causal relationship to the proposed action" and are not "remote in time, geographically remote, or the product of a lengthy causal chain."  This in turn will require Plaintiffs to recruit and retain experts who will need to work on compressed timelines.  For those organizations that do not have legal and technical staff, Plaintiffs' ability to participate in the new NEPA procedures will be dramatically compromised, and in some instances, impossible.  Additionally, by purporting to authorize federal agencies to require the posting of a bond in order to obtain a stay of agency action while NEPA issues remain under review, the Final Rule significantly increases the risk that Plaintiffs will be required to pay for a bond or other security to participate in the NEPA process.  Such expenses would, at minimum, divert funds away from other crucial conservation activities and may deter Plaintiffs and others with whom they associate from fully participating in NEPA

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

processes.  In the absence of the Final Rule, Plaintiffs would dedicate financial and staff capacity towards other organizational programs such as outreach to urban and communities of color, expanding recreational opportunities for youth, building a socially diverse conservation community, developing clean energy and just transition policy platforms, and advocating for congressional protection of wild places.

146.    NEPA expressly commands the federal government to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations."  42 U.S.C. § 4331(b)(1).  The aesthetic, conservation, organizational, recreational, professional, spiritual, and scientific interests of Plaintiffs and their members in ensuring that CEQ's regulations maintain the requirement to fully analyze and disclose to the public the potential environmental impacts of, and feasible alternatives to, federal agency actions, 42 U.S.C. § 4332(c), have been, are being, and, unless the relief prayed for is granted, will continue to be directly and adversely affected by the failure of Federal Defendants to comply with the law.

147.    Vacatur of the Final Rule would redress the injuries to Plaintiffs and their members and supporters by requiring federal agencies to continue conducting meaningful review of their actions' environmental impacts and providing opportunities for public participation in that process.

B.    Defendants

148.    Defendant Council on Environmental Quality is an agency within the Executive Office of the President.  CEQ oversees Federal agency NEPA implementation and develops and recommends national policies to the President that promote the improvement of environmental quality.

149.    Defendant Mary Neumayr is the Chair of the Council on Environmental Quality. Ms. Neumayr is sued in her professional capacity.  Ms. Neumayr was confirmed by the United

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 69 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

States Senate on January 2, 2019, and sworn in on January 10, 2019.  CEQ issued the Final Rule under the direction of Ms. Neumayr.

BACKGROUND

I.   THROUGH NEPA, CONGRESS INFUSED ENVIRONMENTAL AND PUBLIC HEALTH VALUES INTO ALL FEDERAL AGENCY ACTIONS AND DECISIONS.

A.   Congress Enacted NEPA To Address Overwhelming National Concern about Protection of the Environment and Public Health.

150.   The 1960s epitomized a period of rapid economic and social change and heralded the rise of the environmental movement.  Members of both political parties, urban and rural residents, and developers and preservationists all espoused the burgeoning conservation ethic in America.

151.   Seizing the moment of profound political change, the United States Congress hosted a joint House-Senate Colloquium on a "National Policy for the Environment" in July 1968.  Invited to participate in the Colloquium were interested members of the public, executive branch heads, and leaders of industrial, commercial, academic, and scientific organizations, with the purpose of "focusing on the evolving task the Congress faces in finding more adequate means to manage the quality of the American environment."

152.   The outcome of the day-long discussion was a Congressional White Paper on a National Policy for the Environment, published in October 1968.  Noting the near-consensus views expressed by those participating in the Colloquium, the Congressional White Paper explained that "in the recent past, a good deal of public interest in the environment has shifted from its preoccupation with the extraction of natural resources to the more compelling problems of deterioration in natural systems of air, land, and water.  The essential policy issue of conflicting demands has become well recognized."

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 70 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

153.     The Congressional White Paper explained that "If America is to create a carefully designed, healthful, and balanced environment, we must (1) find equitable ways of charging for environmental abuses within the traditional free-market economy; (2) obtain adequate ecological guidance on the character and impact of environmental change; (3) where corporate resource development does not preserve environmental values, then consider the extension of governmental controls in the larger public interest; (4) coordinate the Government agency activities, which share with industry the dominant influence in shaping our environment; and (5) establish judicial procedures so that the individual rights to a productive and high quality environment can be assured."

154.     The Congressional White Paper highlighted a number of additional issues that stakeholders agreed were essential and ripe for Congressional consideration in its development of a national environmental policy.  For example, Dr. Walter Orr Roberts, an atmospheric physicist and founder of the National Center for Atmospheric Research, explained the importance of considering climate change due to "[s]ubtle alterations of the chemical constitution of the atmosphere, through pollutants added in the form of trace gases, liquids, or solids, result from industrial activity or urbanization.  This is an area of biometeorology that has significance in every living person and yet we have not yet seen even the first beginnings of an adequately sustained research effort in this area."

155.     Russell Train, who would become the first Chair of the Council on Environmental Quality, testified that "[t]he urgent necessity of taking into account major environmental influences of foreign economic assistance and other international developments" in American environmental policy.  This was an urgent issue because "to speak about environmental quality without at least referring to the fact of the international components and consequences of even

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

our activity as Americans and considering our own acreage and our own problems with the environment, appears to ... be somewhat shortsighted," according to Dr. Dillon Ripley, the Secretary of the Smithsonian Institution.  In that way, America's national environmental policy needed to consider domestic as well as international environmental quality.

156.   Given the exigency facing the environment and Americans, Senator Henry Jackson "argued that new approaches to environmental management are now required, and urged the Colloquium to provide thoughts on the possible 'action-forcing' processes that could be put into operation" through congressional action.

B.   NEPA Requires All Agencies To Prioritize Protection of the Environment and Human Health.

157.   Congress enacted the National Environmental Policy Act in 1969, adopting nearly all of the Congressional White Paper's elements of a national policy for the environment and public health and heralding a new era of environmental awareness in America.

158.   Section 101 of NEPA sets forth a national policy "to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."  42 U.S.C. § 4331(a).

159.   Section 101 also gives federal agencies "continuing responsibility" to fulfill their role as a "trustee of the environment for succeeding generations"; assure all Americans have "safe, healthful, productive, and aesthetically and culturally pleasing surroundings"; "attain the widest range of beneficial uses of the environment" without degradation or risk; preserve "natural aspects of our national heritage"; "achieve a balance between population and resource

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 72 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   use"; and enhance renewable resources and "maximum attainable recycling of depletable

2   resources."  42 U.S.C. § 4331(b).

3       160.    Finally, Congress recognizes in Section 101 the right and responsibility of each

4   person to "enjoy a healthful environment and … to contribute to the preservation and

5   enhancement of the environment."  42 U.S.C. § 4331(c).

6       161.    Section 102 of NEPA applies the national policy set forth in Section 101 to

7   "proposals for … major Federal actions significantly affecting the quality of the human

8   environment."  42 U.S.C. § 4332(2)(C).  Specifically, Section 102 requires Federal agencies to

9   prepare a "detailed statement," which would soon become known as an environmental impact

10  statement or EIS, analyzing: (1) the environmental impact of the proposed action; (2) any

11  adverse effects that cannot be avoided; (3) alternatives to the proposed action; (4) the

12  relationship between local short-term uses of man's environment and the maintenance and

13  enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments

14  of resources that would be involved in the proposed action.  42 U.S.C. § 4332(2)(C).

15      162.    The congressional mandates set forth in Section 102 are to be implemented "to

16  the fullest extent possible."  42 U.S.C. § 4332(2)(C).  NEPA demands a "systematic,

17  interdisciplinary approach" to "insure the integrated use of the natural and social sciences."  42

18  U.S.C. § 4322(2)(A).  The statute also recognizes the need to ensure "unquantified

19  environmental amenities and values" are considered in agency decision-making.  42 U.S.C. §

20  4322(2)(B).

21      163.    NEPA also requires federal agencies to study and develop alternatives to

22  proposed actions, 42 U.S.C. § 4322(2)(E); to recognize the "worldwide and long-range character

23  of environmental problems" and "maximize international cooperation in anticipating and

24

25  COMPLAINT FOR DECLARATORY

26  AND INJUNCTIVE RELIEF - 73 -

preventing a decline in the quality of mankind's world environment," 42 U.S.C. § 4322(2)(F);

and make advice and information available to states, municipalities, and the public to be used in

"restoring, maintaining, and enhancing the quality of the environment."  42 U.S.C. § 4322(2)(G).

164.    Section 202 of NEPA establishes CEQ within the office of the President.  42

U.S.C. § 4342.  Among other things, the statute directs CEQ to "to develop and recommend to

the President national policies to foster and promote the improvement of environmental quality

to meet the conservation, social, economic, health, and other requirements and goals of the

Nation."  42 U.S.C. § 4344(4).

165.    Roughly half of U.S. states have modeled state laws based on NEPA, and its

example has been adopted by scores of nations around the world.

II.    COURTS INTERPRETING NEPA'S PLAIN LANGUAGE HELD THE STATUTE
       DEMANDS FULL DISCLOSURE OF THE ENVIRONMENTAL IMPACTS OF
       MAJOR FEDERAL ACTIONS AND PUBLIC COMMENT ON SUCH ACTIONS.

166.    As federal agencies began to implement NEPA in the absence of regulatory

direction in the first years after the law's enactment, courts stressed the broad requirements

Congress instilled in the statute.  In an early opinion, the D.C. Circuit confirmed "[t]he sweep of

NEPA is extraordinarily broad, compelling consideration of any and all types of environmental

impact of federal action."  *Calvert Cliffs' Coordinating Comm., Inc. v. U. S. Atomic Energy*

*Comm'n*, 449 F.2d 1109, 1122 (D.C. Cir. 1971); *see also id.* at 1114-15 (stressing "as forcefully

as possible" that the language "to the fullest extent possible ... does not provide an escape hatch

for foot-dragging agencies; it does not make NEPA's procedural requirements somehow

"discretionary"").

167.    Early circuit court opinions also addressed the purposes of an environmental

impact statement, *Silva v. Lynn*, 482 F.2d 1282, 1284–85 (1st Cir. 1973); the standards for

determining whether a project will have a "significant" impact and necessitate an environmental

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 74 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

impact statement, including the need to consider potential direct, indirect, and cumulative

environmental effects, *Hanly v. Kleindienst*, 471 F.2d 823, 830–31 (2d Cir. 1972); and the

importance of agency consideration of a robust range of alternatives, *Nat. Res. Def. Council, Inc.

v. Morton*, 458 F.2d 827 (D.C. Cir. 1972).

168.    The Ninth Circuit in 1975 further outlined the statutory obligation to consider the

indirect effects of agency action.  "[C]onsideration of secondary impacts may often be more

important than consideration of primary impacts. … A new highway located in a rural area may

directly cause increased air pollution as a primary effect.  But the highway may also induce

residential and industrial growth, which may in turn create substantial pressures on available

water supplies, sewage treatment facilities, and so forth."  *City of Davis v. Coleman,* 521 F.2d

661, 676–77 (9th Cir. 1975) (*quoting Scientists' Institute for Public Information v. A. E. C.*, 481

F.2d 1079, 1092 (D.C. Cir. 1973) and Fifth Annual Report of the Council on Environmental

Quality, 410-11 (December 1974)).

169.    In 1976, again before CEQ adopted any regulations, the U.S. Supreme Court

confirmed that comprehensive environmental review under NEPA required consideration of

long-term and cumulative effects.  The Court explained:

> Section 102(2)(C) [of NEPA] is one of the "action-forcing" provisions intended
> as a directive to all agencies to assure consideration of the environmental impact
> of their actions in decisionmaking.  By requiring an [environmental] impact
> statement Congress intended to assure such consideration during the development
> of a proposal or as in this case during the formulation of a position on a proposal
> submitted by private parties.  A comprehensive impact statement may be
> necessary in some cases for an agency to meet this duty.  Thus, when several
> proposals for coal-related actions that will have cumulative or synergistic
> environmental impact upon a region are pending concurrently before an agency,
> their environmental consequences must be considered together.  Only through
> comprehensive consideration of pending proposals can the agency evaluate
> different courses of action.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 75 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    *Kleppe v. Sierra Club*, 427 U.S. 390, 409–10 (1976) (citing Congressional Conference Report on

2    NEPA, 115 Cong. Rec. 40,416 (1969)).

3    III.      CEQ ENGAGED IN EXTENSIVE OUTREACH TO DEVELOP THE 1978 NEPA
           REGULATIONS.

4

5       170.      Prompted by the early case law interpreting NEPA, President Carter issued

Executive Order 11991 on May 24, 1977, directing CEQ to issue regulations that would guide all

6

7 agencies in implementing NEPA. *Relating to Protection and Enhancement of Environmental*

*Quality*, Exec. Order No. 11991, 42 Fed. Reg. 26, 967 (May 24, 1977). The Executive Order

8

9 was based on the President's Constitutional and statutory authority, including NEPA, the

Environmental Quality Improvement Act, and Section 309 of the Clean Air Act. In signing

10

11 Executive Order 11991, the President delegated this authority to the agency created by NEPA,

the Council on Environmental Quality. *Implementation of Procedural Provisions, Final*

12

13 *Regulations*, 43 Fed. Reg. 55,978 (Nov. 29, 1978) (codified at 40 C.F.R. Part 1500).

14       171.      Following President Carter's Executive Order, CEQ announced three days of

public hearings regarding how to best reform NEPA implementation and invited testimony from

15

16 a "broad array of public officials, organizations and private citizens, affirmatively involving

NEPA's critics as well as its friends." 43 Fed. Reg. at 55,980.

17

18       172.      After the hearings, CEQ "culled the record to organize both the problems and the

solutions proposed by witnesses into a 38-page "NEPA Hearing Questionnaire," which it then

19

20 sent "to all witnesses, every State governor, all Federal agencies, and everyone who responded to

an invitation in the Federal Register." 43 Fed. Reg. at 55,980. CEQ collated the responses to the

21

22 questionnaire for use in drafting its anticipated regulations.

23       173.      CEQ also met with every agency of the executive branch to discuss what should

be in the regulations, and it circulated an early draft of proposed regulations to all federal

24

25 COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 76 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

agencies in December 1977.  Further one-on-one consultation with agencies ensued, culminating

with a fourth draft of the proposed NEPA regulations sent to interested parties for comment.

Meanwhile:

> At the same time that Federal agencies were reviewing the early draft, [CEQ]
> continued to meet with, listen to, and brief members of the public, including
> representatives of business, labor, State and local governments, environmental
> groups, and others.  Their views were considered during this early stage of the
> rulemaking.  [CEQ] also considered seriously and proposed in our regulation
> virtually every major recommendation made by the Commission on Federal
> Paperwork and the General Accounting Office in their recent studies on the EIS
> process.

43 Fed. Reg. at 55,980.

174.    Following these extensive hearings and intergovernmental consultations, CEQ

published proposed regulations to implement NEPA in June 1978, with a 60-day public comment

period.  *National Environmental Policy Act Regulations; Proposed Implementation of

Procedural Provisions*, 43 Fed. Reg. 24,230 (June 9, 1978).  CEQ prepared a "special

environmental assessment" to accompany the rulemaking.  CEQ promulgated final regulations

on November 29, 1978 and the regulations became effective July 30, 1979.  43 Fed. Reg. at

55,978.

175.    Prior to the Final Rule at issue in this case, CEQ made only two modifications to

the 1978 regulations.  First, in 1986, CEQ revised a regulation regarding a "worst case analysis."

*National Environmental Policy Act Regulations; Incomplete or Unavailable Information*, 51 Fed.

Reg. 15,625 (April 26, 1986).  Second, in 2005, CEQ changed the address for filing copies of

EISs.  *Other Requirements of NEPA; Final Rule*, 70 Fed. Reg. 41,148 (July 18, 2005).

IV.    CEQ HAS ISSUED NEPA GUIDANCE AND REVIEWS FOR OVER 40 YEARS,
       NONE FINDING A NEED FOR MAJOR AMENDMENTS TO ITS REGULATIONS.

176.    Over the years, CEQ has issued additional guidance regarding the implementation

of NEPA and the 1978 regulations (as amended in 1986).  In particular, CEQ published its "40

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 77 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations" in the Federal Register in 1981. *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026 (March 23, 1981) (*Forty Questions*).

177.    Several congressional and presidential reviews of the regulations have occurred; but none have previously resulted in changes to the 1978 regulations.

178.    In 1981 during the Reagan Administration, CEQ requested public responses to 11 questions, ranging from the specific ("Is the scoping process used at an appropriate stage in the development of agency proposals?") to the general ("What day-to-day practices could be improved to assure better compliance with NEPA?"). *Agency Implementation of CEQ's NEPA Regulations; Request for Public Comment*, 46 Fed. Reg. 41,131 (Aug. 14, 1981). The comment period remained open for 60 days. After release of a summary of the comments in July 1982, a public meeting was held to solicit any additional comments or suggestions. The process resulted in guidance published in 1983 on five particular topics, but no changes to the regulations themselves. *Guidance Regarding NEPA Regulations*, 48 Fed. Reg. 34,263 (July 28, 1983).

179.    In 1997, CEQ published the study *The National Environmental Policy Act: A Study of Its Effectiveness After Twenty-Five Years* (Jan. 1997). The study built on input from some of the original framers of NEPA, members of Congress, state and local agencies, and federal agencies along with a major effort to include the public. Eleven separate groups of partners were established to provide input into this study: businesses, decision-makers, state and local governments, agencies, academicians, Congress, framers of NEPA, drafters of CEQ regulations, Native American tribes, lawyers and public interest/citizen groups. In coordination with CEQ, the Environmental Protection Agency ("EPA") conducted a survey of states regarding NEPA implementation. CEQ, EPA, and the North Carolina Department of Environment, Health

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 78 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

and Natural Resources held a regional conference to investigate the effectiveness of state-federal interaction in NEPA implementation.  The study concluded that "[o]verall, what we found is that NEPA is a success — it has made agencies take a hard look at the potential environmental consequences of their actions, and it has brought the public into the agency decision-making process like no other statute."  The 1997 report emphasized the importance of several factors in ensuring that the congressional intent of NEPA was met, including adequate agency training to implement the 1978 regulations, consideration of a robust range of alternatives, engaging the public early and often in the NEPA process, and the need to develop concise NEPA documents rather than lengthy reviews.

180.    At the same time, CEQ published its guidance on *Considering Cumulative Effects Under the National Environmental Policy Act* (Jan. 1997).  This guidance stated that "[e]vidence is increasing that the most devastating environmental effects may result not from the direct effects of a particular action, but from the combination of individually minor effects of multiple actions over time," highlighting the importance of this aspect of NEPA review.  The 1997 guidance explained how federal agencies may analyze their actions for cumulative effects; provided advice regarding inviting public scoping of and comment on cumulative effects; and included methods, tools, and techniques (including examples) for analyzing cumulative effects.  Nothing in the 1997 guidance suggested that consideration of cumulative effects was difficult, costly, or otherwise resulted in delays in project implementation.

181.    Most recently, the George W. Bush Administration's CEQ published "Modernizing NEPA Implementation" in December 2003.  The NEPA Task Force, *The NEPA Task Force Report to the Council on Environmental Quality: Modernizing NEPA Implementation* (September 2003).  The report was based on the work of a task force composed

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 79 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

of federal agency employees with diverse skills, expertise, and perspectives.  The Task Force

engaged with state, tribal, and local governments and public interest organizations in completing

its report.  CEQ took comments from the public at large for 75 days on the 2003 report.  The

report provided a number of recommendations for action by CEQ, but did not commence

rulemaking to change the 1978 regulations.

## V.  NEPA PROMOTES ENVIRONMENTAL JUSTICE.

182.    Guided by CEQ's 1978 regulations, NEPA became a crucial tool for public

engagement and better governmental decision-making in the fight against environmental racism.

NEPA and the 1978 regulations promote environmental justice by requiring federal agencies to

include a proposed project's potential environmental, economic, and public-health impacts on

low-income communities, communities of color, and rural communities.  One of the visionary

elements of NEPA was its creation of broad opportunities for public participation in government

decisions that affect communities and their environment.

183.    In 1994, President Clinton issued Executive Order 12898, *Federal Actions to

Address Environmental Justice in Minority Populations and Low-Income Populations*, Exec.

Order No. 12898, *codified at* 3 C.F.R. § 859 (1995), *reprinted as amended in* 42 U.S.C. § 4321

(1998).  Executive Order 12898 directs federal agencies to make environmental justice part of

their mission, and to identify and address the disproportionate environmental and health effects

of their activities on communities of color and low-income populations.  The Executive Order

also requires agencies to ensure effective public participation and access to information.

184.    The Presidential Memorandum accompanying the Executive Order directs all

agencies to utilize NEPA to analyze environmental, health, economic, and social effects of

federal actions, including effects on communities of color and low-income communities; develop

mitigation measures that address significant effects of actions on communities of color and low-

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 80 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   income communities; and to provide opportunities for public input in decision-making.  Most

2   importantly, agencies must provide opportunities for effective community participation in the

3   NEPA process.

4   185.   Executive Order 12898 recognized the importance of gathering data and

5   conducting research to identify and address disproportionately high and adverse health,

6   environmental, social, and economic effects of federal agency programs and policies on

7   communities of color and low-income communities.  Public participation is an integral part of

8   addressing environmental justice concerns.  The Presidential Memorandum also makes clear that

9   any NEPA document should "address significant and adverse environmental effects of proposed

10  federal actions on minority populations, low-income populations, and Indian Tribes."

11  Furthermore, each federal agency must provide opportunities for effective community

12  participation in the NEPA process through consultation with affected communities and

13  improving the accessibility of public meetings, crucial documents, and notices.

14  186.   CEQ has repeatedly published guidance documents on how to include

15  environmental justice in NEPA analyses.  In 1997, in consultation with EPA and other agencies,

16  CEQ developed guidance to "further assist Federal agencies with their NEPA procedures so that

17  environmental justice concerns are effectively identified and addressed."  *Environmental Justice*

18  *– Guidance Under the National Environmental Policy Act* (1997).  CEQ recognized that

19  environmental justice issues may arise during federal decision-making and should be considered

20  at any step in the NEPA process, and courts have noted that "[e]nvironmental justice is not

21  merely a box to be checked."  *Friends of Buckingham v. State Air Pollution Control Bd.*, 947

22  F.3d 68, 92 (4th Cir. 2020).

23

24

25  COMPLAINT FOR DECLARATORY

26  AND INJUNCTIVE RELIEF - 81 -

1    187.    In 2016, a Federal Interagency Working Group issued a report on how better to

2    implement environmental justice in the NEPA process: *Promising Practices for EJ*

3    *Methodologies in NEPA Reviews*.  CEQ and other agencies recognized that engaging community

4    members early and often informs an agency's decision-making process, benefitting agencies by

5    communicating their objectives for the proposed activity.  The interagency report recognized that

6    communities have varying levels of access to information, and instructed agencies to "consider

7    providing notice to the public (as appropriate) of the meeting date(s) and time(s) well in advance

8    and through methods of communication suitable for minority and low income populations."

9    Furthermore, when addressing impacts on environmental justice communities, the report stressed

10   that NEPA requires agencies to consider three types of effects or impacts: direct, indirect, and

11   cumulative impacts, and that agencies should be mindful that environmental justice communities

12   may be differently affected by past, present, or reasonably foreseeable future impacts—that is,

13   cumulative effects—than the general population.

14   VI.    THE PRESIDENT'S 2017 INFRASTRUCTURE DIRECTIVE AND CEQ'S 2018
        ADVANCE NOTICE OF PROPOSED RULEMAKING.

15

16       188.    On August 15, 2017, the President issued Executive Order 13807, entitled

17   "Establishing Discipline and Accountability in the Environmental Review and Permitting

18   Process for Infrastructure Projects."  *Establishing Discipline and Accountability in the*

19   *Environmental Review and Permitting Process for Infrastructure Projects*, 82 Fed. Reg. 40,463

20   (Aug. 24, 2017).  The Executive Order emphasized an alleged need for greater efficiency in

21   environmental reviews of infrastructure projects, defined to include "pipelines," "energy

22   production and generation," and "electricity transmission."  For example, the Order noted the

23   importance of "using CEQ's authority to interpret NEPA to simplify and accelerate the NEPA

24

25   COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 82 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

review process" and sought "expedited environmental review for the development of energy infrastructure projects."  *Id*. at 40,468.

189.    In response to the Executive Order, CEQ announced its intention to review existing NEPA regulations to "identify changes needed to update and clarify those regulations" in September 2017.  *Initial List of Actions To Enhance and Modernize the Federal Environmental Review and Authorization Process*, 82 Fed. Reg. 43,226 (Sept. 14, 2017).

190.    On June 18, 2018, CEQ issued an "advance notice of proposed rulemaking ("ANPRM") indicating that CEQ was proposing to amend the longstanding CEQ regulations governing NEPA.  *Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act; Advanced Notice of Proposed Rulemaking*, 83 Fed. Reg. 28,591 (June 20, 2018).

191.    The ANPRM gave little or no indication of what revisions CEQ was considering. Instead, it asked a series of twenty open-ended questions about whether various features of the existing regulations should be amended, and if so, how.

192.    Plaintiffs and others responded with detailed comments explaining why the CEQ regulations should not be amended.  Instead, the vast majority of the public comments explained how NEPA was successful in meeting its goals, and offered suggestions as to how implementation of NEPA could be improved to increase efficiency without undermining those goals.  The purported problems that CEQ sought to address, Plaintiffs and others explained, were a product of external factors such as inadequate training, funding, and implementation of the existing regulations and would not be solved by amending and weakening the CEQ regulations themselves.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 83 -

VII.   CEQ PROPOSED SIGNIFICANT CHANGES TO THE 1978 REGULATIONS THAT
CONFLICT WITH CONGRESSIONAL INTENT IN ENACTING NEPA.

193.   On January 10, 2020, CEQ issued its proposed revision to its implementing

regulations in a Notice of Proposed Rulemaking in the Federal Register ("Proposed Rule").

*Update to the Regulations Implementing the Procedural Provisions of the National*

*Environmental Policy Act; Notice of Proposed Rulemaking*, 85 Fed. Reg. 1,684 (Jan. 10, 2020).

The Proposed Rule aimed to "comprehensively update and substantially revise" the longstanding

1978 CEQ regulations, touching virtually every aspect of them.  Taken as a whole, the Proposed

Rule sought to transform NEPA from a sweeping infusion of environmental values and

environmental justice into federal decision-making to an expedited paperwork exercise designed

primarily to limit NEPA's reach, reduce public involvement, and narrow the scope of what

environmental consequences of federal agency actions are considered by federal agencies in

direct contravention to the statutory command to implement NEPA "to the fullest extent

possible."

194.   In virtually every instance where CEQ proposed changes, the effect was to

undermine NEPA or create ambiguity about the applicability and scope of NEPA review.  The

Proposed Rule contained changes that undermined NEPA's policies, including by deleting prior

regulatory language focused on the policy-driving, action-forcing congressional mandate.  In

other places, the Proposed Rule replaced the word "possible" with the word "practicable."

195.   The Proposed Rule also advanced changes to reduce the scope of NEPA's

applicability, limiting the number and types of federal actions that are subject to NEPA.  For

example, the Proposed Rule ignored longstanding regulatory and judicial precedent that the

adjective "major" in front of "federal action" reinforces but does not have independent meaning

from the qualifier "significantly."  In other words, the Proposed Rule refocused on the extent of

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 84 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

federal "control" rather than the extent and nature of the impacts of federal actions to the environment.  The Proposed Rule compounded this mistake by asserting that federal financial assistance does not qualify as a "major federal action" if the agency did not retain an undefined level of "control and responsibility" over the effects of the action.

196.    Additionally, the Proposed Rule proposed to add a new "functional equivalency" test, allowing NEPA to be waived if there was some other environmental review process associated with the project.  Nothing in the Proposed Rule set any meaningful boundaries on such use, meaning that alternative reviews with lower environmental standards and less robust public processes could be used to avoid the application of NEPA.  Even the example offered by CEQ—a Regulatory Impact Analysis ("RIA") required by an Executive Order—proved the point: an RIA focuses on economic cost-benefit analysis, rather than review of environmental impacts and potential alternatives.

197.    The Proposed Rule announced a new definition of "significance" that would reduce the number of actions deemed substantial enough to trigger the preparation of an environmental impact statement.  The Proposed Rule similarly eliminated language prohibiting "piecemealing" or segmentation of agency actions by breaking them into individually less significant or relatively minor component parts, and it expanded the scope and application of "categorical exclusions," a mechanism to simplify NEPA compliance for actions that did not individually or cumulatively have a significant effect on the environment.

198.    In addition to narrowing the type of actions to which NEPA applied in the first instance, the Proposed Rule also significantly limited the scope of environmental review for those actions that still triggered NEPA compliance.  Of particular concern, the Proposed Rule categorically eliminated the requirement to consider cumulative effects and eliminated any

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 85 -

obligation to consider indirect effects.  Under the 1978 CEQ regulations and longstanding

judicial interpretation, cumulative effects constitute an "impact on the environment which results

from the incremental impact of the action when added to other past, present, and reasonably

foreseeable future actions," regardless of what agency (Federal or non-Federal) or person

undertakes such other actions, while indirect effects are those effects that are "caused by the

action and are later in time or farther removed in distance, but are still reasonably foreseeable."

Indirect and cumulative effects are critical components of environmental impacts that must be

considered under NEPA.  In many cases, they are the most important issues of concern to the

public and other stakeholders.

199.    While there are many reasons why the consideration of indirect and cumulative

effects is essential to sound decision-making, the failure to consider such effects is especially

harmful with regard to the issue of climate change, both in terms of a proposed action's

greenhouse gas emissions that contribute to it, as well as how a changing climate could affect a

proposed action or the location where the action takes place.  As many agencies and courts have

recognized, climate change is the ultimate "cumulative effect," because it arises from the

aggregate of countless actions over time and around the world.  CEQ in the past has issued

guidance on how to include climate change in NEPA analyses, and courts have been repeatedly

called on to interpret agencies' duties in this regard.  By eliminating the review of cumulative

and indirect effects, the Proposed Rule attempted to relieve agencies of the duty to consider

climate change related impacts in their NEPA analyses.

200.    The Proposed Rule also undermined the analysis of environmental justice impacts

without explanation.  Environmental justice addresses the disproportionate impact of pollution

and environmental degradation on people of color and low-income communities.  Cumulative

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 86 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

impact analysis is essential to identifying whether and how low income and frontline

communities of color may be overburdened by the additive environmental impacts of a proposed

federal action, particularly actions that contribute air, land, and water pollution to the

environment.  By eliminating cumulative impact review, the Proposed Rule allowed agencies to

sidestep considering environmental justice impacts.  CEQ also failed to conduct an

environmental justice analysis of the Proposed Rule under Executive Order 12898, *Federal

Actions To Address Environmental Justice in Minority Populations and Low-Income

Populations*, 59 Fed. Reg. 7,629 (Feb. 11, 1994).

201.    The Proposed Rule limited the discussion of alternatives, the "heart" of the EIS

process.  *Forty Questions; Answer to Question 7*, 46 Fed. Reg. at 18,026.  Indeed, the Proposed

Rule explicitly struck regulatory language declaring as much.  Instead, the Proposed Rule sought

to constrain the range of alternatives considered in an EIS, providing that federal agencies did

not need to consider alternatives not within the jurisdiction of the lead agency—in contravention

of precedent and governing caselaw.  *NRDC v. Morton*, 458 F.2d 827, 834 (D.C. Cir. 1972)

(noting that the reasonableness requirement does not limit the agency to evaluate only measures

within its jurisdiction); *see EDF v. U.S. Army Corps of Engineers*, 492 F.2d 1123, 1135 (5th Cir.

1974) (agreeing with the D.C. Circuit that there is no statutory restriction that limits "an agency

to consideration of only those alternatives that it could adopt or put into effect").

202.    The Proposed Rule included a series of provisions that would raise barriers to

public participation, limit the requirements for agencies to engage with the public and respond to

comments, and eliminate protections against conflicts of interest.  The Proposed Rule eliminated

restrictions on project proponents writing their own environmental reviews, stripped references

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 87 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

to public participation from regulations, eliminated the requirement for public comments at the scoping stage for EAs.

203.    The Proposed Rule also included provisions intended to raise the bar on public comment, effectively allowing agencies to ignore comments that do not meet an arbitrary technical standard of precision.  Many commenters, especially members of the public, may have useful environmental, cultural, social, or other knowledge that should be brought to bear in agency decision-making, but lack the technical knowledge to express that information consistent with the Proposed Rule.  Simultaneously, the Proposed Rule reduced requirements that the agency respond to comments with detailed explanation and citation to authorities.  In other words, the Proposed Rule raised the bar for the public in commenting during the NEPA process while it lowered the bar for agencies to respond to comments.

204.    Finally, the Proposed Rule contained several elements which were directed at limiting judicial review of agency compliance with NEPA, for example, redefining "final agency action" for purposes of APA review to exclude an agency's failure to act and stating that "it is the Council's intention that the regulations ... create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm."

205.    In sum, the Proposed Rule fundamentally mischaracterized, and attempted to fundamentally rewrite, the statutory purpose and goals of NEPA.  It proposed to substantially reduce both the breadth and depth of NEPA analysis, and to eviscerate available remedies for inadequate agency compliance.  Instead of centering environmental values and sound decision-making at the heart of the environmental and public health review process, the Proposed Rule elevated private interests and resource exploitation.  The Proposed Rule proposed to reverse

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 88 -

1  longstanding positions accepted by CEQ, other agencies, and the courts for decades without

2  explanation or a basis in fact or law.

3  VIII.  DESPITE OVERWHELMING OPPOSITION TO THE PROPOSED RULE, CEQ
       RUSHED TO ISSUE A FINAL RULE THAT EVISCERATED NEPA.

4

5      206.   The Proposed Rule ran for nearly 50 pages in the Federal Register and touched on

6  virtually every aspect of the longstanding prior regulations, yet CEQ only offered 60 days for

7  public comment.  Hundreds of states, Tribes, organizations, and others—including 167 members

8  of the United States Congress—formally requested additional time to comment; CEQ denied all

9  extension requests.

10     207.   CEQ only held two public hearings on the Proposed Rule, one in Denver,

11  Colorado and one in Washington, D.C.  Speaking slots were made available during a 90-minute

12  window, in advance, through a web-based registration system.  After the online registration

13  system opened, all available speaking slots filled within a few minutes.  The vast majority of

14  people who wished to provide oral comment were not able to do so.  Again, many members of

15  the public requested additional hearings in vain.

16     208.   Despite the truncated process and the impacts of the global COVID-19 pandemic

17  on every aspect of people's lives, CEQ received over one million public comments, a significant

18  number of them containing detailed and comprehensive analyses explaining the significant harm

19  that would arise from the proposal.  Opposition came from states and state agencies, Tribes, and

20  a broad swath of public interests such as environmental protection, environmental justice, human

21  health, public lands, and outdoor recreation groups, as well as former Chairs and staff of CEQ

22  under both Republican and Democratic administrations.  Plaintiffs submitted detailed comments

23  on the proposal.

24

25  COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 89 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

209.    CEQ closed the comment period for the Proposed Rule on March 10, 2020.  CEQ

released a pre-publication version of the Final Rule on July 15, 2020.  The Final Rule was

published in the Federal Register on July 16, 2020.  85 Fed. Reg. 43,304.  Despite CEQ's prior

statement that the Proposed Rule was only an update to the 1978 regulations, in announcing the

Final Rule, President Trump declared that the new regulations were a "top to bottom overhaul"

intended to bolster America "as a nation of builders."

IX.    CEQ'S FINAL RULE MADE ONLY MINOR CHANGES TO THE PROPOSED RULE.

210.    Aside from small changes such as altering verb tense and other technical

corrections, the Final Rule closely mirrors the content of the Proposed Rule.

211.    The Final Rule only requires agencies to consider environmental information and

"inform" the public regarding an agency decision.  40 C.F.R. §§ 1500.1(a), 1503.1(2)(v),

1507.3(f)(3) (2020).  The Final Rule deleted language that NEPA should be implemented "to the

fullest extent possible."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.2 (1978).[2]

212.    The Final Rule prohibits agencies from imposing any more stringent procedures

or requirements beyond that required by the Final Rule.  40 C.F.R. 1507.3(b) (2020).  It deleted

language stating that an EIS is an "action forcing" document intended to ensure NEPA's goals

are "infused" into programs and activities of the Federal government.  40 C.F.R. 1502.1 (2020).

213.    The Final Rule replaces the word "possible" in the 1978 regulations with the word

"practicable," weakening existing requirements and providing agencies with open-ended

discretion to refuse to comply with requirements if they are inconvenient or cumbersome.  *See,*

*e.g.,* 40 C.F.R. §§ § 1500.2, 1501.2(b)(2), 1501.5(d), 1501.7(g), (g)(1), (g)(2), (i), (j),

---

[2] The following citations to the 1978 regulations include changes made to 40 C.F.R. § 1502.22 in
1986.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 90 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1501.8(b)(1), (b)(6), (b)(8), 1501.9(a), (b), 1502.5(b), 1502.9(b), 1502.11(g), 1505.2(g)(3), 1506.2(b), (c), 1506.4, 1506.2(b), (c) (2020).

214.   The Final Rule limits the number and nature of federal actions that are subject to NEPA.  For example, the Final Rule departs from longstanding regulatory and judicial precedent that the adjective "major" in front of "federal action" reinforces but does not have independent meaning from the qualifier "significantly."  40 C.F.R. § 1508.1(q) (2020).

215.   The Final Rule asserts that federal financial assistance does not qualify as a "major federal action" if the agency does not retain an undefined level of "control and responsibility" over the effects of the action, in a manner that is inconsistent with judicial precedent, creates confusion, and invites abuse by applicants. 40 C.F.R. § 1508.1(q) (2020).

216.   The Final Rule narrowed the definition of "major federal action" even further by deleting language that defines "action" to include circumstances where an agency "fails to act" and that failure is reviewable under the APA.  40 C.F.R. § 1508.1(q)(1)(iii) (2020).

217.   The Final Rule allows federal agencies to waive NEPA if other review processes are either associated with or required for the project.  40 C.F.R. §§ 1501.1(a)(6) (2020), 1506.2, 1506.4, 1506.5, 1506.9, 1506.11(e), 1507.3(c)(5), (d)(6).

218.   The Final Rule allows federal agencies to circumvent NEPA by authorizing agencies, in their discretion, to determine that other statutes or directives conflict with NEPA.  40 C.F.R. §§ 1501.1(a)(2), (a)(3), § 1507.3(d)(2) (2020).  However, Congress did not delegate federal agencies authority to interpret "whether compliance with NEPA would clearly and fundamentally conflict with the requirements of another statute," or "whether compliance with NEPA would be inconsistent with Congressional intent expressed in another statute."  This is

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 91 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

also inconsistent with NEPA's statutory directive to apply the law to "the fullest extent possible," as well as judicial precedent prohibiting such a narrow reading of NEPA.

219.    The Final Rule exempts certain categories of federal actions from the definition of "major federal action," including actions that have long been understood to trigger NEPA review, such as "loans, loan guarantees and other forms of financial assistance." 40 C.F.R. § 1508.1(q)(1)(vii) (2020).  Similarly, the Final Rule characterizes the "action" for treaties and international conventions such that NEPA compliance would only be required for implementation of treaties and international conventions or agreements, 40 C.F.R. § 1508.1(q)(3)(i) (2020); the Final Rule eliminated the ratification of treaties from the definition of "proposals for legislation." 40 C.F.R. § 1508.17 (1978).

220.    The Final Rule eliminates language from the 1978 regulations that programmatic EISs are sometimes required and language that they are specifically required under certain circumstances. 40 C.F.R. § 1502.4(b) (2020).

221.    The Final Rule eviscerates the regulatory definition of "significance," which will reduce the number of actions deemed significant enough to trigger the preparation of an environmental impact statement. *Compare* 40 C.F.R. §§ 1501.3(a)(2) (2020), (b)(1), 1501.5(a), 1502.16(a)(1) *with* 40 C.F.R. §§ 1508.27 (1978), 1508.8.  Specifically, the Final Rule eliminates the consideration of critical concerns like context, cumulative effects, scientific controversy, and effects to listed species from the evaluation of a federal action's significance. *Id.*

222.    The Final Rule no longer prohibits the "piecemealing" or segmentation of agency actions by breaking them into individually less significant or relatively minor component parts. *Compare* 40 C.F.R. § 1501.3(b) (2020), 1501.9(e)(1) *with* 40 C.F.R. §§ 1508.25(a)(1) (1978), (a)(2), (a)(3).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 92 -

223.    The Final Rule substantially expands the scope and application of "categorical exclusions," normally a mechanism to simplify NEPA compliance for actions that do not individually or cumulatively have a significant effect on the environment. *Compare* 40 C.F.R. § 1508.1(d) (2020) *with* 40 C.F.R. § 1508.4 (1978).  Instead, the Final Rule eliminates key factors that previously prevented the use of categorical exclusions for actions that "individually or cumulatively" may have impacts to the environment. *Id.*  Regardless of whether extraordinary circumstances exist, the Final Rule allows federal agencies, in their sole discretion, to use a categorical exclusion if there are "circumstances that lessen the impacts or other conditions sufficient to avoid significant effects;" but does not require the utilization of these other "circumstances" or "conditions."  40 C.F.R. § 1501.4(b)(1) (2020).  The Final Rule allows agencies to apply a different agency's categorical exclusion, a sweeping expansion of what should be a narrow exception tailored to a specific federal agency and its mission-specific undertakings. *Id.* at §§ 1506.3(d) (2020), 1507.3(f)(5).

224.    The Final Rule authorizes multiple exceptions to the general rule that action may not be taken to advance a proposal pending finalization of the NEPA process, thereby allowing agencies and private applicants to commit resources before a decision is made (including without public comment), and "steamroll" decisions before environmental analysis is complete and the information shared with the public.

225.    The Final Rule eliminates the requirement that agencies consider both "cumulative" and "indirect" effects from NEPA analysis. *Compare* 40 C.F.R. § 1508.1(g)(3) (2020) *with* 40 C.F.R. §§ 1502.16(b) (1978), 1508.25(c), 1508.4, 1508.7, 1508.8, 1508.27(b)(7).  Indirect and cumulative effects are critical components of environmental impacts and in many cases, they are the most important issues of concern to the public and other stakeholders.  For

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 93 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

example, allowing agencies to forgo consideration of cumulative and indirect effects will have profound adverse effects on the environment, particularly on the global climate, which is the ultimate example of indirect effects aggregated into cumulative effects.  A robust indirect and cumulative effects analysis is essential to preventing the disproportionate impact of pollution and environmental degradation on people of color and low-income communities.

226.    The Final Rule only requires NEPA to consider effects that have a "reasonably close causal relationship" with the proposed action, ruling out effects that are "remote in time and space" or "the product of a lengthy causal chain."  40 C.F.R. § 1508.1(g) (2020).  Terms such as "reasonably close" and "lengthy" were not defined, inviting agencies to ignore decades of judicial and regulatory precedent interpreting the scope of review by claiming that foreseeable impacts do not have a "reasonably" close causal relationship to the proposed action. Without any standard against which to gauge these determinations, public and judicial accountability will be undermined, and efficiency in agency decision-making will not occur.

227.    The Final Rule adopts a new definition of "reasonably foreseeable" that imports tort law concepts by linking impacts to what a "person of ordinary prudence" would consider "likely."  40 C.F.R. §§ 1508.1(g), (aa) (2020).  But federal agencies using NEPA to evaluate risks and impacts are not "ordinary people:" they purport to be expert agencies applying technical analysis under standards developed over decades of experience.  The new regulation will allow agencies to ignore impacts that are truly "foreseeable," simply because they may beyond the ken of an "ordinary" person.

228.    The Final Rule limits the scope of NEPA's application to domestic federal agency actions, regardless of whether those actions have extraterritorial effects.  40 C.F.R. §

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 94 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1508.1(q)(1)(i) (2020).  This regulation is inconsistent with NEPA's statutory directive to "recognize the worldwide and long-range character of environmental problems."

229.    The Final Rule does not require federal agencies to seek out and include information regarding the adverse impacts of federal agency actions, an important departure from the 1978 regulations.  40 C.F.R. § 1502.21 (2020).  Instead, the duty to obtain information is waived if the cost of doing so is "unreasonable," an undefined term that invites abuse and provides no standards against which to evaluate compliance.  *Id.*  The Final Rule further asserts that agencies do not need to undertake "new scientific and technical research" to inform an EIS, *id.* at § 1502.23 (2020), in contravention to decades of precedent identifying the importance of new research when needed to accomplish NEPA's goals.  Without this information, the environmental consequences of many federal actions will be unknown, in contravention to the congressional intent of NEPA.

230.    The Final Rule also limits the discussion of alternatives, which has always represented the "heart" of the EIS process: indeed, the Final Rule strikes this keystone language from the 1978 regulations.  40 C.F.R. § 1502.14 (2020).  The Final Rule constrains the range of alternatives considered in an EIS, providing that federal agencies need not consider alternatives not within the jurisdiction of the lead agency, *compare* 40 C.F.R. § 1502.14 (2020) *with* 40 C.F.R. § 1502.14(e) (1978), in contravention of precedent and governing caselaw.

231.    The Final Rule revises the definition of "purposes and need" to highlight the applicant's preferred project purpose, 40 C.F.R. § 1502.13 (2020), diminishes the role of alternatives, *id.* at § 1502.14 (2020), and redefines "reasonable alternatives" such that alternatives focus on the needs of the applicant rather than the public and federal agency involved, *id.* at § 1508.1(z) (2020).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 95 -

1    232.    The Proposed Rule required contractors to execute a disclosure statement

2  specifying that they have no financial or other interest in the outcome of the project.  In one of

3  the only substantive changes to the Proposed Rule, the Final Rule instead requires contractors to

4  submit a disclosure statement to the lead agency that specifies any financial or other interest in

5  the outcome of the action.  40 C.F.R. § 1506.5(b)(4) (2020).  Thus, the Final Rule authorizes

6  conflicts of interest, so long as they are disclosed to the federal agency; but there is no

7  requirement that the public be informed of a contractor's conflict of interest.  *Id.*

8    233.    The Final Rule undermines public participation in the NEPA process, even though

9  public involvement is one of NEPA's "twin aims."  For example, the Final Rule eliminates a

10  requirement to circulate draft EISs that satisfy NEPA standards, meaning that agencies could

11  circulate incomplete or misleading draft EISs that undercut the public's ability to comment.  40

12  C.F.R. § 1502.9 (2020).  The Final Rule eliminates the scoping process for EAs, an important

13  step that allows the public to provide comment to federal agencies regarding developing

14  alternatives for further review.  *Id.* at § 1501.9(a).  The Final Rule imposes a 30-day timeline for

15  comment on Final EISs, even in instances where there are changes in the project considered in a

16  draft EIS, with no discretion for extensions, *id.* at § 1506.11, and eliminates a requirement in the

17  1978 regulations that EISs be available for 15 days before a public hearing, allowing agencies to

18  schedule hearings without allowing the public meaningful time to review EISs prior to such a

19  hearing.  40 C.F.R. § 1506.6(c)(2) (1978).

20    234.    The Final Rule imposes obligations on the public to provide technically specific

21  and detailed comments on an agency action, but many commenters, including Plaintiffs, have

22  useful environmental, cultural, social, or other knowledge that should be brought to bear in

23  agency decision-making, but lack the technical knowledge to express that information consistent

24

25  COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 96 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

with the undefined requirements of the Final Rule.  40 C.F.R. § 1503.3 (2020).  Commenters must not only provide "data sources and methodologies supporting the proposed changes" to a proposed agency action, but also comment on the "economic and employment impacts" of that change, issues that they may or may not have anything to say, or the expertise and resources to bring to bear.  *Id*. at § 1503.3(a).

235.    The Final Rule allows agencies to respond to public comments without detailed explanation and citation to authorities, 40 C.F.R. § 1503.4 (a)(5) (2020), makes responding to comments permissive rather than obligatory by changing "shall" to "may," *id.* at § 1503.4 (a), and broadens the agency's discretion to respond to substantive public comments generically rather than specifically, *id.* at §§ 1503.4 (a), (a)(5).  The Final Rule eliminates the requirement that a federal agency "assess and consider" public comments and instead allows a brief summary of comments, *id*. at §§ 1503.4(a), § 1502.17, replaces the requirement to assess and consider comments with a statement "certifying" that the agency "considered" the comments, *id.* at § 1505.2, and in an effort to shift the burden for judicial review, imposes a "conclusive presumption" that an agency has considered all comments and other information during the comment process, *id.* at § 1505.2(b).  Coupled with the changes to the public's comment obligations, these changes raise the bar for the public in commenting during the NEPA process while lowering the bar for agencies to respond to those comments.

236.    The Final Rule imposes arbitrary and unworkable page and time limits, which will undermine the NEPA process and increase conflict and litigation around NEPA reviews rather than promoting efficiency.  40 C.F.R. §§ 1501.5(f) (2020), § 1501.10, § 1502.7, § 1508.1(v).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 97 -

237.    The Final Rule redefines "final agency action" for purposes of APA review to limit reviews of NEPA compliance where no "record of decision" or formal decision document is created, for example, where an agency fails to undertake an otherwise required environmental analysis (e.g., a failure to act). 40 C.F.R. § 1508.1(q)(1)(iii) (2020). The effort is contrary to settled precedent and serves only to unlawfully constrain judicial review.

238.    Contrary to judicial precedent disfavoring the practice, the Final Rule allows agencies to impose "bond and security" requirements on plaintiffs seeking administrative and judicial review of agency decisions. 40 C.F.R. § 1500.3(c) (2020). Plaintiffs will be required to divert organizational assets in order to participate in a public review process guaranteed by statute.

239.    The Final Rule states that "it is the Council's intention that the regulations ... create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm" and that "it is also the Council's intention that minor, nonsubstantive errors that have no effect on agency decision-making shall be considered harmless and shall not invalidate an agency action." 40 C.F.R. § 1500.3(d). The Final Rule misstates current law, and impinges upon the role of the judiciary to assess whether a party has demonstrated irreparable harm and whether a legal violation is "harmless error."

240.    The Final Rule is a sweeping alteration of the legal framework for environmental review and public engagement.

241.    The effective date of the Final Rule is September 14, 2020.

242.    The Final Rule states that "No more than 12 months after September 14, 2020 ... each agency shall develop or revise, as necessary, proposed procedures to implement the regulations in this subchapter, including to eliminate any inconsistencies with the regulations in

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 98 -

this subchapter ... Except for agency efficiency (see paragraph (c) of this section) or as otherwise required by law, agency NEPA procedures shall not impose additional procedures or requirements beyond those set forth in the regulations in this subchapter."  40 C.F.R. § 1507.3(b).

CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF

Violation of the National Environmental Policy Act and the Administrative Procedure Act:
Failure to Prepare an EA or EIS

243.     Plaintiffs re-allege, as if fully set forth herein, every allegation contained in the preceding paragraphs.

244.     NEPA is America's "basic national charter for protection of the environment."  40 C.F.R. § 1500.1 (1978).  NEPA requires all agencies of the federal government to prepare a "detailed statement" analyzing the environmental effects of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  This statement is commonly known as an environmental impact statement.

245.     Under the CEQ regulations in effect while CEQ considered, proposed, and promulgated the Final Rule, a "major federal action" upon which an EIS may be required included "new or revised agency rules [and] regulations."  40 C.F.R. § 1508.18(a) (1978).  The environmental effects that must be considered in an EIS include "indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," as well as direct effects.  40 C.F.R. § 1508.8 (1978).  An EIS must also consider the cumulative impacts of the proposed action, that is, the environmental impacts that result "from the incremental impact of the action when added to other past, present, and reasonably

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 99 -

1   foreseeable future actions."  40 C.F.R. § 1508.7 (1978); *see also* 40 C.F.R. § 1508.27(b)(7)

2   (1978).

3   246.   The purpose of an EIS is to inform federal agency decision-makers as well as the

4   public of the significant environmental impacts of the proposed action, means to mitigate those

5   impacts, and reasonable alternatives that may have reduced environmental effects.

6   247.   CEQ is a federal agency subject to NEPA.

7   248.   CEQ's issuance of the Final Rule is a "major federal action significantly affecting

8   the quality of the human environment."  42 U.S.C. § 4332(2)(C).

9   249.   In issuing the Final Rule, CEQ did not prepare an EA, EIS, or any NEPA

10  documentation at all.  Responding to the fact that CEQ prepared "special environmental

11  assessments" for the original 1978 regulations and 1986 amendment, CEQ noted that "long-prior

12  voluntary decisions do not forever establish that CEQ has an obligation to apply the CEQ's

13  regulations to changes to those regulations."  85 Fed. Reg. at 43,353.  Instead, CEQ insisted that

14  because the Final Rule "would not authorize any activity or commit resources to a project that

15  may affect the environment," preparation of an EA or EIS was not required.  *Id.* at 43,354.  CEQ

16  also stated that preparing an EA for the Final Rule "would not meaningfully inform CEQ or the

17  public," and that there was no precedent for applying the 1978 regulations "to a rule that revises

18  those same regulations."  *Id.*

19  250.   Because the Final Rule is a major federal action significantly affecting the quality

20  of the human environment within the meaning of 42 U.S.C. § 4332(2)(C), CEQ violated NEPA

21  by failing to prepare and circulate either an EA or an EIS for public comment prior to the

22  publication of the Final Rule.  Public comments on the Proposed Rule, including comments

23  submitted by Plaintiffs, highlighted the significant environmental impact that will result from

24

25  COMPLAINT FOR DECLARATORY

26  AND INJUNCTIVE RELIEF - 100 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

CEQ's decision to adopt the Final Rule. For example, the Final Rule will have a significant environmental impact because it substantially reduces the scope and applicability of NEPA to meet the explicit goal of expediting development and resource extraction projects as directed by EO 13807. Indeed, CEQ promulgated the Final Rule to achieve EO 13807's mandate to streamline federal approvals for consequential, high-impact projects like pipelines and energy generation, production, and transmission projects. Assuming that the premise of the Final Rule is correct—that the Final Rule will expedite the approval and construction of many such projects with potential significant environmental impacts—then it unavoidably follows that the Final Rule itself will have significant environmental impacts that CEQ must consider in an EIS or, at the very least, an EA.

251. Consistent with NEPA, an EIS, or at least an EA, on the Final Rule should have considered the adverse environmental and health impacts of replacing the 1978 regulations with the Final Rule and identified alternative approaches that could meet the objectives of the rulemaking without significant environmental impacts.

252. To satisfy NEPA, an EA or EIS on the Final Rule should also have analyzed the environmental justice impacts of abandoning the 1978 regulation's robust standards for environmental analysis. Environmental justice communities are disproportionately affected by pollution and other environmental and health hazards. These communities have the most to lose from the truncated NEPA process set forth in the Final Rule that narrows NEPA's applicability, ignores cumulative and indirect impacts, reduces the range of alternatives, and raises the bar for both public participation and judicial review.

253. Consideration of the environmental justice implications of the Final Rule is required both by NEPA and EO 12898.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 101 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

254.    An EA or EIS on the Final Rule should have been prepared that would also have assessed the impact of the Final Rule on efforts to limit greenhouse gas emissions that contribute to global climate change, as well as efforts to evaluate how a changing climate affects proposed projects that are under review.  As noted above, the Final Rule limits the requirement that federal agencies consider the climate-related effects of their actions.  This is a significant impact that NEPA required CEQ to assess in an EA or EIS.

255.    An EA or EIS on the Final Rule should have been prepared that considered the extent to which the Final Rule's changes will affect agencies' ability to take other cumulative effects into consideration in their decision-making.  Agencies such as the U.S. Army Corps of Engineers, U.S. Forest Service, BLM, and others make decisions that individually may not have significant impacts but that cumulatively have such impacts in conjunction with other federal, state, local, and private actions.  By precluding these agencies from considering such impacts in their NEPA decision-making, the Final Rule will have a significant adverse environmental impact that should have been considered in an EA or EIS.

256.    CEQ's promulgation of the Final Rule without preparing an EA or EIS that: (a) examines a reasonable range of alternatives; (b) has a statement of purpose and need that corresponds to the agencies' proposed action; (c) identifies the correct no action alternative baseline for comparing and assessing direct, indirect, and cumulative environmental effects; (d) uses high quality scientific information; and (e) examines the overarching direct, indirect, and cumulative environmental effects of the Final Rule is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of NEPA and the APA, 5 U.S.C. § 706(2).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 102 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

SECOND CLAIM FOR RELIEF

<u>Violation of the National Environmental Policy Act and Administrative Procedure Act:
Failure to Review Environmental Justice Impacts</u>

257.    Plaintiffs re-allege, as if fully set forth herein, every allegation contained in the preceding paragraphs.

258.    In adopting NEPA, Congress placed environmental justice concerns at the core of the statute by recognizing that each person "should enjoy a healthful environment" and by premising the entire requirement for an environmental impact statement on "major Federal actions significantly affecting the quality of the <u>human</u> environment."  42 U.S.C. § 4332(C) (emphasis added).

259.    Beginning with Executive Order 12898 in 1994 and continuing with CEQ's 1997 "Environmental Justice Guidance under the National Environmental Policy Act" Guidance and the 2016 Federal Interagency Working Group report "Promising Practices for EJ Methodologies in NEPA Reviews," CEQ has developed longstanding policies and practices that rely on advancing environmental justice through NEPA.

260.    In the Final Rule, CEQ acknowledged that it was required to analyze the effect of its proposal on Executive Order 12898, and asserted that it "analyzed this final rule and determined that it would not cause disproportionately high and adverse human health or environmental effects on minority populations and low-income populations."  85 Fed. Reg. at 43,356.  CEQ failed to provide factual support for this assertion.

261.    Nothing in the Final Rule provides rational reasons for departing from CEQ's longstanding policy and practice of fully analyzing the environmental justice impacts of its actions through a NEPA review.  Many provisions in the Final Rule will have a disparate and adverse impact on communities of color and low-income communities.  These provisions include

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 103 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

but are not limited to imposing arbitrary page limits, redefining "major federal action," striking

required cumulative impact analysis, authorizing the imposition of a bond requirement to

participate in the NEPA process, and allowing collective responses to public comments.

262.   CEQ claimed that environmental justice effects should be analyzed only at the

point of action agency project implementation, 85 Fed. Reg. at 43,356.  To the contrary, CEQ

has an obligation under NEPA and the 1978 implementing regulations to assess environmental

justice impacts in its rulemaking, especially when considering changes to longstanding

regulations that, among other changes that will disproportionately affect environmental justice

communities, eliminate requirements to consider indirect and cumulative impacts on

overburdened communities that already bear disproportionate impacts of past harmful actions.

263.   NEPA has been an essential mechanism for ensuring that disenfranchised and

underrepresented communities have voice in major federal actions.  The sweeping changes in the

Final Rule will fundamentally alter nearly every step of the NEPA review process, and yet

because CEQ did not engage in a NEPA analysis of the Final Rule, there is no explanation or

analysis of how the development and implementation of the Final Rule will affect

implementation of Executive Order 12898; if the Final Rule is consistent with CEQ's 1997

environmental justice guidance; or how the Final Rule will affect environmental justice

communities themselves.  CEQ acknowledged that commenters raised these issues, 85 Fed. Reg.

at 43,356, but insisted that the Final Rule would not result in any adverse environmental impacts.

*Final Rule Response to Comments* (June 30, 2020) at 34.

264.   CEQ's decision to adopt the Final Rule without analyzing how the Rule and its

implementation would affect the environmental justice mandates in Executive Order 12898, how

the Final Rule affects with CEQ's 1997 environmental justice guidance, or how the Final Rule

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 104 -

will affect environmental justice communities themselves is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of NEPA and the APA, 5 U.S.C. § 706(2).

THIRD CLAIM FOR RELIEF

Violation of the National Environmental Policy Act and Administrative Procedure Act: CEQ's Arbitrary and Capricious Decision-Making

265.    Plaintiffs re-allege, as if fully set forth herein, every allegation contained in the preceding paragraphs.

266.    CEQ's issuance of the Final Rule is a "final agency action" subject to judicial review under the APA.  5 U.S.C. § 704.

267.    The APA provides that courts must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

268.    The Supreme Court has clarified that an agency action is arbitrary and capricious for purposes of the APA "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs v. State Farm*, 463 U.S. 29, 43 (1983).  The agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id*.  Moreover, "an agency changing course" is "obligated to supply a reasoned analysis for the change" beyond what would be required if the agency were operating on a clean slate.  *Id*. at 42; *see also Organized Vill. of Kake v. U.S. Dep't of Agriculture*, 795 F.3d 956, 968 (9th Cir. 2015) ("[E]ven when reversing a policy after an

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 105 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

election, an agency may not simply discard prior factual findings without a reasoned explanation.").

269.     When an agency issues a regulation changing or amending a prior regulation, it faces an even higher burden.  The agency must demonstrate that: (1) a new rule is permissible under the statute; (2) there are good reasons for the change; (3) the agency believes it to be better; and (4) the agency displays awareness that it is changing its position.  *F.C.C. v. Fox Television Stations, Inc,*, 556 U.S. 502, 514-16 (2009) (*Fox*).  When a new regulation rests upon a factual finding contrary to prior policy, an agency must provide a more detailed justification than what would suffice if the new policy were created on a blank slate.  An unexplained inconsistency between the prior rule and its replacement is a basis for finding the agency's interpretation arbitrary and capricious.  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).  Furthermore, when an agency reverses course and chooses a new policy direction, it must address how the new policy affects other parties who have relied upon the old policy to meet their legal obligations; and failing to take account of legitimate reliance interests is arbitrary and capricious.  *Fox*, 556 U.S. at 515-16; *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742, (1996); *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016).

270.     In issuing the Final Rule, CEQ violated these fundamental standards.  CEQ failed to make a rational connection between the facts in the record, including comments submitted by Plaintiffs, and the conclusions it made in the text of the Final Rule, and/or failed to consider an important aspect of the problem, and/or relied on factors that it should not have considered.

271.     Promulgation of the Final Rule is also unlawful because CEQ failed to provide a rational explanation for changes in its longstanding agency practice.  For example, the Final Rule

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 106 -

glossed over the significance of the many changes to longstanding statutory and judicial

interpretation and packages the Final Rule as "streamlining" and "efficiency" without providing

support in the record for these changes.  In fact, the Final Rule will achieve the exact opposite of

its goals, by creating conflict with governing case law, agency regulations and guidance, and

longstanding practices that the public, decision-makers, and the courts have relied upon for the

past four decades.  Conflicts like these will slow NEPA implementation, sow public and agency

confusion, and increase litigation, undermining the very goals of efficiency that the Final Rule

claimed to seek to implement.

272.    The Final Rule is arbitrary, capricious, and not in accordance with law, in

violation of the APA, 5 U.S.C. § 706(2).

FOURTH CLAIM FOR RELIEF

Violation of National Environmental Policy Act and Administrative Procedure Act:<br>CEQ Exceeded Its Delegated Authority

273.    Plaintiffs re-allege, as if fully set forth herein, every allegation contained in the

preceding paragraphs.

274.    CEQ is a federal agency delegated authority to implement NEPA, including by

promulgating interpretive regulations.

275.    As part of this authority, CEQ may define terms found in NEPA, provided it is

consistent with congressional intent and the purposes of the Act.  CEQ may also develop

procedures to guide implementation of NEPA.

276.    CEQ cannot adopt regulations that are manifestly contrary to the text and purpose

of NEPA.

277.    Both individually and collectively, provisions in the Final Rule are contrary to

law and the plain language and purpose of NEPA.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 107 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

278.     For example, the Final Rule exceeds CEQ's delegated authority by purporting to determine whether a party has standing to go to court and challenge violations of NEPA, the presumptions courts apply in such cases, and other matters that are the province of the judiciary.

279.     Similarly, the Final Rule exceeds CEQ's delegated authority and violates NEPA by authorizing agencies to create bonding and other security requirements as a condition for public participation in the NEPA process.  In enacting NEPA, Congress sought to increase public participation and input into agencies' analysis of environmental impacts.  The Final Rule's bonding requirements impede congressional intent and the purposes of NEPA.

280.     The Final Rule also dramatically alters the parameters regarding exhaustion of administrative remedies, stating that "comments or objections of any kind not submitted, including those based on submitted alternatives, information, and analyses, shall be forfeited as unexhausted."  While the principles of administrative exhaustion are well known, exceptions to the principle exist within the case law, such as when an issue arises after the administrative process about which a party was unaware and therefore could not have commented; the Final Rule impermissibly purports to preclude this well-known exception.

281.     Likewise, the Final Rule states that "it is the Council's intention that the regulations ... create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm" and that "it is also the Council's intention that minor, non-substantive errors that have no effect on agency decision-making shall be considered harmless and shall not invalidate an agency action."  The Final Rule is based on an erroneous and incomplete reading of case law, and impinges upon the role of the judiciary to assess whether a party has demonstrated irreparable harm and whether a legal violation is "harmless error."

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 108 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

282.    Moreover, while CEQ has been delegated an interpretive and implementation role under NEPA, other agencies have been given no such role.  NEPA is a "good government" statute that regulates, constrains, and imposes obligations on such federal agencies.  The Final Rule purports to authorize federal agencies to self-certify their NEPA compliance that will be given a conclusive presumption of compliance by federal courts.  This provision exceeds CEQ's authority under NEPA and intrudes into the province of the judiciary.

283.    These and other provisions of the Final Rule are inconsistent with the plain language of NEPA as interpreted by longstanding judicial precedent.

284.    The Final Rule is arbitrary, capricious, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2).

FIFTH CLAIM FOR RELIEF

Violation of the Administrative Procedure Act:<br>CEQ Invalidly Attempted To Amend Thresholds for Judicial Review

285.    Plaintiffs re-allege, as if fully set forth herein, every allegation contained in the preceding paragraphs.

286.    Congress enacted the APA to establish procedures agencies must follow in promulgating rules.  The APA is applicable to all federal agencies.

287.    CEQ does not have unique authority or expertise in interpreting the applicability of the APA, and CEQ cannot amend the APA's statutory thresholds for judicial review through a rulemaking.

288.    The Final Rule attempts to eliminate the APA's failure to act cause of action by narrowing the definition of "major federal action" such that the NEPA process would not apply to where a responsible agency official fails to act.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 109 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

289.     In the APA, Congress provided a cause of action for an agency's failure to act.  5 U.S.C. § 551(13).  The APA causes of action apply when there is no other adequate remedy at law.  The Final Rule unlawfully purports to eliminate this cause of action.

290.     The Final Rule states that it "create[s] no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm," yet in the APA Congress provided that courts shall hold unlawful and set aside agency actions, findings, and conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or in excess of statutory jurisdiction, authority, or limitations.  5 U.S.C. § 706(2)(A) & (C).

291.     The Final Rule is arbitrary, capricious, not in accordance with law and in excess of statutory jurisdiction and authority, in violation of the APA, 5 U.S.C. § 706(2).

PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

(1)     Declare that federal defendants acted arbitrarily, capriciously, and contrary to NEPA, in violation of the APA, 5 U.S.C. § 706(2), by failing to prepare an EA or EIS on the Final Rule, and by failing to evaluate alternatives to, and the full direct, indirect, and cumulative impacts of, the Final Rule;

(2)     Declare that federal defendants acted arbitrarily, capriciously, and contrary to law by failing to analyze how the Final Rule and its implementation would affect the directive of Executive Order 12898 and CEQ's longstanding policy and practice of fully analyzing the environmental justice impacts of its actions;

(3)     Declare that federal defendants violated NEPA and the APA by issuing regulations that are inconsistent with the statutory purpose and language of NEPA;

(4)     Declare that federal defendants acted in excess of statutory authority by issuing the Final Rule;

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 110 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

(5)     Hold unlawful and vacate the Final Rule, reinstating the 1978 regulations, as amended, in place prior to the enactment of the Final Rule;

(6)     Enjoin federal defendants from implementing, enforcing, or relying upon the Final Rule;

(7)     Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees; and

(8)     Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

DATED this 29th day of July, 2020.

Respectfully submitted,

*s/ Kristen L. Boyles*
KRISTEN L. BOYLES (CSBA # 158450)
JAN E. HASSELMAN (WSBA # 29017)
*[Pro Hac Vice Application Pending]*
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA  98104
(206) 343-7340
kboyles@earthjustice.org
jhasselman@earthjustice.org

SUSAN JANE M. BROWN (OSBA # 054607)
*[Pro Hac Vice Application Pending]*
WESTERN ENVIRONMENTAL LAW CENTER
4107 N.E. Couch St.
Portland, OR 97232
(503) 914-1323
brown@westernlaw.org

*Attorneys for Plaintiffs*

GREGORY C. LOARIE (CSBA # 215859)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
(415) 217-2000
gloarie@earthjustice.org

*Local Counsel for Plaintiffs*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 112 -