# Exhibit A

**WESTERN ENVIRONMENTAL LAW CENTER**

HEADQUARTERS
120 Shelton McMurphey Blvd.
Suite 340
Eugene, OR 97401
(541) 485-2471
info@westernlaw.org

OFFICES
Oregon
Washington
New Mexico
Montana

Defending the West       westernlaw.org

July 31, 2020

Mary Neumayr, Chair
Council on Environmental Quality
730 Jackson Place, NW
Washington, DC 20503
mary.b.neumayr@ceq.eop.gov

Chris Oliver, Asst. Administrator for Fisheries
National Oceanic and Atmospheric Administration
1315 East-West Highway
Silver Spring, MD 20910
chris.w.oliver@noaa.gov

Wilbur Ross, Secretary
Department of Commerce
1401 Constitution Ave., NW
Washington, DC 20230
WLRoss@doc.gov

Aurelia Skipwith, Director
U.S. Fish and Wildlife Service
1849 C Street, NW
Washington, DC 20240
Aurelia_Skipwith@fws.gov

David Bernhardt, Secretary
Department of the Interior
1849 C Street, NW
Washington, DC 20240
Ex_sec@ios.doi.gov

*Via Electronic and Certified Mail*

**Re: Notice of Intent to Sue for Violations of the Endangered Species Act:** *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act; Final Rule* **85 Fed. Reg. 43,304 (July 16, 2020).**

Dear Chair Neumayr, Secretaries Ross and Bernhardt, Assistant Administrator Oliver, and Director Skipwith:

On behalf of Alaska Community Action on Toxics, California Wilderness Coalition, Center for Biological Diversity, Center for Environmental Health, Center for Food Safety, Environment America, Environmental Protection Information Center, Food & Water Watch, Friends of the Earth, National Parks Conservation Association, National Wildlife Federation, Ocean Conservancy, Rio Grande International Study Center, Southern Utah Wilderness Alliance, The Wilderness Society, WE ACT for Environmental Justice, and Western Watersheds Project ("Petitioners"), we ask that you take immediate action to remedy your violations of the Endangered Species Act ("ESA" or "Act") by the Council on Environmental Quality ("CEQ") in issuing on July 16, 2020 the final rule *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act* (hereafter "2020 Final Rule"), 85 Fed. Reg. 43,304-76 (July 16, 2020).

CEQ is violating Section 7(a)(2) of the ESA by taking an action that "may affect" ESA-listed species without having first engaged in mandatory consultation under the ESA.[1] Moreover, any implementation of the 2020 Final Rule prior to the conclusion of consultation activities constitutes a violation of Section 7(d) of the Act, which prohibits the "irretrievable commitment of resources" pending the completion of consultation.[2] The Endangered Species Act requires CEQ to consult prior to taking any final action that it funds, authorizes, or carries out so that it may affirmatively "insure" that the action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat.[3]

Pursuant to Section 11(g) of the Act, CEQ has sixty days from the postmark of this letter to come into compliance with its ESA consultation obligations.[4] If it does not remedy these ongoing violations within that time period, the Petitioners intend to initiate litigation in federal court to resolve the matter.

The fundamental purposes for which Congress enacted NEPA are more urgent today than they were in 1970:

> To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.[5]

NEPA's implementing regulations are fundamental to achieving two of its core purposes: (1) ensuring that federal agencies take a "hard look" at the environmental impacts of their actions; and (2) providing public participation in the decision-making process through a federal agency's completion of either an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") or where a federal action will have significant impacts, an Environmental Impact Statement ("EIS").[6]

The 2020 Final Rule substantially weakens the environmental review process in many ways, including by allowing federal agencies to: (1) disregard and/or inadequately analyze direct, indirect, and cumulative impacts of proposed projects; (2) establish arbitrary time limits on the completion of EAs and EISs, truncating and reducing the quality of those reviews; (3) gather no new data when preparing completing environmental reviews; (4) undercutting the importance of

---

[1] 16 U.S.C. § 1536(a)(2).
[2] 16 U.S.C. § 1536(d).
[3] 16 U.S.C. § 1536(a)(2).
[4] 16 U.S.C. § 1540(g)(2)(A)(i).
[5] 42 U.S.C. § 4321.
[6] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (noting the Supreme Court's "hard look" standard was based on "[t]he sweeping policy goals announced in § 101 of NEPA are thus realized through a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences.").

analyzing a range of reasonable alternatives; (5) significantly expanding the use of categorical exclusions when in fact adverse environmental impacts are likely; and (6) reducing public input and use of in-person meetings.

By truncating and narrowing the scope of all environmental reviews under NEPA, by all federal agencies nationwide, agencies will inevitably adopt decisions that cumulatively weaken and degrade the environment. Specifically, federal actions that affect ESA-listed species and/or their critical habitats will have impacts to threatened, endangered, and/or candidate species left unaddressed. Indeed, these impacts will be the most significant, real world impacts of the changed regulations precisely because all agencies will be prohibited from considering indirect and cumulative impacts.

Despite the misleading and contradictory rhetoric in the preamble of the 2020 Final Rule, perhaps the greatest cumulative impact that will no longer be considered at all in any NEPA review is that of climate change. As stated in the Fourth National Climate Assessment, the impacts of greenhouse gas emissions and other anthropogenic activities that drive climate change are — by definition — cumulative, the product of thousands of federal agency and private decisions. Federal agency decisions already have a significant impact on climate change. For example, a 2018 U.S. Geological Survey report concluded that development, production, and combustion of fossil fuel from federal lands in one year (2014) added 1.3 billion tons of $CO_2$ equivalent greenhouse gas pollution to the atmosphere.[7] Yet, the 2020 Final Rule instructs federal agencies to put their heads in the sand and pretend cumulative climate change impacts do not exist and need not be analyzed because they are "remote in time, geographically remote, or the result of a lengthy causal chain."[8] Consequently, the 2020 Final Rule will inevitably result in *more* federal agency actions that *worsen* climate change by ignoring climate impacts completely.[9]

Another significant, cumulative impact that will no longer be considered in NEPA reviews is cumulative pollution impacts both to water and air. Cumulative impacts of water pollution, for example, will result in downstream impacts far from the location where a federal agency action occurs, and will only get worse as more and more pollution moves downstream. Yet federal agencies will no longer have to consider these types of "geographically remote" downstream and down-wide impacts, and again will inevitably approve more-harmful projects.

As explained below, such devastating changes in the NEPA regulations are not only violative of the law's longstanding purposes, but they also trigger CEQ's obligation to consult pursuant to ESA section 7, an obligation CEQ has ignored.

---

[7] U.S. Geological Survey, Federal Lands Greenhouse Gas Emissions and Sequestration in the United States: Estimates for 2005–14, Scientific Investigations Report 2018–5131 (2018), https://pubs.usgs.gov/sir/2018/5131/sir20185131.pdf.
[8] 40 C.F.R. § 1508.1(g) (2020), 85 Fed. Reg. 43,375.
[9] *See* U.S. Global Change Research Program, *Fourth National Climate Assessment: Impacts, Risks, and Adaptation in the United States, Volume II* (2018), https://nca2018.globalchange.gov/downloads/NCA4_2018_FullReport.pdf.

## LEGAL BACKGROUND

Section 2(c) of the ESA establishes "that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this [Act]."[10] The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary."[11]

As the Supreme Court has unequivocally stated, the ESA's "language, history, and structure" make clear and "beyond doubt" that "Congress intended endangered species to be afforded the highest of priorities" and endangered species should be given "priority over the 'primary missions' of federal agencies."[12] Simply put, "[t]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, *whatever the cost*."[13]

To fulfill the ESA's substantive purposes, Section 7 requires each agency to engage in consultation with the U.S. Fish and Wildlife Service and/or the National Marine Fisheries Service (collectively the "Services") to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the adverse modification of habitat of such species . . . determined . . . to be critical . . . ."[14] The obligation to "insure" against a likelihood of jeopardy or adverse modification requires the agency to give the benefit of the doubt to listed species.[15]

As the Supreme Court explained in *Tennessee Valley Authority v. Hill*, the language of Section 7 "admits of no exception."[16] Indeed, Congress was well aware of the "broad sweep" of Section 7 because it reflects Congress' intent to give endangered species priority over the primary missions of federal agencies like the CEQ. In sum, "[t]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, *whatever the cost*. This is reflected not only in the stated policies of the Act, but in literally every section of the statute."[17]

The unambiguous text of the ESA firmly establishes that federal agencies have a duty to engage in the Section 7 consultation process prior to taking any action that 'may affect' a threatened or endangered species or their habitats..[18] Only where the action agency determines that its action will have "no effect" on listed species or designated critical habitat is the consultation obligation lifted.[19]

---

[10] 16 U.S.C. § 1531(c)(1).
[11] *Id.* § 1532(3).
[12] *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174-75 (1978).
[13] *Id.* at 184 (emphasis added).
[14] 16 U.S.C. § 1536(a)(2).
[15] *See Sierra Club v. Marsh*, 816 F.2d 1376, 1385 (9th Cir. 1987).
[16] *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 188 (1978).
[17] *Id.* at 184 (emphasis added).
[18] 50 C.F.R. § 402.14.
[19] 50 C.F.R. § 402.14(a).

As the Supreme Court has made clear, Section 7 consultation is required for every *discretionary* agency action that "may affect listed species or critical habitat."[20] Agency "action" is broadly defined in the ESA's implementing regulations to include "(a) actions intended to conserve listed species or their habitat; (b) *the promulgation of regulations*; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air."[21] The Services' joint regulations further clearly require programmatic consultations on federal, nationwide rulemakings that impact listed species.[22]

If a federal agency first undertakes an informal consultation, it must initially determine whether its actions are "not likely to adversely affect" ("NLAA") a listed species or are "likely to adversely affect" ("LAA") a listed species.[23] The Services define NLAA determinations to encompass those situations where effects on listed species are expected to be "discountable, insignificant, or completely beneficial."[24] Discountable effects are very rare and limited to situations where it is not possible to "meaningfully measure, detect, or evaluate" harmful impacts.[25] Any harm or take of an individual member of a listed species crosses the LAA threshold and requires formal consultations with the Services.[26] If an action agency makes an NLAA determination, it must still receive a written concurrence from the Services that this determination was correct, otherwise the agency must complete formal consultations.

During the formal consultation process, the Services first receive an initial package of information from the action agency, and then complete an independent assessment — utilizing the "the best scientific and commercial data available" — of the effects of that action on listed species. At the completion of consultation, the Services are required to issue a Biological Opinion that determines if the agency action is likely to jeopardize any affected species or destroy/adversely modify designated critical habitat. If the action jeopardizes listed species or adversely modifies or destroys critical habitat, the Biological Opinion must specify "Reasonable and Prudent Alternatives" that will avoid jeopardy and allow the agency to proceed with the action. For actions that do not jeopardize listed species or adversely modify or destroy critical habitat, the Services provide "Reasonable and Prudent Measures" that minimize take and "avoid the likelihood of adverse effects" to the listed species even when not necessary to avoid jeopardy.[27] The Services must also provide an Incidental Take Statement that sets forth the

---

[20] *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007); 50 C.F.R. § 402.14(a).

[21] 50 C.F.R. § 402.02 (emphasis added); *see also Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054-55 (9th Cir. 1994); *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988); *National Wildlife Fed'n v. FEMA*, 345 F. Supp. 3d 1151, 1169 (W.D. Wash. 2004).

[22] *See*, *e.g*., Interagency Cooperation – Endangered Species Act of 1973, as Amended; Incidental Take Statements, 80 Fed. Reg. 26,832 (May 11, 2015).

[23] U.S. Fish and Wildlife Service and National Marine Fisheries Service. 1998. *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act*.

[24] *Id*.

[25] *Id*.

[26] *Id*.

[27] 50 C.F.R. § 402.13.

anticipated and allowed take by the action agency, as well as thresholds, which if exceeded, require reinitiation of consultation.

Section 7(d) of the ESA provides that after federal agencies initiate consultation on an action under the Act, but prior to completion of consultation, the agencies "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section."[28] The purpose of Section 7(d) is to maintain the environmental status quo pending the completion of consultation. Section 7(d) prohibitions remain in effect throughout the consultation period and until the federal agency has satisfied its obligations under Section 7(a)(2) that the action will not result in jeopardy to the species or adverse modification of its critical habitat. This prohibition is not an exception to the requirements of Section 7(a)(2); it is in addition to the requirements of Section 7(a)(2); and it ensures that Section 7(a)(2)'s substantive mandate is met.[29]

## ENDANGERED SPECIES ACT VIOLATIONS

### I.  Failure to Insure Against Jeopardy; Failure to Insure Against Destruction or Adverse Modification of Critical Habitat

The CEQ's discretionary decision to weaken its regulations required consultation under the ESA.[30] First, it is beyond dispute that the revision of the NEPA regulations was a discretionary action, and the CEQ acknowledges as much in the 2020 Final Rule.

Second, and more importantly, the CEQ wrongly concluded that the 2020 Final Rule has "no effect" on listed species and critical habitat. The Rule in fact will have detrimental impacts on listed species and, in any event, clearly crosses the "may affect" threshold.[31] CEQ asserts, without any support in the record, that the 2020 Final Rule has absolutely no effect on the environment in any manner whatsoever, but that the reduced delays in project approvals will result in "trillion[s]" in savings to the economy by expediting a plethora of logging, mining, transportation, and other projects.[32] This makes no sense. If the new rules will expedite and facilitate a multitude of ground-disturbing (and greenhouse-gas-producing projects), then this belies the larger notion that the environment — and, in particular, endangered and threatened species and their habitats — will be unaffected by the changes in the 2020 Final Rule, and illustrates the arbitrary and capricious conclusions that the CEQ asserts here about the Rule's lack of any effects on species and habitats.

---

[28] 16 U.S.C. § 1536(d); *see also Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1128 n.6 (9th Cir. 1998); *Marsh*, 816 F.2d at 1389.
[29] *See, e.g.*, *Pacific Rivers Council*, 30 F.3d 1050, 1056-57 (9th Cir. 1994); *Defs. of Wildlife v. Jackson,* 791 F. Supp. 2d 96, 113 (D.D.C. 2011).
[30] 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).
[31] 85 Fed. Reg. 43,354 ("CEQ has determined that updating its regulations implementing the procedural provisions of NEPA has 'no effect' on listed species and critical habitat. Therefore, ESA section 7 consultation is not required.").
[32] 85 Fed. Reg. 43,352 ("there are no adverse environmental impacts" from the final rule).

By definition, the 2020 Final Rule's requirement that all federal agencies not assess *any* cumulative impacts and, at best, the Rule's significant weakening of the obligation to consider indirect effects,[33] means that agencies need not even consider mitigating those impacts during the NEPA process. Failing to consider mitigating or addressing those impacts will result in cumulative degradation of the environment over time, at the landscape level, downstream, downwind, and for the planet's climate — all impacts that CEQ demands be ignored because they are geographically remote or later in time. For endangered species that are harmed primarily through such indirect and cumulative effects, they will inevitably be harmed by weaker, truncated NEPA reviews. These impacts — programmatic in nature — are real and easily exceed the "relatively low" consultation threshold set out in the ESA.[34]

Yet, despite the significant effects that will accrue from undercutting federal agencies' consideration of indirect and cumulative impacts, CEQ did not even attempt to identify, quantify, or otherwise consider the adverse impacts of this change on a programmatic level, nor did it consider the impacts to any specific, individual threatened or endangered species prior to finalizing the rulemaking.[35] Instead, it erroneously assumed that there would be no impacts, categorically, to over 1,800 listed species and hundreds of millions of acres of critical habitat, despite the different threats that each one faces. By finalizing the 2020 Final Rule without first complying with the ESA's substantive and procedural requirements, CEQ has failed to ensure that its actions will not jeopardize listed species, or adversely modify critical habitat and thus undermines the fundamental purposes of the Endangered Species Act.[36]

The lack of cumulative and indirect effects analysis particularly harms threatened and endangered species that depend on rivers and whose habitat quality is linked to climate change. Species that may be adversely affected by the 2020 Final Rule as a result of the lack of an analysis of the cumulative and/or indirect climate and water quality effects on these species include, but are not limited to::

> Polar Bear, Ringed Seal, Bearded Seal, All Listed Corals, Southern Resident DPS of Orca, Bull Trout, California red-legged frog, Humpback chub, Little Colorado spinedace, Little Kern golden trout, Loach minnow, Lost River sucker, Modoc Sucker, Razorback sucker, Shortnose sucker, Virgin River chub, Warner sucker,

---

[33] 85 Fed. Reg. 43,326, 43,331, 43,343, 43,355 (noting CEQ improperly concluded its new definition of "effects" encompasses cumulative effects when CEQ stated that the "final rule does not ignore cumulative effects on listed species. Rather, the final rule includes a definition of effects that comports with Supreme Court case law to encompass all effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives").
[34] *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009).
[35] 85 Fed. Reg. 43,354-55 (noting that CEQ stated it reviewed the rulemaking "to determine if it 'may affect' listed species or their designated critical habitat" and CEQ improperly concluded that "[n]one of the changes to the 1978 regulations are anticipated to have environmental impacts, including potential effects to listed species and critical habitat.").
[36] 16 U.S.C. § 1531(b); *see also Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985) ("If anything, the strict substantive provisions of the ESA justify more stringent enforcement of its procedural requirements, because the procedural requirements are designed to ensure compliance with the substantive provisions.").

> White River spinedace, White River springfish, woundfin, Yaqui catfish, Yaqui chub, Zuni bluehead sucker, river winter-run Chinook salmon, Snake River fall-run Chinook salmon, Snake River spring/summer run Chinook salmon, Upper Columbia River spring-run Chinook salmon, Upper Willamette River Chinook salmon, Central California coast Coho salmon, Lower Columbia River Coho salmon, Oregon coast Coho salmon, South Oregon and North California coasts Coho salmon, Ozette Lake Sockeye salmon, Snake River Sockeye salmon, California Central Valley steelhead, Central California coast steelhead, Lower Columbia steelhead, Middle Columbia steelhead, Northern California steelhead, Puget Sound steelhead, Snake River Basin steelhead, South-Central California coast steelhead, Southern California steelhead, Hood Canal summer-run chum salmon, Upper Columbia River steelhead, Upper Willamette River steelhead, Rio Grande chub, Rio Grande cutthroat trout, Rio Grande sucker, Rio Grande silvery minnow, Ozark hellbender, eastern Hellbender DPS, longfin smelt, Southern DPS of Pacific smelt, Southern DPS of green sturgeon, shortnose sturgeon, Carolina DPS of Atlantic sturgeon, Chesapeake Bay DPS of Atlantic sturgeon, Gulf of Maine DPS of Atlantic sturgeon, New York Bight DPS of Atlantic sturgeon, and South Atlantic DPS of Atlantic sturgeon.

The elimination of cumulative impacts analysis under NEPA is especially harmful to these species because the cumulative impacts analysis under the prior CEQ regulations was *broader* than that conducted pursuant to the ESA itself. As explained by one court in the course of rejecting an agency's contention that NEPA review is the "substantial equivalent" of the analysis of listed species impacts required by the ESA, "the ESA Section 7 consultation process differs from the cumulative impacts analysis required by NEPA in a number of important ways."[37]

In particular, the ESA Section 7 regulations "only require agencies to consider the cumulative impacts of non-federal actions" on endangered and threatened species, while the 1978 CEQ regulations "require[d] agencies to consider the cumulative impacts of *all* actions."[38] Because the "ESA Section 7 consultation process [was] not the functional equivalent of the cumulative impacts analysis required by NEPA"[39] it is apparent that CEQ's 2020 Final Rule elimination of *any* cumulative impacts analysis as part of the NEPA process will have highly detrimental impacts on the ability of federal agencies to take cumulative effects on species into consideration when making decisions regarding particular activities and projects.

The rule changes may affect listed species and critical habitat in other ways as well, including by eliminating the consideration of species and critical habitat impacts as a specific significance criterion (for purpose of analyzing whether an EIS is necessary), and by eliminating the requirement that additional surveys and studies be undertaken and additional information be

---

[37] *Fund for Animals v. Hall*, 448 F.Supp.2d 127, 136 (D.D.C. 2006).
[38] *Id.* (emphasis added).
[39] *Id*. at 136-37.

obtained when necessary to adequately analyze an action's impacts.[40] CEQ's explanation for its baseless "no effect" determination does not meaningfully address any of these concerns. The bottom line is that the sweeping changes made by CEQ not only "may affect" — the low standard for triggering Section 7 consultation — but *will* adversely affect listed species and critical habitats in a plethora of ways.

## II.    Irreversible or Irretrievable Commitment of Resources

Section 7(d) of the ESA prohibits a federal agency from "mak[ing] any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section."[41] By failing to consult with the Services, CEQ has guaranteed that some land, water, and air will be degraded or destroyed without the possibility that a reasonable and prudent measure could ever be implemented to protect a listed species or its critical habitat because CEQ has improperly foreclosed the possibility of consultations in the rule.

## CONCLUSION

By failing to initiate and complete consultation with the Services regarding the effects of the 2020 Final Rule prior to its promulgation, and by failing to insure against jeopardy and adverse modification of critical habitat, CEQ is in violation of the Endangered Species Act. If the Council on Environmental Quality does not act within 60 days to correct the violations described in this letter, we will pursue litigation.

Sincerely,

*/s/ Susan Jane B.*

Susan Jane M. Brown,
Wildlands Program Director & Staff Attorney
Western Environmental Law Center
4107 NE Couch Street
Portland, OR. 97232
brown@westernlaw.org
503-914-1323

*/s/ Kristen L. Boyles*

Kristen L. Boyles,
Attorney
Earthjustice Northwest Office
810 Third Avenue, Suite 610
Seattle, WA  98104
kboyles@earthjustice.org
206.343.7340 x1033

---

[40] *See* letter of P. Lopes, Center for Biological Diversity to M. Neumayr, CEQ re: Comments on Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act (Mar. 9, 2020) at 3-6.
[41] 16 U.S.C. § 1536(d).