JEFFREY BOSSERT CLARK
Assistant Attorney General
JONATHAN BRIGHTBILL
Principal Deputy Assistant Attorney General
PAUL E. SALAMANCA
Deputy Assistant Attorney General
BARCLAY T. SAMFORD (NM State Bar No. 12323)
Senior Attorney, Natural Resources Section
U.S. Department of Justice
Environment and Natural Resources Division
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel.: (303) 844-1475
Fax: (303) 844-1350
E-mail: clay.samford@usdoj.gov
ALLEN M. BRABENDER (MN State Bar No. 0324012)
Attorney, Appellate Section
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7415
Washington, DC 20044
Tel.: (202) 514-5316
Fax: (202) 353-1873
E-mail: allen.brabender@usdoj.gov

*Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ALASKA COMMUNITY ACTION ON TOXICS, et al., | Case No. 3:20-cv-05199-RS |
| Plaintiffs, | **DEFENDANTS' MOTION TO DISMISS** |
| v. | Judge: Hon. Richard Seeborg |
| COUNCIL ON ENVIRONMENTAL QUALITY, and MARY NEUMAYR, in her official capacity as Chair of the council on Environmental Quality, | Hearing Noticed: February 25, 2020 at 1:30pm |
| Defendants. | |

# TABLE OF CONTENTS

NOTICE OF MOTION TO DISMISS AND MOTION ..................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 1

BACKGROUND ................................................................................................................ 3

    I.      National Environmental Policy Act. ....................................................... 3

    II.     CEQ: The 1970s Guidelines and Regulations. .................................... 3

    III.    NEPA Practice Outgrows the 1978 Regulations. .................................. 4

    IV.    Modernizing the NEPA Regulations. ..................................................... 8

    V.     The Current Lawsuit. ............................................................................... 9

STANDARD OF REVIEW ............................................................................................ 10

ARGUMENT .................................................................................................................. 10

    I.      In the Absence of a Live Dispute Over the Application of the Regulations to a Particular Project or Decision, Plaintiffs' Challenge Is Not Ripe..................... 11

            A.    A Regulation Is Ordinarily Subject to APA Review Only As Part of a Challenge to a Particular Application of the Regulation. ..................... 11

            B.    No Special Circumstances Justify Direct Review of the 2020 Rule......... 14

            C.    The Hardship to the Parties Favors Deferring Judicial Review Until the 2020 Rule Is Applied to Concrete Decisions. ..................................... 16

    II.     In the Absence of a Live Dispute Over the Concrete, Site-Specific Application of the 2020 Rule, Plaintiffs Lack Standing. ..................................... 18

            A.    *Summers* Forecloses Plaintiffs' Lawsuit. .................................................. 19

            B.    Plaintiffs Fail to Allege Specific Factual Allegations of Concrete, Imminent Injury and Instead Rely on Speculation About Possible Future Injuries to Their Interests in the Environment............................... 22

            C.    Plaintiffs' Claims of Amorphous "Procedural" and "Informational" Injuries Do Not Satisfy Article III ............................................................. 27

                    1.    Mere Deprivation of a Procedural Right Without Concrete Harm Is Not Justiciable Under Article III.................................... 27

Defs.' Mot. to Dismiss                                        i

*Alaska Cmty. Action on Toxics v. CEQ*, No. 3:20-cv-05199-RS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.      Plaintiffs' Informational and Organizational Injuries Are Also Not Justiciable Under Article III. ......................................... 30

a.      NEPA Does Not Create a Statutory Right to Information. ....................................................................... 30

b.      Plaintiffs' Alleged Informational Injuries Are Speculative. ...................................................................... 32

c.      Plaintiffs Identify No Cognizable Harms Resulting From a Mere Denial of Information................................. 32

CONCLUSION ......................................................................................... 34

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967)................................................................. 11, 12, 13, 15, 16

4

*Allen v. Wright*,
    468 U.S. 737 (1984)................................................................. 19, 21

5

6

*Amoco Prod. Co. v. Vill. of Gambell*,
    480 U.S. 531 (1987)................................................................. 15

7

*Andrus v. Sierra Club*,
    442 U.S. 347 (1979)................................................................. 4, 5

8

9

*Ass'n for Retarded Citizens v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*,
    19 F.3d 241 (5th Cir. 1994) ................................................................. 33

10

11

*Ass'n of Am. Med. Colls. v. United States*,
    217 F.3d 770 (9th Cir. 2000) ................................................................. 17

12

13

*Bova v. City of Medford*,
    564 F.3d 1093 (9th Cir. 2009) ................................................................. 26

14

*CASA de Md., Inc. v. Trump*,
    971 F.3d 220 (4th Cir. 2020) ................................................................. 33

15

16

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
    341 F.3d 961 (9th Cir. 2003) ................................................................. 28

17

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*,
    123 F.3d 1142 (9th Cir. 1997) ................................................................. 6

18

19

*City of Dallas v. Hall*,
    562 F.3d 712 (5th Cir. 2009) ................................................................. 7

20

21

*Clapper v. Amnesty Int'l. USA*,
    568 U.S. 398 (2013)................................................................. 10, 26, 28, 29, 33

22

*Cottonwood Env't Law Center v. U.S. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015) ................................................................. 13, 28

23

24

*Cronin v. U.S. Dep't of Agric.*,
    919 F.2d 439 (7th Cir. 1990) ................................................................. 7

25

*Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004) ................................................................. 3, 14, 23, 24, 26

26

27

*Dreher v. Experian Info. Sols., Inc.*,
    856 F.3d 337 (4th Cir. 2017) ................................................................. 30

28

*Fed. Election Comm'n v. Akins,*
  524 U.S. 11 (1998) ................................................................................. 30

*Fleck & Assocs., Inc. v. Phoenix,*
  471 F.3d 1100 (9th Cir. 2006) .............................................................. 21

*Forsham v. Harris,*
  445 U.S. 169 (1980) ............................................................................... 31

*Found. on Econ. Trends v. Lyng,*
  943 F.2d 79 (D.C. Cir. 1991) ................................................................ 31

*Friends of Animals v. Bernhardt,*
  961 F.3d 1197 (D.C. Cir. 2020) ............................................................ 32

*Friends of Animals v. Jewell,*
  828 F.3d 989 (D.C. Cir. 2016) ......................................................... 30, 31

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*
  460 F.3d 13 (D.C. Cir. 2006) ................................................................ 13

*Gardner v. U.S. Bureau of Land Mgmt.,*
  638 F.3d 1217 (9th Cir. 2011) .............................................................. 21

*Habeas Corpus Res. Center v. U.S. Dep't of Justice,*
  816 F.3d 1241 (9th Cir. 2016) .................................................. 13, 16, 19

*In re Endangered Species Act Section 4 Deadline Litig.-MDL No. 2165,*
  704 F.3d 972 (D.C. Cir. 2013) .............................................................. 29

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,*
  624 F.3d 1083 (9th Cir. 2010) .................................................. 21, 32, 33

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) .............................................. 18, 19, 21, 26, 27, 29

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ...................................................................... 2, 11, 14

*Mayo v. Reynolds,*
  875 F.3d 11 (D.C. Cir. 2017) ................................................................ 14

*Metro. Edison Co. v. People Against Nuclear Energy,*
  460 U.S. 766 (1983) ............................................................................... 23

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
  551 U.S. 644 (2007) ............................................................................... 29

*Nat'l Ass'n of Home Builders v. EPA,*
  667 F.3d 6 (D.C. Cir. 2011) .................................................................. 33

*Nat'l Park Hosp. Ass'n v. U.S. Dep't of the Interior,*
  538 U.S. 803 (2003) .............................................................. 12, 18, 26

*New River Valley Greens v. U.S. Dep't of Transp.,*
No. 97-1978, 1998 WL 633959 (4th Cir. Sept. 10, 1998) ....................................... 7

*Northcoast Env't Ctr. v. Glickman,*
136 F.3d 660 (9th Cir. 1998) ....................................................................................... 25

*Norton v. S. Utah Wilderness All.,*
542 U.S. 55 (2004) ........................................................................................................ 21

*Ohio Forestry Ass'n v. Sierra Club,*
523 U.S. 726 (1998) ............................................................................... 1, 12, 13, 16, 17

*Pac. Nw. Generating Coop. v. Brown,*
38 F.3d 1058 (9th Cir. 1994) ....................................................................................... 33

*Principal Life Ins. Co. v. Robinson,*
394 F.3d 665 (9th Cir. 2005) ....................................................................................... 11

*Public Citizen v. U.S. Dep't of Justice,*
491 U.S. 440 (1989) ............................................................................................... 30, 31

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.,*
415 F.3d 1078 (9th Cir. 2005) ..................................................................................... 10

*Reno v. Catholic Social Servs., Inc.,*
509 U.S. 43 (1993) ......................................................................................... 11, 12, 15

*Reno v. Flores,*
507 U.S. 292 (1993) ...................................................................................................... 17

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989) ............................................................................................. 3, 4, 14

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC,*
713 F.3d 175 (4th Cir. 2013) ....................................................................................... 33

*Sabine River Auth. v. U.S. Dep't of the Interior,*
951 F.2d 669 (5th Cir. 1992) ......................................................................................... 7

*Safer Chems., Healthy Fams. v. EPA,*
943 F.3d 397 (9th Cir. 2019) ....................................................................................... 18

*Salmon Spawning & Recovery All. v. Gutierrez,*
545 F.3d 1220 (9th Cir. 2008) ..................................................................................... 28

*San Luis & Delta-Mendota Water Auth. v. Salazar,*
638 F.3d 1163 (9th Cir. 2011) ............................................................................... 11, 15

*Schlesinger v. Reservists Comm. to Stop the War,*
418 U.S. 208 (1974) ...................................................................................................... 19

*Sierra Club v. Morton,*
405 U.S. 727 (1972) ...................................................................................................... 32

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ................................................................. 19, 27, 28, 32

*St. Clair v. City of Chico*,
  880 F.2d 199 (9th Cir. 1989) .................................................................... 10

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) .......................................... 19, 20, 21, 27, 28, 29, 32

*Tex. Energy Rsrv. Corp. v. U.S. Dep't of Energy*,
  710 F.2d 814 (Temp. Emer. Ct. App. 1983) ............................................ 11

*Texas v. United States*,
  523 U.S. 296 (1998) ............................................................................ 17, 26

*Thomas v. Anchorage Equal Rights Comm'n*,
  220 F.3d 1134 (9th Cir. 2000) .................................................................. 17

*Toilet Goods Ass'n v. Gardner*,
  387 U.S. 158 (1967) ................................................................................. 15

*Utah Int'l Inc. v. Andrus*,
  488 F. Supp. 962 (D. Utah 1979) ............................................................... 7

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) ................................................................................. 10

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
  435 U.S. 519 (1978) ................................................................................. 26

*W. Watersheds Project v. Kraayenbrink*,
  632 F.3d 472 (9th Cir. 2011) ................................................................... 28

*Wash. Toxics Coal. v. EPA*,
  413 F.3d 1024 (9th Cir. 2005) ................................................................. 11

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ................................................................................. 15

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ...................................................................... 19, 21, 26

*Wilderness Society, Inc. v. Rey*,
  622 F.3d 1251 (9th Cir. 2010) .............................................. 21, 22, 28, 29, 30

**Statutes**

16 U.S.C. § 1540(g)(1) ................................................................................. 11

16 U.S.C. § 1604(d)(2) ................................................................................. 13

42 U.S.C. § 4332(2)(B) ................................................................................... 3

42 U.S.C. § 4332(2)(C) ...................................................................... 3, 30, 31

42 U.S.C. § 4332(2)(I)) ......................................................................................... 3

42 U.S.C. § 4342 ................................................................................................... 3

42 U.S.C. § 4344 ................................................................................................... 3

42 U.S.C. § 7607(b)(1) ........................................................................................ 14

5 U.S.C. § 704 ..................................................................................................... 15

**Rules**

Fed. R. Civ. P. 12(b)(1) .......................................................................................... 1

**Regulations**

23 C.F.R. Pt. 771 (2019) ........................................................................................ 4

33 C.F.R. Pt. 230 (2019) ........................................................................................ 4

36 C.F.R. § 51.3 (2002) ........................................................................................ 12

36 C.F.R. Pt. 220 (2019) ........................................................................................ 4

40 C.F.R. § 1501.1(b) (2020) ........................................................................... 2, 24

40 C.F.R. § 1501.4(b) (2019) .............................................................................. 25

40 C.F.R. § 1501.5(e) (2020) .............................................................................. 25

40 C.F.R. § 1502.10 (2020) ................................................................................... 3

40 C.F.R. § 1502.7 (2019) ..................................................................................... 5

40 C.F.R. § 1507.1 (2020) ................................................................................... 29

40 C.F.R. § 1507.3 (2019) ............................................................................... 4, 16

40 C.F.R. §§ 1500-1599 (2019) ............................................................................ 4

40 C.F.R. §§ 1503.3(a),(b) (2020) ...................................................................... 25

**Other Authorities**

43 Fed. Reg. 55,978 (Nov. 29, 1978) .................................................................... 3

44 Fed. Reg. 873 (Jan. 3, 1979) ............................................................................ 4

46 Fed. Reg. 18,026 (Mar. 23, 1981) .................................................................... 6

83 Fed. Reg. 28,591 (June 20, 2018) ..................................................................... 8

85 Fed. Reg. 1,684 (Jan. 10, 2020) ....................................................................... 8

85 Fed. Reg. 43,304-01 (July 16, 2020) ................................. 1, 2, 4, 5, 6, 8, 14, 16, 17, 23, 24, 25

Council on Environmental Quality, Environmental Impact Statement Timelines (2010-2018) (June 12, 2020) ................................................................................................. 5, 6

Council on Environmental Quality, Length of Environmental Impact Statements (2013-2018) (June 12, 2020) ........................................................................................................................... 5

Philip K. Howard, COMMON GOOD, TWO YEARS, NOT TEN: REDESIGNING INFRASTRUCTURE APPROVALS, (Sept. 2015).......................................................................................................... 6

Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, Final Rule Response to Comments, RIN 0331-AA03, Council on Environmental Quality (June 30, 2020)............................................................................... 7

Vice President Al Gore, COMMON SENSE GOVERNMENT: WORKS BETTER AND COSTS LESS (1995) .............................................................................................................................................. 6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION TO DISMISS AND MOTION

Please take notice that on Thursday, February 25, 2010 at 1:30pm this motion will be heard before the Honorable Judge Seeborg.  Defendants Council on Environmental Quality (CEQ), et al. move to dismiss this case pursuant to Federal Rule of Civil Procedure 12(b)(1).  As set forth in the following memorandum, the case should be dismissed because Plaintiffs' claims are not ripe and Plaintiffs do not have standing.

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs—a group of non-profit environmental groups—ask this Court to conduct a broad, facial review of CEQ's updated regulations governing implementation of the National Environmental Policy Act (NEPA) (2020 Rule). 85 Fed. Reg. 43,304 (July 16, 2020).  There is no jurisdiction to do so.  The 2020 Rule applies to *internal* federal agency processes, not to the public.  Any purported harm allegedly caused by the 2020 Rule can only occur after the Rule has been applied to a particularized action and results in a final agency decision.  Only then might a particular provision of the 2020 Rule be challenged "at a time when harm is more imminent and more certain."  *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998).  No such application of the Rule is before the Court.  Plaintiffs' premature facial review is barred by the doctrines of ripeness and standing.

This year, CEQ rightly update its NEPA regulations—something it has been trying (without success) to get right for decades.  NEPA is a procedural statute.  Congress intended it to ensure that federal agencies consider environmental effects before committing to major federal actions.  But over time, the process NEPA created became mired in an accretion of guidance documents, inconsistent agency interpretations, conflicting case law, and litigation.  NEPA implementation and related litigation can be lengthy.  It can significantly delay major infrastructure and other projects that this country urgently needs. 85 Fed. Reg. at 43,305.  CEQ found that NEPA reviews for Federal Highway Administration projects, on average, take more than seven years to proceed from a notice of intent (NOI) to preparation of an environmental impact statement (EIS) to issuance of a record of decision (ROD). *Id.*  This is a dramatic departure from CEQ's prediction in 1981 that federal agencies would be able to complete most

Defs.' Mot. to Dismiss                                                          1
*Alaska Cmty. Action on Toxics v. CEQ*, No. 3:20-cv-05199-RS

1   EISs—the most intensive review of a project's environmental impacts under NEPA—in twelve

2   months or less.  *Id.*

3         In July 2020, CEQ took action.  CEQ issued its first comprehensive revision of the NEPA

4   implementing regulations in over forty years.  85 Fed. Reg. at 43,304.  The result of a deliberate

5   and thorough two-year rulemaking proceeding under the Administrative Procedure Act (APA),

6   the 2020 Rule clarifies and streamlines the NEPA process.  It reduces paperwork and delay, and

7   promotes better decisions.  The 2020 Rule regulates federal agencies by establishing the

8   procedures that those agencies must follow as they revise their own agency-specific NEPA

9   procedures, and as they propose and analyze future agency actions.  *See, e.g.*, 40 C.F.R. §

10   1501.1(b) (2020) (providing that agencies may determine whether actions or decisions are

11   "major Federal actions" through promulgation of agency-specific NEPA procedures, or on an

12   individual basis as appropriate).

13         Plaintiffs' Amended Complaint challenges no concrete application of the 2020 Rule that

14   causes them actual harm.  Yet, they mount a facial challenge to the Rule.  They bring claims

15   under the APA and Endangered Species Act (ESA).  But the 2020 Rule can cause no actual harm

16   unless and until it is actually applied to a specific proposed action and results in a final agency

17   decision.  Thus Plaintiffs' demand for direct facial review runs afoul of fundamental precepts of

18   judicial review under Article III of the United States Constitution and the APA.  When

19   proceeding by the general review provisions of the APA or even the ESA's citizen suit

20   provision—rather than by statute-specific judicial review provisions that "permit broad

21   regulations to serve as the 'agency action,' and thus to be the object of judicial review

22   directly"—a plaintiff must "direct its attack against some particular 'agency action' that 'causes

23   it harm."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (*NWF*).  If the 2020 Rule is

24   ever applied to a specific proposed action and results in a decision that actually causes harm to

25   Plaintiffs, they can challenge that decision and the 2020 Rule provisions that the decision may

26   rely upon.  But in its current posture, Plaintiffs' case must be dismissed for lack of jurisdiction.

27

28

1

**BACKGROUND**

2

**I.      National Environmental Policy Act.**

3

Enacted in 1969 and signed into law in 1970, NEPA is considered the first major

4

environmental law in the United States.  Unlike many other statutes, NEPA does not mandate

5

particular results or substantive standards.  It requires federal agencies to go through an

6

analytical process before taking major action significantly affecting the environment.  *Robertson*

7

*v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  The core element of that process

8

is the requirement to prepare a "detailed statement," which under CEQ regulations has come to

9

be known as an "environmental impact statement," or EIS, "on proposals for legislation and

10

other major Federal actions significantly affecting the quality of the human environment."  42

11

U.S.C. § 4332(2)(C).  An EIS generally describes, among other items, the purpose and need for

12

the proposed action, the alternatives to the action, the affected environment, and the

13

environmental consequences of alternatives.  *See id.*; 40 C.F.R. § 1502.10 (2020).[1]

14

**II.     CEQ: The 1970s Guidelines and Regulations.**

15

NEPA also established CEQ—an agency within the Executive Office of the President—

16

"with authority to issue regulations interpreting" the statute.  CEQ "has promulgated regulations

17

to guide federal agencies in determining what actions are subject to [its] statutory requirement."

18

*See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (citing 40 C.F.R. § 1500.3

19

(2003)); *see also* 42 U.S.C. §§ 4332(2)(B), (C), (I), 4342, 4344.  At first, CEQ issued only

20

"guidelines" to federal agencies on how to comply with NEPA.  43 Fed. Reg. 55,978, 55,978

21

(Nov. 29, 1978).  But while CEQ considered the guidelines to be binding on federal agencies,

22

"some agencies viewed them as advisory only."  *Id.*  The courts also differed over the weight that

23

should be accorded the guidelines in evaluating agency compliance with NEPA.  *Id.*  The result

24

was inconsistent agency practices and judicial interpretations of the law, impeding federal

25

26

27

---

28

[1] Defendants use the year "2020" to designate CEQ's new regulations, effective September 14, 2020, and the year "2019" to designate its old regulations.

1  agency coordination and public participation and causing unnecessary paperwork, delay, and

2  duplication of agency efforts.  *Id.*

3  In part to cut through that tangle, CEQ issued regulations implementing NEPA in 1978.

4  The stated goal was "[t]o reduce paperwork, to reduce delays, and at the same time to produce

5  better decisions [that] further the national policy to protect and enhance the quality of the human

6  environment."  *Id.*; *see also* 44 Fed. Reg. 873 (Jan. 3, 1979) (technical corrections); 40 C.F.R. §§

7  1500-1599 (2019) (CEQ regulations).[2]  In the years since the promulgation of the 1978

8  regulations, the Supreme Court has held that CEQ's interpretation of NEPA in its regulations

9  must be given "substantial deference."  *Robertson*, 490 U.S. at 355 (citing *Andrus v. Sierra Club*,

10  442 U.S. 347, 358 (1979)).

11  **III.    NEPA Practice Outgrows the 1978 Regulations.**

12  Since 1978, the implementation of NEPA has become increasingly complicated.  Due in

13  large part to the complexity of the regulations,[3] conflicting judicial decisions have continued to

14  hamper agencies as they try to comply with the statute.  *See* 85 Fed. Reg. at 43,310.  "A

15

16

_____

17  [2] In addition, the 1978 regulations directed federal agencies to adopt their own implementing
procedures, as necessary, in consultation with CEQ.  *See* 40 C.F.R. § 1507.3 (2019).  Over

18  eighty-five federal agencies and their subunits have developed such procedures.  *See, e.g.*, 23
C.F.R. Pt. 771 (2019) (Federal Railroad Administration/Federal Highway Administration/Federal

19  Transit Administration); 33 C.F.R. Pt. 230 (2019) (U.S. Army Corps of Engineers—Civil

20  Works); 36 C.F.R. Pt. 220 (2019) (U.S. Forest Service).

21  [3] The complexity of the regulations has given rise to CEQ's issuance of more than
thirty guidance documents to assist federal agencies in understanding and complying with

22  NEPA.  *See* 85 Fed. Reg. at 43,308-09 (describing CEQ's guidance documents and reports).  In
their own implementing procedures, many federal agencies have included additional processes

23  and practices to improve their own implementation of NEPA.  Presidents also have issued
directives, and Congress has enacted legislation to reduce delays and expedite the

24  implementation of NEPA and the CEQ regulations, including for transportation, water, and other
types of infrastructure projects.  *See id.* at 43,310-12.  Despite these efforts, the NEPA process

25  continues to slow or prevent the development of important infrastructure and other projects that
require federal permits or approvals, as well as rulemakings and other proposed actions.  The

26  past four decades' worth of CEQ guidance, agency practices, more recent presidential directives

27  and statutory developments, and the body of case law related to NEPA implementation had not
previously been harmonized or codified in CEQ's regulations.  The 2020 Rule fixes that

28  interlocking set of problems, decades in the making.

_____

Defs.' Mot. to Dismiss                                                          4
*Alaska Cmty. Action on Toxics v. CEQ*, No. 3:20-cv-05199-RS

challenge for agencies is that courts have interpreted key terms and requirements differently, adding to the complexity of environmental reviews." *Id.* The complexity of the regulations and the diversity of judicial interpretations has led NEPA to become the single most litigated environmental statute in the United States. *See* James E. Salzman and Barton H. Thompson, Jr., ENVIRONMENTAL LAW AND POLICY 340 (5th ed. 2019) ("Perhaps surprisingly, there have been thousands of NEPA suits. It might seem strange that NEPA's seemingly innocuous requirement of preparing an EIS has led to more lawsuits than any other environmental statute.").

Agencies have responded to the litigation risk "by generating voluminous studies analyzing impacts and alternatives well beyond the point where useful information is being produced and utilized by decision makers." 85 Fed. Reg. at 43,305. The public is not served by a plethora of EISs and other NEPA documentation so extensive that finding particular points of environmental concern becomes a search for the proverbial needle in the haystack. In its most recent review, CEQ found that final EISs averaged 661 pages in length. *See* Council on Environmental Quality, Length of Environmental Impact Statements (2013-2018) at 1 (June 12, 2020) (CEQ Length of EISs Report), available at https://ceq.doe.gov/nepa-practice/eis-length.html (last visited Dec. 1, 2020). One quarter were 748 pages or longer. *Id.* This page count does not include appendices, which can span thousands of additional pages. Thus, the average modern EIS is more than four times as long as the already thorough, 150-page level of analysis contemplated by the 1978 regulations. *See* 40 C.F.R. § 1502.7 (2019) (the text of an EIS "shall normally be less than 150 pages").

With the length of documents dramatically increasing, so too are the delays brought about by the NEPA process. *See* 85 Fed. Reg. at 43,305 ("[T]he NEPA process has become increasingly complicated and can involve excessive paperwork and lengthy delays."). As noted above, CEQ has found that NEPA reviews for Federal Highway Administration projects, on average, take more than *seven years* to proceed from a notice of intent to preparation of an EIS to issuance of a record of decision. *See* Council on Environmental Quality, Environmental Impact Statement Timelines (2010-2018) at 10 (June 12, 2020) (2020 Timelines Report), *available at* https://ceq.doe.gov/nepa-practice/eis-timelines.html (last visited Dec. 1, 2020). This is a

dramatic departure from CEQ's prediction in 1981 that federal agencies would be able to complete most EISs in twelve months or less.  *See* 46 Fed. Reg. 18,026, 18,037 (Mar. 23, 1981) (Question 35).  In its most recent review, CEQ found that, across the federal government, the average time for completion of an EIS and issuance of a decision was 4.5 years.  2020 Timelines Report at 1.  CEQ determined that one quarter of EISs took less than 2.2 years, and one quarter of the EISs took *more than 6 years*.  *Id.*  And these timelines do not include further delays associated with litigation.  Note as well that in the infrastructure context, even projects that Congress has fully funded have trouble moving forward.  *See* Philip K. Howard, COMMON GOOD, TWO YEARS, NOT TEN: REDESIGNING INFRASTRUCTURE APPROVALS, at 3 (Sept. 2015), *available at* https://www.commongood.org/wp-content/uploads/2017/07/2YearsNot10Years.pdf (last visited Dec. 1, 2020) ("Funding is obviously critical for new infrastructure, but it's not sufficient.  Even fully-funded projects have trouble moving forward.");[4]  *see also, e.g.*, *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1176 (9th Cir. 1997) (Trott, J., concurring in part and dissenting in part) ("too much of anything can be trouble, and one can only wonder if this case and the tortured history of this traffic amelioration proposal suggest that too much process now renders any controversial project too difficult and costly to accomplish, regardless of its merit").

Although other factors may contribute to project delays, the frequency and consistency of multi-year review processes for EISs leaves no doubt that NEPA implementation and related litigation is a significant factor.  These delays impact the many projects and activities that are subject to NEPA each year, "slow[ing] or prevent[ing] the development of important infrastructure and other projects that require Federal permits or approvals, as well as rulemakings and other proposed actions."  *See* 85 Fed. Reg. at 43,305.  As courts have recognized, a determination that the preparation of an EIS is necessary "has been the kiss of death to many a federal project"—but not because of the project's environmental impacts or lack of need—

---

[4] Philip K. Howard was an advisor to Vice President Gore's Reinventing Government Initiative, writing the introduction to his book on streamlining government.  *See* Vice President Al Gore, COMMON SENSE GOVERNMENT: WORKS BETTER AND COSTS LESS (1995).

1   simply because EISs have become "very costly and time-consuming to prepare."  *City of Dallas*

2   *v. Hall*, 562 F.3d 712, 717 (5th Cir. 2009) (quoting *Sabine River Auth. v. U.S. Dep't of the*

3   *Interior*, 951 F.2d 669, 677 (5th Cir. 1992) (citing *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439,

4   443 (7th Cir. 1990))); *see also New River Valley Greens v. U.S. Dep't of Transp.*, No. 97-1978,

5   1998 WL 633959, at *2 (4th Cir. Sept. 10, 1998) (per curiam) (drolly explaining that NEPA

6   "creates a somewhat cumbersome procedure"); *Utah Int'l Inc. v. Andrus*, 488 F. Supp. 962, 973

7   (D. Utah 1979) ("[T]he enactment of NEPA in 1969 has materially aided the transformation of

8   federal coal leasing into a complicated and cumbersome process.  Substantial delays pending

9   preparation of EISs and the implementation of new regulations appear to be inherent in such a

10  labyrinthine process.").

11          In our modern globalized economy, a project delayed by "analysis paralysis" can often

12  turn into a project that evaporates.  Capital flows elsewhere to a place where a return on

13  investment can be achieved sooner and with more certainty.  This phenomenon harms the ability

14  to build modern, resilient infrastructure.  *See* Update to the Regulations Implementing the

15  Procedural Provisions of the National Environmental Policy Act, Final Rule Response to

16  Comments, RIN 0331-AA03, Council on Environmental Quality (June 30, 2020) (RTC) at 13

17  ("Commenters have noted that the development of infrastructure depends on the existence of

18  predictable and reasonably expeditious schedules for review.").[5]  Additionally, one of the

19  paradoxes of NEPA is that over time the process has discouraged updating of crumbling

20  infrastructure.  In other words, slowing down infrastructure development can and does have the

21  counterproductive effect of worsening the environment by perpetuating older infrastructure and

22  technologies.  *See* RTC at 2 (noting that a timely NEPA process "that is focused on significant

23  environmental impacts will benefit not only our economy but also our environment, resulting in

24  less congested roadways, sustainable infrastructure, and large-scale habitat restoration").

25

26

27  _____

28  [5] https://ceq.doe.gov/docs/laws-regulations/ceq-final-rule-response-to-comments-2020-06-30.pdf
    (last visited Dec. 1, 2020).

1

## IV.     Modernizing the NEPA Regulations.

2        Following so many decades of NEPA practice, implementation, and litigation, CEQ took

3   its first steps towards enhancing the efficiency of the process through rulemaking in June 2018.

4   CEQ issued an advance notice of proposed rulemaking (ANPRM) requesting comment on

5   potential updates and clarifications to the CEQ regulations.  83 Fed. Reg. 28,591 (June 20,

6   2018).  Issuing an ANPRM—an optional APA process—demonstrates CEQ's commitment to

7   soliciting new ideas as it considered potential revisions to its NEPA regulations.  On January 10,

8   2020, CEQ published a notice of proposed rulemaking proposing to update its regulations for

9   implementing the procedural provisions of NEPA.  85 Fed. Reg. 1,684 (Jan. 10, 2020).  "CEQ

10   received approximately 1,145,571 comments on the proposed rule."  85 Fed. Reg. at 43,306.

11        On July 16, 2020, CEQ published its final rule modernizing and clarifying its regulations

12   to facilitate more efficient, effective, and timely NEPA reviews by federal agencies.  The final

13   rule "simplif[ied] regulatory requirements, codif[ied] certain guidance and case law relevant to

14   these regulations, revis[ed] the regulations to reflect current technologies and agency practices,

15   eliminat[ed] obsolete provisions, and improv[ed] the format and readability of the regulations."

16   *Id.*  The revisions finalized in the rule advance the original objective of the 1978 regulations:

17   "[t]o reduce paperwork, to reduce delays, and at the same time to produce better decisions [that]

18   further the national policy to protect and enhance the quality of the human environment."  *Id.* at

19   43,313 (quoting 43 Fed. Reg. at 55,978).

20        CEQ made various revisions in the 2020 Rule "to align the regulations with the text of

21   the NEPA statute, including revisions to reflect the procedural nature of the statute."  *Id.*  CEQ

22   also revised the regulations to ensure that NEPA documents are as concise as possible and "serve

23   their purpose of informing decision makers regarding significant potential environmental effects

24   of proposed major Federal actions and the public of the environmental issues in the pending

25   decision-making process."  *Id.*  CEQ made changes "to ensure that the regulations reflect

26   changes in technology, increase public participation in the process, and facilitate the use of

27   existing studies, analyses, and environmental documents prepared by States, Tribes, and local

28   governments."  *Id.*

1   In sum, in the 2020 Rule CEQ sought to provide greater clarity for federal agencies,
2   States, Tribes, localities, and the public, and to advance the original goals of the CEQ regulations
3   to reduce paperwork and delays and promote better decisions consistent with NEPA's policy
4   objectives.
5   The 2020 Rule took effect on September 14, 2020.  *See* 40 C.F.R. § 1506.13 (2020).
6   Federal agencies throughout the Executive Branch are now beginning to implement the updated
7   CEQ regulations, including by proposing updates to agency NEPA procedures for public review
8   and comment.  40 C.F.R. § 1507.3 (2020) (providing that agencies are to revise their NEPA
9   procedures in consultation with CEQ); 40 C.F.R. § 1501.1(b) (providing that agencies may
10   determine whether actions or decisions are "major Federal actions" on a case-by-case basis or
11   through the promulgation of agency-specific NEPA procedures, as appropriate); *see also*, *e.g.*,
12   Procedures for Considering Environmental Impacts, 85 Fed. Reg. 74,640 (Nov. 23, 2020) (issued
13   for public comment by the Office of the Secretary, Department of Transportation).

14   **V.    The Current Lawsuit.**
15   On July 29, 2020, Plaintiffs filed a Complaint bringing a direct, facial challenge to the
16   2020 Rule, Compl., ECF No. 1, which they amended on October 6, 2020 to add (inter alia) a
17   claim under the ESA, Am. Compl., ECF No. 22.  The Amended Complaint alleges that the 2020
18   Rule violates NEPA, the ESA, and the APA in various ways.  *Id.* ¶¶ 256-315.  The Amended
19   Complaint makes various allegations that the 2020 Rule *could* cause *other* federal agencies to
20   apply the 2020 Rule to *future* NEPA reviews in some way that could harm Plaintiffs' interests.
21   *Id.* ¶¶ 12-158.  It also alleges that CEQ failed to consult under the ESA with the relevant wildlife
22   agencies over the effects of the 2020 Rule on threatened and endangered species.  *Id.* ¶¶ 305-15.
23   But the Amended Complaint (like the original Complaint) does not tie its allegations of legal
24   violations or harm to any concrete, real-world application of the 2020 Rule in final agency
25   action.  Notwithstanding that fatal omission, the Amended Complaint asks the Court to vacate
26   and set aside the final rule and reinstate the 1978 regulations.  *Id.* at Prayer for Relief ¶¶ (1)-(9).
27
28

1

**STANDARD OF REVIEW**

2      A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure

3 challenges subject matter jurisdiction.  Plaintiffs bear the burden of establishing subject matter

4 jurisdiction.  *See St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989).  If the material

5 jurisdictional facts are not in dispute, and the moving party is entitled to judgment as a matter of

6 law, the Court should grant the Rule 12(b)(1) motion to dismiss.  *Id.*

7

**ARGUMENT**

8      Article III of the United States Constitution limits the jurisdiction of federal courts to

9 "Cases" and "Controversies."  U.S. Const. art. III, § 2.  Effectuated by a cluster of overlapping

10 doctrines—including standing and ripeness—the case-or-controversy requirement serves both to

11 maintain the separation of powers and to ensure that legal issues "will be resolved, not in the

12 rarified atmosphere of a debating society, but in a concrete factual context conducive to a

13 realistic appreciation of the consequences of judicial action."  *Valley Forge Christian Coll. v.*

14 *Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982); *see also Clapper*

15 *v. Amnesty Int'l, USA*, 568 U.S. 398, 408-09 (2013).

16      Here, well-established Article III principles as applied generally and in the context of

17 APA review—and as articulated in a plethora of Supreme Court cases—demonstrate that

18 Plaintiffs' broad, facial challenge to the 2020 Rule is not justiciable because it is not ripe and

19 because Plaintiffs lack standing.  As will be further explained below, there is no jurisdiction for

20 judicial review unless Plaintiffs challenge particular provisions of the 2020 Rule in the context of

21 specific application in final agency action causing them actual, concrete "real world" harm.

22   **I.     In the Absence of a Live Dispute Over the Application of the Regulations to a**
23            **Particular Project or Decision, Plaintiffs' Challenge Is Not Ripe.**

24      Because "NEPA provides no private right of action," Plaintiffs' challenge to CEQ's

25 NEPA compliance in promulgating 2020 Rule is brought under the APA.  *Ranchers Cattlemen*

26 *Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1102 (9th

27 Cir. 2005).  To determine whether administrative action is ripe for judicial review under the APA

28

and ESA,[6] courts evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding review. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967); *see also Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 670 (9th Cir. 2005).

### A. A Regulation Is Ordinarily Subject to APA Review Only As Part of a Challenge to a Particular Application of the Regulation.

Where—as here—the challenged agency action is a regulation, courts presume the challenge is not ripe. As the Supreme Court explained in *NWF*,

> Absent [a pre-enforcement review] provision, however, a regulation is not ordinarily considered the type of agency action "ripe" for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.

497 U.S. at 891. The only exceptions to this presumption against pre-application review of regulations are where there is a special review statute permitting the regulation "to be the object of judicial review directly" or where the regulation is a substantive rule requiring the plaintiff to immediately adjust its primary conduct under threat of serious penalties. *Id.*

Subsequent decisions of the Supreme Court are to the same effect. In *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43 (1993), the Court applied *NWF* in rejecting, as unripe, a challenge to regulations issued by the Immigration and Naturalization Service. Those regulations would be applied in individual agency adjudications to determine whether an alien was eligible for legalization, a particular form of immigration relief. The Court explained that newly promulgated regulations may be ripe for judicial review outside the context of any

---

[6] The ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1), authorizes a private right of action for Plaintiffs' newly-added claim seeking to compel CEQ to consult with the appropriate federal wildlife services under Section 7 of the ESA (Am. Compl. ¶¶ 6, 305-15). *See Wash. Toxics Coal. v. Env't Prot. Agency*, 413 F.3d 1024, 1034 (9th Cir. 2005). But this Court has held that the *Abbott Labs* ripeness analysis, discussed herein, also applies to pre-enforcement review claims brought under the ESA's citizen suit provision. *See San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1173 (9th Cir. 2011); *see also Tex. Energy Rsrv. Corp. v. Dep't of Energy*, 710 F.2d 814, 817-18 (Temp. Emer. Ct. App. 1983). Plaintiffs' ESA claim therefore is not ripe for the same reasons as their NEPA and APA claims.

Defs.' Mot. to Dismiss                                                      11
*Alaska Cmty. Action on Toxics v. CEQ*, No. 3:20-cv-05199-RS

1   particular affirmative application by the agency *only* if the regulations "present[] plaintiffs with

2   the immediate dilemma to choose between complying with newly imposed, disadvantageous

3   restrictions and risking serious penalties for violation." *Id.* at 57 (citing, inter alia, *Abbott Labs.*,

4   387 U.S. at 152-53).  The Court cited *NWF* for the proposition that, if such a dilemma is absent,

5   "a controversy concerning a regulation is not ordinarily ripe for review under the [APA] until the

6   regulation has been applied to the claimant's situation by some concrete action."  *Reno*, 509 U.S.

7   at 58.  Noting that the regulations at issue in *Reno* "impose[d] no penalties for violating any

8   newly imposed restriction," the Court held that the plaintiffs' challenge would not be ripe until

9   they had taken the steps necessary to cause the regulations to be applied to their own applications

10  for legalization.  *Id.* at 58-59.

11      Similarly, in *National Park Hospitality Ass'n v. Department of the Interior*, 538 U.S. 803

12  (2003), the Court considered a facial challenge to a National Park Service regulation.  That

13  regulation provided that its concession contracts "are not contracts within the meaning of" the

14  Contract Disputes Act.  *Id.* at 806 (quoting 36 C.F.R. § 51.3 (2002)).  The Court concluded that

15  the case was not ripe.  Applying the two-part *Abbott Labs* test, the Court found that there would

16  be no undue hardship from withholding review.  The rule did not command anyone to do or

17  refrain from doing anything, did not affect the concessioner plaintiffs' primary conduct, and did

18  not impose serious penalties for violations.  *Id.* at 809-10.  In addition, the Court held that the

19  case was not fit for review, even though the question presented was purely legal and the rule

20  constituted "final agency action."  The Court concluded that "further factual development would

21  significantly advance our ability to deal with the legal issues presented."  *Id.* at 812 (citation and

22  internal quotation marks omitted).  Accordingly, the Court held that "judicial resolution of the

23  question presented here should await a concrete dispute about a particular concession contract."

24  *Id.*

25      Likewise, in *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998), the Court held that

26  a facial challenge to a forest plan for a particular National Forest was not ripe for judicial review.

27

28

1    *Id.* at 732-37.[7]   The Court noted that the plan alone caused no hardship to the plaintiff—it "does

2    not give anyone a legal right to cut trees, nor does it abolish anyone's legal authority to object to

3    trees being cut." *Id.* at 733.   Rather, as here, plaintiff "will have ample opportunity later to bring

4    its legal challenge" to the plan in the context of a specific logging project "at a time when harm

5    is more imminent and more certain." *Id.* at 734.   And in *Habeas Corpus Resource Center v. U.S.*

6    *Department of Justice*, 816 F.3d 1241 (9th Cir. 2016), the Ninth Circuit similarly held that a

7    facial challenge to the Department of Justice's final regulations for fast-tracking certain habeas

8    corpus petitions was not ripe for review.   816 F.3d at 1252-54.   There, as here, the final

9    regulations did not immediately affect the plaintiffs' primary conduct. *Id.* at 1252.   Rather, the

10   Court classified the regulations' impact as indirect, because there (as here) the regulations would

11   only impact plaintiffs to the extent they are applied in future final agency actions. *Id.*   The Court

12   thus held that the facial challenge was not ripe because, "in the absence of a concrete application

13   of the Final Regulations, the challenges to the substance of the Final Regulations represent

14   'abstract disagreements over administrative policies' that the ripeness doctrine seeks to avoid."

15   *Id.* at 1254 (quoting *Ohio Forestry*, 523 U.S. at 736 (quoting *Abbott Labs.*, 387 U.S. at 148)); *see*

16   *also Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18-21 (D.C. Cir. 2006).

17   

18   ───────────────────

     [7] Dictum from *Ohio Forestry* states that "*a person with standing who is injured by a failure to*
19   *comply with the NEPA procedure* may complain of that failure at the time the failure takes place,
     for the claim can never get riper." 523 U.S. at 737 (emphasis added).   Thus, to pursue claims that
20   CEQ committed procedural errors, Plaintiffs must demonstrate standing (which, as addressed
     below, they cannot).   Moreover, the Court's dictum should not be taken to mean that every claim
21   raising a procedural error is ripe for judicial review as soon as it occurs.   Although many
     procedural claims are ripe as soon as the alleged violations occur—if, for example, the associated
22   agency action *directly* authorized particular trees to be cut, a specific highway to be built, or any
     other specific activity that would have direct on-the-ground consequences.   Thus, for a person
23   with standing, a regulation would be subject to immediate challenge for failure to comply with a
     procedure if it directly authorized actions with real on-the-ground consequences.   The Ninth
24   Circuit in *Cottonwood Environmental Law Center v. U.S. Forest Service*, 789 F.3d 1075 (9th Cir.
     2015), *abrogated in part by statute*, 16 U.S.C. § 1604(d)(2), viewed the standards and guidelines
25   for preserving lynx habitat at issue in that case as having such consequences because they were
     being actively applied in site-specific projects that already had been authorized—and in fact
26   many were actually underway.   789 F.3d at 1084.   But this is not such a case.   Unlike in
     *Cottonwood*, where the court viewed the plaintiffs' allegations as tying their "injury to imminent
27   harm in specific forests and project areas," *id.* at 1081, no such imminent harm is alleged here.

28

1

**B.      No Special Circumstances Justify Direct Review of the 2020 Rule.**

2

Under the first prong of the *Abbott Labs* test—as applied by the Supreme Court in

3   *NWF*—a challenge to a regulation is presumed not to be fit for review until the regulation has

4   been applied in a manner that harms a plaintiff.  497 U.S. at 891.  The only exceptions to this

5   presumption are where there is a special review statute permitting the regulation "to be the object

6   of review directly" or where the regulation is a "substantive rule" requiring a plaintiff to

7   immediately adjust its primary conduct under threat of serious penalties.  *Id.*  Neither of those

8   special circumstances is present here.

9

First, neither the APA nor NEPA nor the ESA contains any specialized review procedure

10   that would allow for a direct challenge to CEQ regulations.[8]  *Mayo v. Reynolds*, 875 F.3d 11, 19

11   (D.C. Cir. 2017); *see supra* n.6.  Second, the 2020 Rule is a procedural rule guiding actions of

12   other agencies—it is not a substantive rule regulating the conduct of, or posing an immediate

13   threat to, Plaintiffs or their members.  *See* 85 Fed. Reg. at 43,358 (The regulations "provide

14   direction to Federal agencies to determine what actions are subject to NEPA's procedural

15   requirements and the level of NEPA review where applicable."); *Pub. Citizen*, 541 U.S. at 756-

16   57 ("NEPA imposes only procedural requirements on federal agencies with a particular focus on

17   requiring agencies to undertake analyses of the environmental impact of their proposals and

18   actions." (citing *Robertson*, 490 U.S. at 349-50)).  As a rule outlining the procedures agencies

19   will follow as they conduct environmental analysis of future decisions, the 2020 Rule does not

20   threaten Plaintiffs with the prospect of penalties of any kind, let alone the serious penalties

21   needed to overcome the presumption against direct facial review.

22

23

24

_____

25   [8] This is in contrast, for example, to the Clean Air Act, which expressly allows direct review of
     certain Environmental Protection Agency regulations in the D.C. Circuit within sixty days of
26   publication, because Congress saw a need to confirm rapidly, and on a national basis, the validity
     of a new set of clean air regulations through the process of judicial review.  42 U.S.C. §
27   7607(b)(1).  As to NEPA or the ESA, Congress did not opt to create such a carefully calibrated
     judicial review provision explicitly authorizing an exception to the ordinary rule that facial
28   challenges to regulations are not ripe.

1    Two mutually reinforcing sets of controlling principles support the fitness for review

2    framework described above.  First, the declaratory and injunctive remedies that Plaintiffs seek

3    under the APA and ESA are equitable in nature.  As the Supreme Court explained in *Abbott*

4    *Labs*, such remedies are discretionary, and "courts traditionally have been reluctant to apply

5    them to administrative determinations unless they arise in the context of a controversy 'ripe' for

6    judicial resolution." 387 U.S. at 148; *see Reno*, 509 U.S. at 57; *Amoco Prod. Co. v. Vill. of*

7    *Gambell*, 480 U.S. 531, 542-43 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-13

8    (1982).  Absent a statute directing that particular categories of regulations are subject to direct

9    pre-enforcement review, the ripeness principles discussed above define the manner in which, and

10   extent to which, a reviewing court's equitable discretion should be exercised.

11   Second, the APA does not authorize direct and immediate judicial review of every

12   agency action—only of "[a]gency action made reviewable by statute and final agency action for

13   which there is no other adequate remedy in a court." 5 U.S.C. § 704.  Because NEPA itself does

14   not confer a private right of action, NEPA claims must proceed under the APA, but may proceed

15   in this manner only if "there is no other adequate remedy in a court."  Where a particular mode

16   of review carries with it the prospect of serious penalties for an unsuccessful challenge—such as

17   in a defense against an enforcement suit—that mode of review ordinarily would not be

18   "adequate" within the meaning of the APA.  But where, as here, judicial review can be deferred

19   until a concrete application of a rule and where no potential challenger is forced into the

20   Hobson's Choice-style dilemma described in *Abbott Labs*, immediate pre-enforcement review of

21   agency regulations is unavailable under the APA.  In these circumstances, judicial review of the

22   agency's application of the rule in a site-specific decision is a fully adequate remedy for any

23   legal defect in the regulation.  *See Reno*, 509 U.S. at 60-61; *Toilet Goods Ass'n v. Gardner*, 387

24   U.S. 158, 165 (1967) (where non-compliance with an agency regulation would result in only a

25   minor sanction, which could then be challenged in court, "[s]uch review will provide an adequate

26   forum for testing the regulation in a concrete situation").  The same is true for the ESA claim.

27   *See San Luis & Delta-Mendota Water Auth.*, 638 F.3d at 1173 (*Abbott Labs* ripeness analysis

28   also applies to pre-enforcement review claims brought under the ESA's citizen suit provision).

1
2

**C.**     **The Hardship to the Parties Favors Deferring Judicial Review Until the 2020 Rule Is Applied to Concrete Decisions.**

3
4
5

In addition to the fitness of an issue for judicial review, courts must consider the relative "hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149; *see also Ohio Forestry*, 523 U.S. at 733. This factor also weighs in favor of concluding that Plaintiffs' facial challenge to the 2020 Rule is not ripe. *See Habeas Corpus Res. Ctr.*, 816 F.3d at 1253-54 (holding that a challenge seeking pre-enforcement review of a regulation was not ripe because it would hinder agency efforts to refine its policies).

6
7
8

As noted above, Plaintiffs face absolutely no hardship from waiting to pursue their claims through a challenge to a specific application of the 2020 Rule. The 2020 Rule itself does not govern primary conduct and thus has no impact on Plaintiffs—it does not "command anyone to do anything or to refrain from doing anything"; "grant, withhold, or modify any formal legal license, power, or authority"; "subject anyone to any civil or criminal liability"; or create "legal rights or obligations." *Ohio Forestry*, 523 U.S. at 733. The 2020 Rule will only impact Plaintiffs if and when it is applied in the context of a future site-specific action that affects their interests. While it might be "easier, and certainly cheaper, to mount one legal challenge against the [Rule] now, than to pursue many challenges to each site-specific [] decision to which the Rule might eventually lead . . . [t]he case-by-case approach is the traditional, and remains the normal, mode of operation of the courts." **Error! Bookmark not defined.***Id.* at 735 (internal quotation marks, ellipses and citations omitted).

9
10
11
12
13
14
15
16
17
18
19
20

In contrast, immediate facial review would hinder agency efforts to refine their policies. Before the 2020 Rule can result in final agency actions that harm Plaintiffs, CEQ and federal agencies must apply the procedural rule to site-specific actions. The 2020 Rule did not even become effective until September 14, 2020. Moreover, federal agencies, in consultation with CEQ, are developing and then will propose for public comment agency-specific NEPA procedures in response to the 2020 Rule. *See* 85 Fed. Reg. at 43,373-74 (40 C.F.R. § 1507.3 (2020)). In addition to conforming revisions, the 2020 Rule instructs agencies to develop and include in their implementing procedures processes unique to each agency, as necessary. The

21
22
23
24
25
26
27
28

1    2020 Rule directs agencies to develop "agency NEPA procedures to improve agency efficiency

2    and ensure that agencies make decisions in accordance with the Act's procedural requirements."

3    *See* 85 Fed. Reg. at 43,373.

4           Under these circumstances, allowing a facial challenge to the 2020 Rule to proceed at this

5    point would "hinder agency efforts to refine [their] policies." *Ohio Forestry*, 523 U.S. at 735.

6    The 2020 Rule requires federal agencies to rethink and then revise their own NEPA procedures

7    in light of the 2020 Rule and their existing statutory authorities.  Many of these changes will be

8    developed as part of public processes under the requirements of the 2020 Rule.  85 Fed. Reg. at

9    43,373 ("Agencies shall provide an opportunity for public review and review by the Council for

10   conformity with the Act and the regulations in this subchapter before adopting their final

11   procedures.").  Critically, "[t]o prevail in such a facial challenge," Plaintiffs "must establish that

12   no set of circumstances exists under which the [regulation] would be valid." *Reno v. Flores*, 507

13   U.S. 292, 301 (1993) (citation omitted).  It is entirely speculative for Plaintiffs to make such

14   claims now.

15          In the absence of a site-specific application, Plaintiffs' challenge to the 2020 Rule is both

16   unmanageable and relies on speculation about future applications.  *See Thomas v. Anchorage*

17   *Equal Rights Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000) (rejecting claim based on chain of

18   uncertain future events as unripe).  Moreover, to the extent they might be harmed by some

19   concrete application of the procedures contained in the 2020 Rule, Plaintiffs would suffer no

20   hardship from waiting to bring their challenge until it materializes and solidifies.  At this time,

21   Plaintiffs have not alleged a cognizable injury-in-fact.  But they are free to seek judicial review

22   of the relevant agency action if their now-speculative alleged harms ever become concrete and

23   particularized.  "A claim is not ripe for adjudication if it rests upon contingent future events that

24   may not occur as anticipated, or indeed may not occur at all." *Ass'n of Am. Med. Colls. v. United*

25   *States*, 217 F.3d 770, 782 (9th Cir. 2000) (quoting *Texas v. United States*, 523 U.S. 296, 300

26   (1998)).  Allowing for judicial review in this case—before Plaintiffs have identified a specific

27   proposed action that has resulted in a decision causing them harm—would interfere in numerous

28

Defs.' Mot. to Dismiss                                                                              17
*Alaska Cmty. Action on Toxics v. CEQ*, No. 3:20-cv-05199-RS

1   agencies' environmental review processes and embroil this Court in an abstract challenge to a

2   government-wide program that does not raise any special circumstances justifying direct review.

3          At this point, no one can say with any certainty if the first concrete application of the new

4   NEPA regulations resulting in final agency action that can be challenged will arise in a General

5   Services Administration building project for a new federal courthouse, a Department of

6   Transportation case about a new off-ramp from a highway, a Federal Energy Regulatory

7   Commission regulation involving wholesale energy markets, a Federal Communications

8   Commission order concerning 5G networks, a Bureau of Land Management easement for an

9   electric transmission line for a wind or solar farm, or a new Department of Housing and Urban

10  Development fair housing initiative—or any one of hundreds of other federal agency contexts

11  and permutations of new rules, new adjudications, or new orders that hybridize rulemaking and

12  adjudication procedures.  And when application of a promulgated rule presents such a black box,

13  facial challenges to the overarching promulgated rule are not ripe.  Uncertainty simply is not

14  enough.  *See Nat'l Park Hosp. Ass'n*, 538 U.S. at 811 (mere uncertainty as to the validity of a

15  legal rule is insufficient hardship for purposes of the ripeness analysis); *see also Safer Chems.,*

16  *Healthy Fams. v. EPA*, 943 F.3d 397, 415 (9th Cir. 2019).

17         In sum, a suit challenging the 2020 Rule in the context of some forthcoming, site-specific

18  action subject to NEPA and the ESA would provide a fully "adequate remedy" under the APA

19  and the ESA for any legal defect in the 2020 Rule.  Plaintiffs' lawsuit does not identify such a

20  site-specific action, and thus it must be dismissed because it is not ripe.

21  **II.   In the Absence of a Live Dispute Over the Concrete, Site-Specific Application of the**
    **2020 Rule, Plaintiffs Lack Standing.**
22

23         For similar reasons, Plaintiffs lack Article III standing.  To establish Article III standing,

24  a plaintiff must allege facts showing (1) that it has suffered an injury in fact, (2) that is fairly

25  traceable to the defendant's conduct, and (3) that it is likely, and not merely speculative, that the

26  injury will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61

27  (1992).  The elements of standing must exist at the time the complaint is filed.  *Id.* at 570 n.5.

28  "Where, as here, a case is at the pleading stage, the plaintiff must clearly … allege facts

1   demonstrating each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citation and

2   internal quotation marks omitted).  A straightforward application of the Supreme Court's

3   decision in *Summers v. Earth Island Institute* demonstrates that Plaintiffs lack standing to bring a

4   facial challenge to the 2020 Rule.

5        **A.    *Summers* Forecloses Plaintiffs' Lawsuit.**

6        Like respondents in *Summers*, Plaintiffs challenge a rule that "neither require[s] nor

7   forbid[s] any action" on their part.  *See Habeas Corpus Res. Ctr.*, 816 F.3d at 1252 (explaining

8   that regulations governing future agency decisionmaking do not regulate citizens' "primary

9   conduct").  They are therefore not the object of the 2020 Rule.  "[W]hen the plaintiff is not

10  [it]self the object of the government action or inaction [it] challenges, standing is not precluded,

11  but is ordinarily 'substantially more difficult' to establish." *Defs. of Wildlife*, 504 U.S at 562

12  (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)).  Thus, Plaintiffs face a high bar to establish

13  their standing here—one they cannot surmount with their speculative allegations of possible

14  future harms disconnected to any challenge to a concrete application of the 2020 Rule.

15       Plaintiffs "can demonstrate standing only if application of the [2020 Rule] by the

16  Government will affect" them in a way that threatens to impose an "'injury in fact' that is

17  concrete and particularized." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493-494 (2009).

18  That threat of "'concrete' injury must be '*de facto*'; that is, it must actually exist." *Spokeo*, 136

19  S. Ct. at 1548.  It also "must be actual and imminent, not conjectural or hypothetical." *Summers*,

20  555 U.S. at 493; *see also Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).  To meet the

21  imminence requirement, a "threatened injury must be certainly impending"; "[a]llegations of

22  *possible* future injury are not sufficient." *Clapper*, 568 U.S.at 409-10 (citation omitted).  Merely

23  increasing the risk of some speculative future harm is not enough.  *Id.*  Combined, these

24  requirements ensure that the alleged injury is not too speculative for Article III purposes, *id.* at

25  409, and "that 'there is a real need to exercise the power of judicial review in order to protect the

26  interests of the complaining party.'" *Summers*, 555 U.S. at 493 (quoting *Schlesinger v.*

27  *Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974)).

28

In *Summers*, the Supreme Court applied these deep-rooted standing principles to a suit brought by environmental organizations to prevent the Forest Service from enforcing regulations that exempted certain smaller projects from the notice, comment, and appeal process used by the Forest Service for more significant projects. 555 U.S. at 490-91. The organizations challenged both the procedural regulations themselves and a particular application of the regulations to the Burnt Ridge Project. *Id.* at 491. By the time the case came to the Supreme Court, the parties had settled their dispute concerning the Burnt Ridge Project, leaving only the plaintiffs' challenge to the regulations in the abstract. *Id.* at 491-92, 494. The Supreme Court held that the organizations did not have standing to challenge the regulations after the settlement because plaintiffs failed to demonstrate that the government had applied the regulations to any other particular project that would imminently harm one of their members. *Id.* at 492-96. According to the Supreme Court, there is

> no precedent for the proposition that when a plaintiff has sued to challenge the lawfulness of certain action or threatened action but has settled that suit, he retains standing to challenge the basis for that action (here, the regulation in the abstract), apart from any concrete application that threatens imminent harm to his interests.

*Id.* at 494. "Such a holding," the Supreme Court continued, "would fly in the face of Article III's injury-in-fact requirement." *Id.*

Just as in *Summers*, Plaintiffs' challenge presents precisely the sort of review— untethered to a concrete factual context—that flies in the face of Article III. Plaintiffs assert fears and concerns that the 2020 Rule will result in future projects or decisions premised on less robust impacts or alternatives analyses, predictions of diminished access to information and public participation, and projected resource expenditures on additional future litigation, information gathering, and early commenting. Am. Compl. ¶¶ 9-160. But none of these hypothetical future projects have been developed under the 2020 Rule. And Plaintiffs offer only speculation about how, when, and where the 2020 Rule will be applied. These speculative claims are followed by further conjecture about how the 2020 Rule, as applied to possible future actions, would result in injury. But it is not sufficient to recite that they are harmed because the 2020 regulations *could* allegedly cause *other* federal agencies to apply the 2020 Rule to *future*

1  NEPA reviews in an attenuated chain of events that *could* lead to environmental harm.[9]  The

2  causal chain is too tenuous.  Even before *Summers*, it was well established that "[a]llegations of

3  possible future injury do not satisfy the requirements of Art[icle] III."  *Whitmore*, 495 U.S. at

4  158.

5       As the Supreme Court recognized in *Summers*, typically only concrete applications of

6  regulations in the context of ground-disturbing actions have the potential to cause injuries in fact

7  to a citizen's interests.  That does not mean that one must wait for the ground-disturbing action to

8  begin before bringing suit, but it does mean that, until a specific final agency action authorizes

9  that action to occur, the risk of harm to the plaintiff remains too distant and too speculative for

10  Article III.  Thus, challenging a concrete application of a regulation is necessary to the Article III

11  analysis.  In fact, even before *Summers*, the Supreme Court recognized that programmatic

12  challenges disconnected from challenges to specific applications of the program (such as through

13  a project approval) were "rarely if ever appropriate for federal-court adjudication."  *Defs. of*

14  *Wildlife*, 504 U.S. at 568 (quoting *Allen*, 468 U.S. at 759-60); *see also Norton v. S. Utah*

15  *Wilderness All.*, 542 U.S. 55, 67 (2004) ("The prospect of pervasive oversight by federal courts

16  over the manner and pace of agency compliance with such congressional directives is not

17  contemplated by the APA."); *Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1221 (9th

18  Cir. 2011) (same).

19       The Ninth Circuit confirmed these principles in *Wilderness Society, Inc. v. Rey*, 622 F.3d

20  1251 (9th Cir. 2010), holding that "[t]he lack of any linkage between the project and the claimed

21

22  ─────────────────

23  [9] For the same reasons, Plaintiffs also cannot sustain the specific requirements of representational
or organizational standing.  To demonstrate representational standing (also known as

24  associational standing), an organization must show that it has members who "would have
standing to sue in [their] own right."  *Fleck & Assocs., Inc. v. Phoenix*, 471 F.3d 1100, 1105 (9th

25  Cir. 2006).  To demonstrate organizational standing, an organization must show a concrete and
imminent injury that is fairly traceable to the challenged conduct and that could be redressed by a

26  favorable court order—*i.e.*, the same standard three-part test that applies to individuals.  *La*
*Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir.

27  2010).  Plaintiffs fail in both regards because their alleged harms are entirely speculative and
untethered to any threat of imminent injury to a concrete interest, and are therefore insufficient

28  for Article III standing.

1  injury undermines the effort to establish standing." *Id.* at 1257; *see also id.* at 1260 ("A concrete
2  and particular project must be connected to the procedural loss.").  There, as here, the court was
3  reviewing a facial challenge to federal regulations that provided certain procedures governing
4  agency decisionmaking (*i.e.*, regulations on regulations). *Id.* at 1253-54.  Before the district
5  court in *Rey*, the plaintiffs claimed that the deprivation of the procedure itself (*in vacuo*) was
6  sufficient to confer Article III standing, but they changed direction on appeal after *Summers*,
7  contending instead that their Article III injuries stemmed from a concrete application of the
8  challenged regulations in an action known as the Ash Creek Project. *Id.* at 1256-57.  But the
9  Ninth Circuit rejected this basis for standing because the Ash Creek Project was not even in
10  existence when the complaint was filed. *Id.* at 1257.

11      Here too, Plaintiffs challenged the 2020 Rule on July 29, 2020, *before* it even went into
12  effect on September 14, 2020.  And their Amended Complaint adds an ESA claim, but does
13  nothing to fix this fatal problem.  They necessarily therefore cannot be challenging any concrete
14  and particular project applying the 2020 Rule, as required by *Summers* and *Rey*.  And at this
15  point one can only speculate when and if such a concrete and particular project will be approved,
16  whether it will actually injure Plaintiffs' interests, in a geographic location that they intend to
17  imminently visit, and whether those injuries are caused by the 2020 Rule or by some other factor.
18  Plaintiffs therefore lack Article III standing.

19      **B.  Plaintiffs Fail to Allege Specific Factual Allegations of Concrete, Imminent
20           Injury and Instead Rely on Speculation About Possible Future Injuries to
             Their Interests in the Environment.**

21      Because Plaintiffs fail to challenge a concrete application of the 2020 Rule, their
22  allegations of injury to their interests in the environment necessarily rest on pure speculation
23  about how federal agencies other than CEQ may apply the 2020 Rule in the future.  As noted
24  above, the 2020 Rule did not even become effective until September 14, 2020.  Moreover,
25  agency-specific processes are often governed by separate substantive statutes that control agency
26  decisionmaking and not just by the APA alone (the APA provides a default set of procedures that
27  apply if Congress does not provide more specific structure for matters such as the promulgation
28  of regulations, the public commenting processes, and judicial review).  How the 2020 Rule will

Defs.' Mot. to Dismiss                                                              22
*Alaska Cmty. Action on Toxics v. CEQ*, No. 3:20-cv-05199-RS

1    fit into those processes is largely left to agency discretion.  Thus, the when, the where, and the

2    how of the 2020 Rule's application to a specific project or decision is within the control of other

3    federal agencies, not CEQ.  *See supra* § I.C.

4           Plaintiffs' speculation regarding how federal agencies other than CEQ will apply the

5    2020 Rule in a manner that allegedly may harm their interests in the physical environment can be

6    separated into four basic categories.  But each category of alleged harm is insufficient to confer

7    Article III standing because each category is untethered to any concrete application of the 2020

8    Rule and therefore rests on pure speculation of how federal agencies other than CEQ will apply

9    the 2020 Rule in the context of their own decisionmaking.

10          *First*, Plaintiffs speculate that under the 2020 Rule various agencies will fail to consider

11   impacts of their proposed projects, including impacts previously categorized as indirect or

12   cumulative under the 1978 regulations.  Am. Compl. ¶¶ 25, 31-32, 36, 38, 45, 50, 54, 62, 67, 70-

13   71, 74, 83, 87, 96, 101-02, 106-07, 110, 125, 144, 155.  But the 2020 Rule does not preclude

14   consideration of impacts previously categorized as indirect or cumulative.  The 2020 Rule rather

15   replaces the concepts of indirect and cumulative impacts with a more straightforward

16   requirement to consider "those effects that are reasonably foreseeable and have a reasonably

17   close causal relationship to the proposed action" consistent with case law, including from the

18   Supreme Court, that bounded all effects analysis. 85 Fed. Reg. at 43,331.  Under that standard,

19   these agencies can consider the kind of indirect and cumulative impacts that Plaintiffs speculate

20   may not be considered under the new rule.  At this point, Plaintiffs can do no more than

21   speculate about how the 2020 Rule might produce a different analysis from its predecessor.

22          Importantly, this proximate-cause analysis approach to effects under NEPA was already

23   the approach the Supreme Court had applied in cases such as *Public Citizen*.  *See* 541 U.S. at 767

24   ("NEPA requires 'a reasonably close causal relationship' between the environmental effect and

25   the alleged cause . . . [akin] to the 'familiar doctrine of proximate cause from tort law.'" (quoting

26   *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983))).  Even before

27   the new Rule, NEPA analysis was not limitless.  Thus, how an impact is categorized is the

28   incorrect question under NEPA.  Instead, the proper question is whether that impact is the

Defs.' Mot. to Dismiss                                                                    23
*Alaska Cmty. Action on Toxics v. CEQ*, No. 3:20-cv-05199-RS

1   reasonably foreseeable result of the proposed action—regardless of whether it would be

2   categorized as direct, indirect, or cumulative under the old regulations.  At this time, Plaintiffs

3   can only speculate that some impact that used to be categorized as indirect or cumulative will

4   escape analysis, and that failure will affect their interests in a specific geographic location.  Such

5   speculation deserves no audience in a federal court.

6        *Second*, Plaintiffs speculate that various federal agencies might not consider a full range

7   of alternatives to their proposed actions.  Am. Compl. ¶¶ 45, 96.  But just as the 1978 regulations

8   had been interpreted, the 2020 Rule requires these agencies to consider a "reasonable range of

9   alternatives."  85 Fed. Reg. at 43,351.  And, just as the Supreme Court required in *Public Citizen*,

10  Plaintiffs have an obligation under the 2020 Rule to alert agencies to particular alternatives or

11  forfeit their challenges to the agencies' alternatives analysis in a subsequent lawsuit.  *See Pub.*

12  *Citizen*, 541 U.S. at 764-65; 85 Fed. Reg. at 43,317.  So citizens can alert agencies to reasonable

13  alternatives and agencies have an incentive to consider such alternatives to avoid litigation.  It is

14  therefore pure conjecture that under the 2020 Rule some federal agency might not in the future

15  properly consider alternatives.

16       *Third*, Plaintiffs speculate that they may be harmed by a future private action facilitated

17  in part by Farm Service Agency (FSA) loan guarantees, which the 2020 Rule exempts from

18  NEPA because the guarantees are not *major federal* actions (85 Fed. Reg. at 43,348).  Am.

19  Compl. ¶¶ 68-73.  But, of course, Plaintiffs cannot say when and even if any loan guarantee will

20  be given to a private lender that will cause any concrete harm to their interests.  Plaintiffs'

21  speculation is never sufficient but is particularly problematic here because the FSA has indicated

22  that—pursuant to 40 C.F.R. § 1501.1(b) (2020)—it will take (subsequent) final agency action to

23  revise its respective regulations and policies to account for the 2020 Rule, and will maintain the

24  status quo in the interim.  *See* Decl. of Steven Peterson, FSA Associate Administrator ¶ 20

25

26

27

28

1  (Attached).[10]  Particularly until the FSA changes its implementing procedures and applies the

2  updated procedures to loan guarantees, Plaintiffs are under no threat of imminent, concrete harm.

3      If any such imminent, concrete harm materializes in the future, Plaintiffs can bring an

4  action against the final agency action in question, alleging harm due to the implementation of the

5  2020 Rule.  *See Northcoast Env't Ctr. v. Glickman*, 136 F.3d 660, 668 (9th Cir. 1998)

6  (considering the APA's "final agency action" requirement for judicial review separately from

7  NEPA's "major federal action" trigger for the preparation of an EIS).  And that is the kind of

8  APA-compliant action Congress has required and that the constitutional justiciability

9  requirements of standing and ripeness demand.

10     *Fourth*, Plaintiffs express concerns that their ability to comment on future agency actions

11  may be hindered by the 2020 Rule.  Am. Compl. ¶¶ 17, 23, 25, 29, 36, 45, 50, 71, 74, 90, 96,

12  107, 112, 121, 135, 155, 158.  But the 2020 Rule does not subject Plaintiffs to significantly

13  different public participation obligations.[11]  To the contrary, the 2020 Rule largely reiterates and

14  expands public participation from that in the 1978 regulations.

15     For example, Plaintiffs complain that the 2020 Rule requires their comments to be "as

16  specific as possible" and provides that "[c]omments and objections of any kind not provided

17  within the comment period(s) shall be considered unexhausted and forfeited."  Am. Compl. ¶¶

18  25, 90, 155, 158 (complaining of the specificity and forfeiture provisions at 40 C.F.R. §§

19  1503.3(a), (b) (2020)).  But the requirement that comments "shall be as specific as possible" was

20

21  [10] Defendants first filed this declaration in support of their opposition to plaintiffs' motion for a

22  preliminary injunction in the Western District of Virginia case challenging the 2020 Rule.  *See*
    ECF Nos. 75-2, *Wild Va. v. CEQ*, No. 3:20-cv-00045-JPJPM (W.D. Va. Sept. 2, 2020).

23

24  [11] *See* 85 Fed. Reg. at 43,314 (discussing the 2020 Rule provisions that "bring relevant
    comments, information, and analyses to the agency's attention, as early in the process as

25  possible").  Communication with no one is being shut down—Plaintiffs' assertions do not accord
    with what the 2020 Rule actually says.  *Compare, e.g.*, 40 C.F.R. § 1501.4(b) (2019) (the then-

26  codified version of the 1978 regulations) ("The agency shall involve environmental agencies,
    applicants, and the public, to the extent practicable, in preparing assessments required by [these

27  regulations].", *with* 40 C.F.R. § 1501.5(e) (2020) ("Agencies shall involve the public, State,
    Tribal, and local governments, relevant agencies, and any applicants, to the extent practicable in

28  preparing environmental assessments.").

in the 1978 regulations.  40 C.F.R. § 1503.3(a) (2019).  The provisions do no more than codify the obligations under existing case law requiring that comments be meaningful and that issues not raised in a timely matter are waived.  *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 553 (1978) (holding that parties who wish to participate in the NEPA process must structure their participation so that it is meaningful and alerts the agency to their positions); *Pub. Citizen*, 541 U.S. at 764-65 (holding that issues not raised in the public comment process are waived and cannot be pursued in litigation).

Under the 2020 Rule, nothing limits any member of the public from providing comments. It is therefore not clear what harm Plaintiffs may suffer from the 2020 Rule's requirement—consistent with the 1978 regulation—to provide specific comments.  *See also* RTC at 70-71. Even assuming this could result in harm, Plaintiffs can only speculate how agencies other than CEQ may apply the 2020 Rule in a way that affects their ability to comment and participate in the NEPA process.  And, of course, if these agencies apply the 2020 Rule in a way that reduces Plaintiffs' access to information or other procedures in some legally flawed fashion, they can pursue that deprivation in a challenge to that site-specific application—if and when an application actually harming them occurs.  *See NPHA*, 538 U.S. at 812 (concluding that facial challenge to regulations "should await a concrete dispute about a particular" application); *Texas*, 523 U.S. at 301 ("The operation of [a challenged] statute is better grasped when viewed in light of a particular application.").

In sum, Plaintiffs' fears are premised on speculation about what other federal agencies besides CEQ might do or require someday in the future, which plainly does not satisfy Article III's requirements.  *See Whitmore*, 495 U.S. at 158 ("Allegations of possible future injury do not satisfy the requirements of Art. III.").  This sort of open-ended conjecture about pending and future agency actions embodies the very "conjectural or hypothetical" injuries that are not "concrete and particularized" and "actual or imminent" and thus do not confer standing.  *See Defs. of Wildlife*, 504 U.S. at 560; *Clapper*, 568 U.S. at 410; *Bova v. City of Medford*, 564 F.3d 1093, 1096-97 (9th Cir. 2009) (no standing where alleged injury was contingent upon future events that may not occur).  And even when federal agencies apply the 2020 Rule, Plaintiffs

1   would still need to show the injury to be "fairly traceable" to the changes of the 2020 Rule. *See*

2   *Defs. of Wildlife*, 504 U.S. at 560 ("there must be a causal connection between the injury and the

3   conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the

4   defendant" (citation and internal quotation marks omitted)).

5        Because Plaintiffs fail to allege the kinds of concrete and particularized injuries that may

6   only come from real-world applications of the 2020 Rule, which they do not challenge, they lack

7   Article III standing.

### C.   Plaintiffs' Claims of Amorphous "Procedural" and "Informational" Injuries Do Not Satisfy Article III.

10       Unmindful of *Summers*—and having shown no actual or imminent concrete harm caused

11  by the 2020 Rule—Plaintiffs turn to dubious claims of procedural and informational injuries.

12  Am. Compl. ¶¶ 157-58. But because the claims are not attached to a real-world application of

13  the 2020 Rule, these theories for standing fail for the same reason as their theories alleging

14  possible future harms to their interests in the physical environment. For "a bare procedural

15  violation, divorced from any concrete harm," cannot satisfy the injury-in-fact requirement.

16  *Spokeo*, 136 S. Ct. at 1549.

### 1.   Mere Deprivation of a Procedural Right Without Concrete Harm Is Not Justiciable Under Article III.

18       Plaintiffs allege that they have standing to redress "CEQ's violation of procedural duties

19  under NEPA, the ESA, and the APA." Am. Compl. ¶ 157. But *Summers* rejects this argument

20  too. 555 U.S. at 496-97. As here, the respondents in *Summers* argued that they had standing to

21  bring their challenge because they claimed to have suffered procedural injury. *Id.* at 496. The

22  Supreme Court rejected that argument, holding that "deprivation of a procedural right without

23  some concrete interest *that is affected by the deprivation*—a procedural right *in vacuo*—is

24  insufficient to create Article III standing." *Id.* (emphasis added). Because the respondents in

25  *Summers* failed to challenge a concrete application of the regulations, the Court found that the

26  alleged procedural violation was not justiciable. *Id.* at 497. This Court should reach the same

27  conclusion because Plaintiffs likewise do not challenge a concrete application of the 2020 Rule.

28

1    In *Wilderness Society v. Rey*, the Ninth Circuit applied *Summers* to hold that a "concrete

2    and particular project must be connected to the procedural loss."  622 F.3d at 1260.  Ignoring

3    *Summers* and *Rey*, Plaintiffs' Amended Complaint does not challenge any concrete and

4    particular project, but instead relies on the notion from *Citizens for Better Forestry v. U.S.*

5    *Department of Agriculture*, 341 F.3d 961 (9th Cir. 2003) and *Western Watersheds Project v.*

6    *Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011), that standing in procedural rights cases can be

7    established by showing (among other things) that "it is reasonably probable that the challenged

8    action will threaten their concrete interests."  *Citizens for Better Forestry*, 341 F.3d at 969-70.

9    But if Plaintiffs are implying that the "reasonably probable" standard lessens their burden of

10   establishing an injury in fact, that notion also was rejected in *Summers*.  555 U.S. at 497-500

11   (rejecting a finding of injury in fact based on a "statistical probability" or a "realistic threat" of

12   harm); *see also Clapper*, 568 U.S. at 410 (rejecting an "objectively reasonable likelihood" of

13   harm standard).  *Summers* held that—while the redressability showing for standing is lessened

14   (but not eliminated) in procedural rights cases—the injury-in-fact requirement is not.  555 U.S. at

15   497 ("Unlike redressability . . . the requirement of injury in fact is a hard floor of Article III

16   jurisdiction that cannot be removed by statute.").  Plaintiffs' problem here is not merely

17   redressability (although that is an issue too), but that they cannot establish with any likelihood

18   that their concrete interests are under threat of an actual, imminent, and non-speculative injury

19   caused by the 2020 Rule.[12]  They have no less of a burden to establish injury in fact here than in

20   any other case.  *See Spokeo*, 136 S. Ct. at 1549 ("a bare procedural violation, divorced from any

---

[12] The Ninth Circuit's decision in *Cottonwood* illustrates this distinction.  There, because the court viewed the ESA as requiring the agency to undertake a procedure (*but see infra* n.14), the court stated that the plaintiffs did not have to show that the failure to undertake that procedure "would lead to different, injurious results."  *Cottonwood*, 789 F.3d at 1082 (citing *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220 (9th Cir. 2008)).  Thus, while the court relaxed the redressability showing, it made clear that the plaintiffs in *Cottonwood* satisfied the injury-in-fact prong only by tying their allegations of "procedural injury to imminent harm in specific forests and project areas."  *Id.* at 1081.  This is the showing that Plaintiffs fail to make here, and cannot make here because (unlike the challenged policy in *Cottonwood*) there was no concrete application of the 2020 Rule at the time Plaintiffs filed their Amended Complaint.

1   concrete harm," cannot satisfy the injury-in-fact requirement).  In fact, because Plaintiffs are not

2   the "object" of the 2020 Rule,[13] their burden to establish Article III standing is greater, not lesser.

3   *See Defs. of Wildlife*, 504 U.S at 561-62.

4          In any case, a threatened event can be "reasonabl[y] likel[y]" to occur but still be

5   insufficiently concrete and imminent to constitute an injury in fact.  *Clapper*, 568 U.S. at 410.

6   Here, any alleged procedural injuries are entirely speculative.  But even if they were reasonably

7   likely, they are not imminent because any threat cannot emerge until after another federal agency

8   applies the 2020 Rule in the context of a final agency action that is the source of the threat.

9          Ultimately, Plaintiffs' allegation of "procedural" harms under NEPA, the ESA, and the

10  APA adds nothing to their purported standing.[14]  It, too, fails because Plaintiffs cannot show

11  actual and imminent harm caused by the mere unapplied existence of the 2020 Rule.  It makes no

12  difference that Plaintiffs label their claims as procedural.  Speculative allegations of possible

13  future harm are not sufficient under Article III to establish standing.  In short, Plaintiffs lack

14  standing to challenge the 2020 Rule in the absence of a live dispute over a concrete application

15  of those regulations.  *See Rey*, 622 F.3d at 1260 (Under *Summers*, a "concrete and particular

16  project must be connected to the procedural loss" (emphasis added)).

17

18

19

20

---

21  [13] *See* 40 C.F.R. § 1507.1 (2020) ("All agencies of the Federal Government shall comply with
    the regulations in this subchapter."); *see also Summers*, 555 U.S. at 493 (explaining that Forest
22  Service procedural regulations establishing notice, comment, and appeal procedures "govern
23  only the conduct of Forest Service officials engaged in project planning").

24  [14] Moreover, unlike the APA, which provides citizens a right to participate in a rulemaking, or
    NEPA, which provides citizens the right to participate in the preparation of an EIS, Section 7 of
25  the ESA does not confer a personal procedural right on Plaintiffs that relaxes the redressability
    requirement of standing.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644,
26  660 n.6 (2007) (holding that there is no "independent right to public comment with regard to
    consultations conducted under [ESA] § 7(a)(2)"); *see also In re Endangered Species Act Section
27  4 Deadline Litig.-MDL No. 2165*, 704 F.3d 972, 979 (D.C. Cir. 2013) (concluding plaintiff
    lacked standing in part because it had "failed to identify a violation of a procedural right afforded
28  by the ESA that is designed to protect its interests").

1

2

### 2.	Plaintiffs' Informational and Organizational Injuries Are Also Not Justiciable Under Article III.

Plaintiffs also allege that they have standing because the 2020 Rule's procedures will impede their ability to obtain information important to their missions, and will require them to divert resources to obtain that information and comply with the 2020 Rule. Am. Compl. ¶ 158. In other words, Plaintiffs urge the Court to recognize that they may suffer informational injuries as a result of the alleged procedural deprivations. As in *Rey*, Plaintiffs' attempt to reframe their procedural deprivation "in terms of informational loss" also fails because it is untethered to a concrete application of the 2020 Rule. 622 F.3d at 1260. Thus, under Ninth Circuit case law, Plaintiffs must identify imminent and concrete harms here too. *Id.*; *see also Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 346 (4th Cir. 2017) ("[I]t would be an end-run around the qualifications for constitutional standing if any nebulous frustration resulting from a statutory violation would suffice as an informational injury."). But Plaintiffs fail to do so.

### a.	NEPA Does Not Create a Statutory Right to Information.

For their claims of "informational injury" to satisfy the injury-in-fact requirement of standing, Plaintiffs must demonstrate that (1) the law entitles them to information, and (2) they suffer or will suffer, by being denied access to that information, the type of harm that Congress sought to prevent by requiring disclosure. *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (citing *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20-21 (1998)). Here, Plaintiffs cannot make either showing.

NEPA does not legally entitle Plaintiffs to any particular information. In *Akins*, plaintiff voters suffered injury when they were denied specific campaign information that the Federal Election Campaign Act required be disclosed. 524 U.S. at 21. In *Public Citizen v. U.S. Department of Justice*, plaintiffs were injured by the denial of access to information required to be disclosed under the Freedom of Information Act (FOIA). 491 U.S. 440, 449 (1989); *see also Rey*, 622 F.3d at 1258 (collecting cases). Plaintiffs identify no similar statutory right to the information they seek in the present case. While NEPA requires copies of any EIS prepared and comments received be made available to the public under FOIA, *see* 42 U.S.C. § 4332(2)(C),

1    nothing in NEPA's text reveals a congressional intent to confer a legally actionable right to

2    specific information on the public.  *See Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 84 (D.C.

3    Cir. 1991).  The public disclosure of completed EISs through FOIA is merely incidental to

4    NEPA's primary mandate of promoting informed decisionmaking.

5         Further, FOIA requires an agency to disclose only existing documents, not develop

6    additional information.  *See Forsham v. Harris*, 445 U.S. 169, 186 (1980).  Plaintiffs here do not

7    seek disclosure of existing, non-FOIA exempt EISs, as was found sufficient to establish

8    informational standing in, for example, *Public Citizen*.  491 U.S. at 449.  Rather, they are asking

9    the Court to conclude that, as a statutory matter, Congress intended NEPA to require agencies to

10   develop and include certain information in EISs, and created in the public a cognizable right to

11   that information.  As the D.C. Circuit explained in *Lyng*, if this kind of claim seeking the

12   production of certain information under NEPA were sufficient to sustain standing, "[i]t would

13   potentially eliminate any standing requirement in NEPA cases" because any member of the

14   public could always allege a right to more information.  *Lyng*, 943 F.2d at 84-85.

15        Even assuming arguendo that NEPA created a legally cognizable right to information,

16   Plaintiffs' claimed informational injury would not confer standing because the type of injury

17   they allege from not receiving the information—harm to *their* organizational missions and

18   resources (Am. Compl. ¶ 158)—is not "the type of harm Congress sought to prevent by requiring

19   disclosure" under NEPA.  *Friends of Animals*, 828 F.3d at 992.  NEPA's statutory purpose for

20   the creation of EISs is to facilitate informed decisionmaking by federal agencies and Congress,

21   not to inform the general public.  *See* 42 U.S.C. § 4332(2)(C) ("all agencies of the Federal

22   Government shall . . . include in every recommendation or report on proposals for legislation and

23   other major Federal actions significantly affecting the quality of the human environment, a

24   detailed statement by the responsible official").  If NEPA's plain text were not enough, its

25   legislative history further makes clear that Congress required the creation of EISs so that

26   agencies would develop information "for subsequent reviewers and decisionmakers, both within

27   the executive branch and in the Congress," S. Rep. No. 91-296, at 20 (1969), not to inform the

28

general public.  Thus, preventing potential harm to the missions of individual organizations is not the reason Congress required the creation of EISs.

> **b.** **Plaintiffs' Alleged Informational Injuries Are Speculative.**

Even if the informational injury discussed above were actionable under some circumstances, Plaintiffs are not excused from their burden to demonstrative that the alleged deprivation of that information is concrete and imminent rather than speculative.  *See Spokeo*, 136 S. Ct. at 1548-50.  The 2020 Rule itself does not itself take any information away from Plaintiffs.  As noted above, until agencies implement the 2020 Rule and propose projects under the Rule and their own new procedures, Plaintiffs' alleged informational injury remains impermissibly speculative; it cannot be known now whether there will be a change in the amount of information received by Plaintiffs about projects that concern their interests, or how that change in information will impact their education and advocacy.  *See Summers*, 555 U.S. at 497.

> **c.** **Plaintiffs Identify No Cognizable Harms Resulting From a Mere Denial of Information.**

Plaintiffs' alleged informational harms are also insufficient to support their organizations' standing.  Plaintiffs assert that the 2020 Rule will deprive them of information, thereby frustrating their organizational missions of engaging in advocacy and participating in the NEPA process, Am. Compl. ¶¶ 17, 23, 31, 45, 50-51, 54, 68, 70-71, 74, 90-91, 96, 101-102, 110, 136, 155.  But alleged harms to an organization's advocacy or participatory interests, without more, do not support Article III standing and are insufficient to render the organization "adversely affected" or "aggrieved" within the meaning of the APA."  *See Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (an organization's "mere interest in a problem" is insufficient under the APA); *La Asociacion*, 624 F.3d at 1088 (finding that organization lacked standing where it demonstrated a "frustration of its mission" but failed to demonstrate it was forced to expend resources to address the problem or otherwise suffered injury); *see also Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1208 (D.C. Cir. 2020) (holding that organization lacked standing where agency action affected only organization's "interests in advocacy, participating in administrative proceedings, and lobbying"); *S. Walk at Broadlands Homeowner's Ass'n, Inc. v.*

1  *OpenBand at Broadlands, LLC*, 713 F.3d 175, 183 (4th Cir. 2013) (explaining that "an injury to

2  an organizational purpose" by itself does not support standing); *Nat'l Ass'n of Home Builders v.*

3  *EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (a setback to an organization's interest in participating in

4  administrative proceedings is insufficient to constitution an injury-in-fact).

5       If Plaintiffs decide in the future to spend resources collecting information on their own or

6  submitting comments, *see, e.g.*, Am. Compl. ¶ 158,[15] those decisions do not amount to

7  cognizable harms either.  A "voluntary budgetary decision, however well-intentioned, does not

8  constitute Article III injury, in no small part because holding otherwise would give carte blanche

9  for any organization to 'manufacture standing by choosing to make expenditures' about its

10 public policy of choice." *CASA de Md., Inc. v. Trump*, 971 F.3d 220, 239 (4th Cir. 2020)

11 (quoting *Clapper*, 568 U.S. at 402); *see also Pac. Nw. Generating Coop. v. Brown*, 38 F.3d 1058,

12 1063 (9th Cir. 1994) (Standing cannot be manufactured by "subsidizing research in a topic at a

13 university; otherwise it would be an easy matter for any corporation anywhere to create its own

14 standing by an appropriate grant for academic research.").  "Resource reallocations motivated by

15 the dictates of preference" do not support standing where "no action by the defendant has

16 directly impaired the organization's ability to operate and to function." *CASA de Md.*, 971 F.3d

17 at 239.  In addition, an organization "cannot manufacture the injury by incurring litigation costs

18 or simply choosing to spend money fixing a problem that otherwise would not affect the

19 organization at all." *La Asociacion*, 624 F.3d at 1088 (An organization "must . . . show that it

20 would have suffered some other injury if it had not diverted resources to counteracting the

21 problem."); *see also Ass'n for Retarded Citizens v. Dallas Cnty. Mental Health & Mental*

22 *Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994) (The "fact that an organization

23

24  ───────────────

25 [15] Plaintiffs also express concerns that some agency in the future might require one of their
   organizations to obtain a bond.  Am. Compl. ¶ 158.  This too is pure speculation.  If those

26 concerns ever become a reality, the relevant organization can challenge the bond provision in the
   context of a challenge to the final action of the agency that required the bond.  Also, the 2020

27 Rule only authorizes agencies to require bonds when they have independent authority to do so.

28 *See* 40 C.F.R. § 1500.3(c) (2020).

redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.").

Accordingly, even if NEPA confers on Plaintiffs a statutory right to certain information that they speculate the 2020 Rule may eventually deprive them of, the consequences of the feared deprivations that they allege (*i.e.*, setbacks to their organizational interests in advocacy and participation in administrative processes and the resulting voluntary decisions to spend money counteracting those setbacks) are insufficient to confer Article III standing.

* * *

In sum, Plaintiffs' claim to standing, whether premised on substantive, procedural, or informational injuries, is premised on an attenuated series of speculations and inferences.  Rather than indulge Plaintiffs' desire to challenge the 2020 Rule on its face before even a single agency has issued its own implementing procedures or taken a final agency action under the 2020 Rule alleged to cause harm to Plaintiffs, the Court should dismiss this case as unripe and for lack of standing.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion to dismiss.


Dated: December 1, 2020

Respectfully submitted,

1
2
3
4

JEFFREY BOSSERT CLARK
Assistant Attorney General
JONATHAN D. BRIGHTBILL
Principal Deputy Assistant Attorney General
PAUL E. SALAMANCA
Deputy Assistant Attorney General

5
6

*/s/ Allen M. Brabender*
ALLEN M. BRABENDER
MN State Bar No. 0324012
Attorney, Appellate Section
U.S. Department of Justice
Environment and Natural Resources Division
Post Office Box 7415
Washington, D.C. 20044
Tel: (202) 514-5316
E-mail: allen.brabender@usdoj.gov

7
8
9
10
11

12
13

BARCLAY T. SAMFORD
NM State Bar No. 12323
Senior Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1475
E-mail: clay.samford@usdoj.gov

14
15
16
17
18

19
20

CLARE BORONOW
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1362
clare.boronow@usdoj.gov

21
22
23
24
25
26
27
28